UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SIX FLAGS, INC., and TIG INSURANCE 1:44NMG
COMPANY,                        )
                                )
        Plaintiffs,             )
                                )
v.                              )        CIVIL ACTION NO. RECEIPT # _____
                                )                        AMOUNT $ 250
STEADFAST INSURANCE COMPANY,    )                        SUMMONS ISSUED ____
                                )   MAGISTRATE JUDGE ____ LOCAL RULE 4.1 ___
        Defendant.              )                        WAIVER FORM _____
                                )                        MCF ISSUED _____
                                )                        BY DPTY. CLK. _____
                                                         DATE _____

## COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

### PRELIMINARY STATEMENT

This is a complaint by the plaintiffs, Six Flags, Inc. (hereinafter "Six Flags") and TIG

Insurance Company (hereinafter "TIG"), that seeks a declaration of insurance coverage and

rights to indemnification pursuant to 28 U.S.C. § 2201, as well as reimbursement of defense

costs and an award of treble damages from the defendant, Steadfast Insurance Company

(hereinafter "Steadfast"), due to the unreasonable failure of Steadfast to defend Six Flags

and acknowledge coverage for claims made in an underlying Massachusetts state court

action.

### PARTIES

1.    The plaintiff, Six Flags, Inc., is a corporation organized under the laws of

Delaware with principal places of business located at 11501 Northeast Expressway,

Oklahoma City, Oklahoma and 122 E. 42nd Street, New York, New York.

2.      Six Flags, Inc. was previously known as Premier Parks Inc.  The name change became effective on June 30, 2000.

3.      The plaintiff TIG Insurance Company ("TIG") is a corporation organized under the laws of California with a principal place of business located at Irving, Texas.

4.      The defendant, Steadfast Insurance Company, is a corporation organized under the laws of Delaware with a principal place of business located at 1400 American Lane, Schaumburg, Illinois and does business in the Commonwealth of Massachusetts.

## JURISDICTION

5.      Jurisdiction in this matter is based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a), as the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6.      Venue is proper in the District of Massachusetts, pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the claim occurred in the District of Massachusetts.

## FACTS

7.      At all pertinent times, Steadfast provided a commercial general liability insurance policy, number SCO 3776164-00, with per occurrence policy limits of $5 million to O.D. Hopkins Associates, Inc. (hereinafter "Hopkins"), which was in the business of the design, manufacture, and testing of water rides for amusement parks.

8.      Pursuant to certain endorsements in the policy, Six Flags was an additional insured under the Steadfast policy for liability arising out of work performed by Hopkins for Six Flags.

2

9.  At all pertinent times TIG provided a commercial general liability insurance policy, number T7 0003796851600 with per occurrence limits of $1 million to Six Flags.

10.  In or around 1998, Six Flags engaged Hopkins to design, manufacture, and test a water ride named the "Blizzard River Ride" (hereinafter "the subject ride") for one of its amusement parks located in Agawam, Massachusetts (hereinafter "Riverside Park").

11.  In or around November 1998, Premier Parks sent Hopkins a letter agreement setting forth certain terms of the agreement for the development and purchase of the subject ride. A copy of the letter agreement is attached hereto as Exhibit 1.

12.  The letter agreement, in pertinent part, provided as follows:

> 13.  Seller will maintain a minimum of $5,000,000 (Five Million Dollars), per occurrence, of comprehensive general liability, contractual liability and product liability insurance in form and substance and issued by insurers reasonably satisfactory to Premier at all times prior to the end of the warranty period, each of which the insurance shall name Premier as an insured party.

13.  In response to the letter agreement, on or about November 25, 1998, Hopkins wrote to Six Flags assenting, *inter alia,* to Six Flags' term and condition number 13 as stated above. A copy of Hopkins' letter to Six Flags dated November 25, 1998 is attached hereto as Exhibit 2.

14.  In or around June 1999, Hopkins completed the construction and installation of the Blizzard River Ride at Riverside Park.

15.  In or around July 2001, a tort action entitled Ernest Messier and Susan Messier, John Pascone and Kimberly Pascone, individually and as parents and next friends of Jonathan Pascone and Angelica Pascone, and Gerald Pescaro and Kimberly Pescaro v. Six Flags, Inc., Riverside Park Enterprises, Inc., Premier Parks, Inc., O.D. Hopkins Associates, Inc., Martin

3

Flores and Charles Flores, Worcester Superior Court C.A. No. 011494B was filed (hereinafter "the underlying tort suit"). A copy of the amended complaint is attached hereto as Exhibit 3.

16.    The underlying tort suit sought damages against Hopkins for an alleged near-drowning incident on or about August 7, 1999 involving the subject ride. The underlying complaint alleges that the plaintiffs suffered severe physical and psychological injuries as a result of the accident.

17.    In particular, the underlying complaint alleges that the raft occupied by the plaintiffs tipped over completely, submerging all the plaintiffs while they were still strapped into their seat-belts.

18.    The underlying complaint goes on to allege that plaintiff Susan Messier was pregnant at the time; that Ms. Messier lost consciousness, and received CPR after being rescued; that she was hospitalized for six days and suffered severe physical and psychological injuries as well as cognitive deficits.

19.    The underlying complaint alleges that Jonathan Pascone was aged 4 at the time of the accident; that he swallowed large amounts of water and lost consciousness; that he received CPR after being rescued; and that he received extensive medical and psychological treatment as a result of the accident.

20.    The underlying complaint alleges that John Pascone was under water for several minutes; received CPR; was on ventilatory support for seven days and continues to receive medical treatment.

21.    The underlying complaint describes the injuries of all the remaining plaintiffs and alleges that they all sustained severe emotional injuries.

4

22.    The underlying complaint alleges that Hopkins was negligent, stating in

pertinent part as follows:

> 54.    The defendant Hopkins was negligent and careless in that
> it knew or should have known that the ride was developed,
> designed, manufactured, assembled, inspected, operated
> and maintained in such a way that the rafts in the water
> trough were likely to capsize and thereby trap passengers
> beneath the water.

> 55.    The defendant Hopkins was also negligent in that it knew
> or should have known of the dangerous, unstable nature
> of the ride and failed to establish adequate and reasonable
> safety procedures to prevent serious injury to
> unsuspecting passengers.

> 56.    Hopkins was further negligent in its failure to warn of the
> danger created by the dangerous and unstable condition
> of the ride.

> 57.    As the direct and proximate result of Hopkins'
> negligence and complete disregard for the safety. of the
> public, the plaintiffs were caused to suffer severe and.
> permanent personal injuries and emotional distress.

23.    The underlying complaint also alleges that Hopkins designed and manufactured

the ride, that it impliedly warranted the ride was merchantable and safe for the particular

purpose of safely transporting passengers, and that Hopkins breached these implied warranties

because the ride and its component parts, including the procedures for operation and warnings

were defective.

24.    More particularly, the underlying complaint alleges that Hopkins further

breached its implied warranties causing the plaintiffs to suffer severe and permanent injuries

because the ride was designed and manufactured such that rafts in the water trough were likely

to capsize; the procedures for operation of the ride were inadequate to protect against the

known danger of overloading; training and supervision of ride operators was inadequate;

5

monitoring procedures and safety devices on the ride were inadequate; the ride did not have

adequate warnings and instructions for passengers; and because the ride and operating

procedures were inadequately tested, developed and designed.

25.    The underlying complaint alleges that Six Flags was negligent, in

that, *inter alia,* it knew or should have known that the ride was developed,

designed, manufactured, assembled, inspected, operated and maintained in such

a way that the rafts in the water trough were likely to capsize and thereby trap

passengers beneath the water.

26.    TIG has provided a defense for Hopkins in the underlying tort suit.

27.    Endorsement 12 of the Steadfast policy states in relevant part:

> A. Who is an Insured (Section II) is amended to include as
> an insured any person or organization for whom you perform
> operations when you and such person have agreed in writing
> or in a contract or agreement that such person or organization
> be added as an additional insured on your policy. Such
> person or organization is an additional insured only with
> respect to liability arising out of "your work" performed for
> that insured.

28.    Six Flags is an additional insured pursuant to Endorsement 12 of the Steadfast

policy.

29.    Endorsement 11 of the Steadfast policy states in relevant part:

> It is agreed that Section II. Who Is An Insured is amended
> to include any person or organization (herein referred to as
> "vendor") as an insured, but only with respect to the
> distribution or sale in the regular course of the vendor's
> business of the named insured's products ....

30.    Six Flags is an additional insured pursuant to Endorsement 11 of the Steadfast

policy.

6

31.     On or about October 1, 2003, Six Flags informed Steadfast of the underlying tort

suit and requested that Steadfast defend and indemnify Six Flags pursuant to the terms of its

policy.

32.     Steadfast failed to promptly affirm or deny that it would provide coverage for the

underlying tort claims.

33.     In a letter dated June 7, 2005, Steadfast finally stated that it would not provide a

defense or coverage claiming that Six Flags was not an insured under the policy.

34.     Steadfast has failed to assume the defense of Six Flags in the underlying tort

suit.

35.     TIG has assumed the defense of Six Flags in the underlying tort suit and

incurred, and continues to incur, costs and expenses, including attorneys' fees.

36.     Under Endorsement M of the TIG policy, the "Other Insurance" provision states

in relevant part:

> If other valid and collectible insurance is available to the insured
> for a loss we cover under Coverage A or B of the Coverage Part,
> our obligations are limited as follows:
>
> This insurance is excess over any other valid and collectible
> insurance applying to the loss except for insurance bought
> specifically to apply in excess of the Limits of Insurance shown
> in the declarations of this policy.
>
> Notwithstanding the preceding paragraph, the insurance afforded
> by this policy is primary insurance with respect to those insureds
> to whom you are obligated by contract to provided primary
> insurance.

37.     The TIG policy is excess over the Steadfast policy for coverage of Six Flags in

the underlying claim.

7

## COUNT I (SIX FLAGS - DUTY TO DEFEND)

38. The plaintiffs repeat and reallege the allegations set forth in paragraphs 1 - 20 as if fully repeated and realleged herein.

39. The duty of a liability insurer to defend law suits against an insured is determined by reference to the allegations in the underlying tort suit.

40. The underlying tort complaint seeks to impose liability upon Six Flags due to liability arising out of Hopkins' work performed for Six Flags and with respect to the distribution or sale of Hopkins' product.

41. The facts alleged in the tort complaint triggered Steadfast's duty to provide a defense to Six Flags.

42. Steadfast has wrongfully refused to provide a defense to Six Flags.

## COUNT II (SIX FLAGS - DUTY TO INDEMNIFY)

43. The plaintiffs repeat and reallege the allegations set forth in paragraphs 1 - 20 as if fully repeated and realleged herein.

44. In addition to having a duty to defend Six Flags against the underlying tort suit, Steadfast also has a duty to indemnify Six Flags for all covered loss and damages up to the limits of the Steadfast policy.

45. Steadfast has wrongfully denied any duty to indemnify Six Flags.

## COUNT III (TIG – SUBROGATION/ EQUITABLE CONTRIBUTION)

46. The plaintiffs repeat and reallege the allegations set forth in paragraphs 1 - 20 as if fully repeated and realleged herein.

47. Under the terms of the respective policies, Steadfast is required to provide primary coverage for Six Flags in the underlying tort claim and TIG is required to provide

excess coverage.

48.    Steadfast has wrongfully refused to provide a defense to Six Flags.

49.    TIG is contractually and equitably subrogated to the rights of its insured, Six Flags, against Steadfast.

50.    As a result of Steadfast's wrongful refusal to defend Six Flags, TIG has been forced to undertake the defense of Six Flags and to pay the costs and fees incurred in that defense.

51.    TIG is entitled to recover all reasonable attorney's fees and costs that it has incurred in defending Six Flags in the underlying tort suit.

52.    In the alternative, in the event that the policies of Steadfast and TIG both provide primary coverage, Steadfast is liable for payments TIG has made in excess of its share.

## COUNT V (SIX FLAGS - MASSACHUSETTS CONSUMER PROTECTION STATUTE)

53.    The plaintiffs repeat and reallege the allegations set forth in paragraphs 1 - 20 as if fully repeated and realleged herein.

54.    Pursuant to the Massachusetts Consumer Protection Statute, M.G. L. c. 93A, Steadfast had a duty to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim; to acknowledge and act reasonably promptly upon communication with respect to claims arising under an insurance policy; and to fully defend and indemnify an insured where coverage exists.

55.    Steadfast's failure to promptly provide a reasonable explanation of the basis in its policy in relation to the facts or applicable law for denial of Six Flags' claim; failure to acknowledge and act reasonably promptly upon communication with respect to the underlying tort suit's claims arising under the Steadfast policy; and failure to fully defend and indemnify Six

9

Flags as an insured, where coverage exists constitute unfair and deceptive acts and practices prohibited by the Massachusetts Consumer Protection Statute.

56.    Six Flags has suffered damages as a result of Steadfast's unfair and deceptive acts and practices.

57.    Upon information and belief, Steadfast's unfair and deceptive acts and practices were willful and knowing, with conscious disregard of Six Flags' rights under the Steadfast policy.

## **PRAYER FOR RELIEF**

WHEREFORE, Six Flags and TIG respectfully ask that that the court:

1.    Enter a judgment declaring that Steadfast owes a duty to defend Six Flags in the underlying tort suit;

2.    Enter a judgment declaring that Steadfast owes a duty of indemnification to Six Flags for the claims in the underlying tort suit;

3.    Enter a judgment requiring Steadfast to reimburse TIG for all defense costs and fees that it incurred in the defense of the underlying tort suit;

4.    Enter a judgment that Steadfast committed unfair and deceptive acts and practices with respect to the handling of Six Flags' claim for defense and indemnification; and award Six Flags treble damages, attorneys' fees, and any other remedy the court deems just and proper.

## JURY CLAIM

The plaintiffs, Six Flags, Inc., and TIG Insurance Company, demand a trial by jury on all issues so triable.

Plaintiffs,
By their attorneys,

Samuel M. Furgang (BBO #559062)
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street
Boston, MA 02114
(617) 227-3030

Dated: July 8, 2005

363942.1

11

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) ___Six Flags, Inc. v. Steadfast Insurance Company___

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

| | | |
|---|---|---|
| [ ] | I. | 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT. |
| [ ] | II. | 195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. |
| [X] | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891. |
| [ ] | IV. | 220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900. |
| [ ] | V. | 150, 152, 153. |

*Also complete AO 120 or AO 121 for patent, trademark or copyright cases

05-11444 NMG

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

_____

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES [ ]     NO [X]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

YES [ ]     NO [X]

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES [ ]     NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES [ ]     NO [X]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES [ ]     NO [X]

A. If yes, in which division do all of the non-governmental parties reside?

Eastern Division [ ]     Central Division [ ]     Western Division [ ]

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division [ ]     Central Division [ ]     Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES [ ]     NO [ ]

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME ___Samuel M. Furgang___

ADDRESS ___Sugarman, Rogers, Barshak & Cohen, P.C., 101 Merrimac St., Boston, MA 02114___

TELEPHONE NO. ___(617) 227-3030___

(Coversheetlocal.wpd - 10/17/02)

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

SIX FLAGS, INC. and
TIG INSURANCE COMPANY

## DEFENDANTS

STEADFAST INSURANCE COMPANY

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number) (617) 227-3030
Samuel M. Furgang
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac St., Boston, MA 02114

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 28 U.S.C. §1332(a)

Brief description of cause: Failure to defend insured. Reimburse defense costs.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE July 8, 2005

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____



**Six Flags**
A Subsidiary of Premier Parks Inc.

11501 N.E. Expressway
Oklahoma City, OK 73131
405-475-2500
Fax 405-475-2555

O.D. HOPKINS ASSOCIATES, INCORPORATED
40 Park Lane
Contoocook, New Hampshire  03229

Attn:  James Glover

Dear Sirs:

This letter agreement will confirm, on the terms and conditions set forth herein, our agreement to invest in the development of and to purchase from you, and your agreement to develop and sell to us, free and clear of all liens, the ride more fully described in <u>Exhibit A</u> and <u>Exhibit B</u> hereto (the "Ride").

O.D. HOPKINS ASSOCIATES, INCORPORATED ("Seller") and Premier Parks Inc. ("Premier") agree to proceed in good faith to finalize a definitive purchase agreement relating to the Ride ("Agreement") no later than November 30, 1998. The parties agree that the failure of Seller to negotiate in good faith to enter into an Agreement that conforms to the provisions of this letter agreement prior to such date shall constitute a material default of the provisions hereof.  The substantive terms and conditions of development and sale of the Ride will be as follows:

1.  Seller will design, engineer, prototype (as required), test, refine, document and deliver the Ride to Riverside Park (the "Park") that meets the specifications, considerations and standards outlined herein and in <u>Exhibit B</u>.

2.  The purchase price for the Ride will be as indicated on <u>Exhibit A</u>, which purchase price includes all freight and other transportation costs to the Park and the cost of theming the Ride in accordance with Premier's instructions as integral components thereof.  The parties agree to allocate the purchase price between the manufacture and delivery of the Ride and the services to be provided by Seller in respect of the design, engineering and testing thereof (the "Services") as provided in <u>Exhibit A</u>.

3.  In recognition of the obligations of Premier hereunder, Seller agrees that neither Seller nor any subsidiary or affiliated company or person thereof, nor any successor or assignee thereof, shall sell, solicit the sale of, or take orders for, or construct or otherwise agree to construct a ride which is substantially similar to the Ride, to be located within a 400-mile radius of the Park if such ride would be ready for public opening prior to December 31, 2000.

O.D. HOPKINS ASSOCIATES, INCORPORATED
Page 2 of 4

4.  All plans will be provided to Premier with metric dimensions.  U.S. manufactured components will specify "U.S. sized" materials.  Plans/documentation to be provided to Premier will include any and all drawings, design information, specifications and other data necessary for the installation, safe operation, servicing and inspection of the Ride and related equipment.  The Ride shall be designed and fabricated in accordance with the highest quality technological practices and shall meet or exceed all requirements set forth in all applicable state, local and U.S. laws, codes and regulations, all applicable standards of the American Society of Testing and Materials and the specifications specified in Exhibit B.  All final plans will be accurate and free from any material errors and will be subject to Premier's prior written approval.

5.  Plans/documents will include but not be limited to:  Layout, Foundation drawings, Foundation orientation, Foundation loads, Mechanical drawings, Electrical drawings, Vehicle drawings, Control system drawings, Control panel drawings, Repair instructions, Spare parts list, Design calculations, Engineering plans, Structural drawings, Test requirements, Erection drawings, Installation instructions, Assembly instructions, Disassembly instructions, Maintenance instructions, Operating instructions and Operating/Maintenance manuals.

6.  Prior to the Ride's installation and operation, Seller will provide progress reports to Premier upon its request and permit Premier reasonable access to Seller's facilities and documents.  To secure its obligations, Seller hereby grants to Premier a first lien in all materials, components and other assets constituting a part of, or used in the manufacture of, the Ride.  Prior to any scheduled payment, Seller will deliver to Premier evidence of payment of all amounts then owed by Seller to subcontractors or a waiver by all applicable subcontractors of all liens that can arise out of nonpayment of such amounts.

7.  Premier shall have the right to terminate this letter agreement (or the Agreement) upon (i) the reasonable determination by Premier, using U.S. operating standards, that the Ride will not be capable of meeting, in a substantially complete manner, the specifications set forth in the preliminary drawings included or referred to in Exhibit B or (ii) a material default by Seller hereunder (or thereunder) that continues for 10 (ten) days following notice thereof to Seller; provided that such termination shall be in addition to, and not in lieu of, all other remedies available to Premier.  In the event of such termination, and in addition to all remedies of Premier referred to above, Seller shall promptly return to Premier all amounts paid by Premier to Seller hereunder and under the Agreement to the date of termination, plus, in the case of a willful or material default by Seller hereunder, interest thereon at a rate per annum of 2% in excess of the prime rate of Citibank N.A. (New York branch).

8.  All supervisory personnel reasonably required for installation, pre-opening inspection, training of Park personnel and manufacturers certification and commissioning of the Ride at the Park will be provided by Seller.

O.D. HOPKINS ASSOCIATES, INCORPORATED
Page 3 of 4

9.  The Ride will be warranted by Seller for a period of eighteen (18) months from the date
    opened to the public. All Ride components subjected to cyclic loading will be designed
    for a minimum of two million cycles. Seller will timely provide replacement parts for
    the Ride during the applicable warranty period referred to above at Seller's expense and
    thereafter at Premier's expense.

10. The Ride will be of first class quality and fit and safe for its intended use and, in its
    capacity as independent contractor/manufacturer, Seller will protect, indemnify, defend
    and save Premier and its affiliates harmless from any losses or damages other than lost
    profits sustained by Premier or any such affiliate which arise directly or indirectly
    through or on account of defective design, engineering, construction, manufacture,
    material or workmanship incorporated in the Ride, the breach by Seller of its obligations
    hereunder (or under the Agreement) or any infringement or unauthorized use by Seller
    (or its agents or subcontractors) of patents or intellectual property rights of others.
    Premier will have no liability for items delivered to it in a damaged condition or in a
    condition not in compliance with the terms hereof, other than storing or returning such
    items to Seller at Seller's cost and in accordance with Seller's instructions.

11. Goods delivered to or received by Premier will be accepted only if accompanied by a
    detailed shipping list or by a copy of a detailed invoice. Following delivery, Premier will
    have a minimum of ninety days, or longer if such time is reasonable, to inspect for
    shipment of a complete Ride system. Partial payment or payment in full prior to
    completion of inspection does not waive Premier's right of rejection as non-conforming
    goods.

12. The Ride will be designed with redundant and/or fail safe systems in all critical areas.

13. Seller will maintain a minimum of $5,000,000 (Five Million Dollars), per occurrence, of
    comprehensive general liability, contractual liability and products liability insurance in
    form and substance and issued by insurers reasonably satisfactory to Premier at all times
    prior to the end of the warranty period, each of which insurance shall name Premier as
    an insured party.

14. Seller agrees to pay to Premier a penalty of $3000 per day for each day, if the target dates
    with respect to the Ride listed on Exhibit A are missed, it being agreed that time is of the
    essence in this letter agreement.

15. Seller agrees that it and its affiliates shall have no right to use, and shall not use, the name
    of Premier or any other intellectual property of Premier (including, without limitation,
    the name "Six Flags") in any advertising, publicity, promotion or other use not
    contemplated hereby.

16. Seller's obligations and performance under this letter agreement and the Agreement shall
    be unconditionally guaranteed by any controlling person or entity of Seller.

O.D. HOPKINS ASSOCIATES, INCORPORATED
Page 4 of 4

17. This letter agreement may not be assigned by Seller without the prior written consent of Premier. Each party hereto submits to personal jurisdiction in the State of New York and submits to the jurisdiction of any federal court sitting therein in connection with any action arising out of or relating to this letter agreement and, in any such action, the prevailing party shall be entitled to have its reasonable attorney's fees and expenses and related costs paid by the other party.

If any provision of this letter agreement is determined by a court competent jurisdiction to be invalid or illegal, the validity or legality of all other provisions shall not be affected thereby. This letter agreement sets forth the binding agreement of the parties hereto and shall continue in full force and effect until the execution and delivery of the Agreement with respect to the Ride. The terms of this letter agreement shall be governed by the internal laws of the State of New York. The Exhibits hereto are incorporated herein by reference.

If the foregoing meets with your approval, please sign this letter agreement in the space provided below and return a copy to Premier by telecopier at (405) 475-2555.

We look forward to working with you on this exciting and challenging project.

Very truly yours,

PREMIER PARKS INC.

_____    Date:_____
Gary Story
President and Chief Operating Officer

AGREED AND ACCEPTED:

O.D. HOPKINS ASSOCIATES, INCORPORATED

_____    Date:_____
Name:
Title:

## EXHIBIT A

**Ride:**            River Raft Ride

**Park:**            Riverside Park

**Purchase Price:**    $1,057,000 F.B.O. the Park

**Payment Terms:**

- Upon execution:  20%
- Upon shipment of load nos. 1 and 2:  23.3%
- Upon shipment of load nos. 3 and 4:  23.3%
- Upon shipment of load nos. 5 and 6:  23.4%
- 30 days following satisfactory public operation of the Ride:  10%

**Allocation of Purchase Price to Design and Engineering:**    25%

**Target dates which, if missed, trigger penalty payments, payable with respect to the Ride:**

- Delivery of load nos. 1 and 2:       January 8, 1999
- Delivery of load nos. 3 and 4:       February 12, 1999
- Delivery of load nos. 5 and 6:       March 26, 1999
- Ride ready for testing:              April 1, 1999
- Open the Ride to the public:         April 7, 1999

# *FAX TRANSMITTAL*



*amusement rides world-wide*

| | | | |
|---|---|---|---|
| DATE: | November 25, 1998 | SUBJECT: | Riverside Letter of Agreement |
| ATTENTION: | Gary Story | FROM: | Jim Glover, VP Sales & Marketing |
| COMPANY: | Premier Parks | PAGE(S): | 3 |
| FAX NUMBER: | 405-475-2526 | COPIES TO: | R. Kuteman, J. Pendleton |

Dear Gary:

Just prior to my departure to Dallas on November 14, 1998, I received a fax from Mr. Russell Kuteman outlining a Letter of Agreement. There are issues within this Letter of Agreement that we take exception to and are contrary to our offer dated on June 25, 1998. It was my understanding that our offer was the basis for agreement when you gave me a verbal commitment on August 16, 1998. I had hoped to discuss this with you during the Trade Show but unfortunately we did not have the needed time together.

Our respective companies have worked together in the past using our contract that contained specific language you were normally comfortable with. Our offer of June 25, 1998 was based upon our past business dealings. While I certainly understand as your company grows that different demands and considerations are to be generated, this Letter of Agreement is a radical departure from the manner in which we have worked in the past.

At this point in time, the Letter of Agreement/Intent does not provide Hopkins with what we need so to purchase outside vendor components. Since you gave me a verbal commitment in August I have been doing an extensive amount of work on this ride based upon intent. The rafts are built, much of the lift and station frames completed and we are at the point that by early next week the final layout will be approved by Riverside. We need to have a signed contract, or at the very least, the deposit, so we can get outside components ordered.

While we will attempt to work in a manner that is acceptable to you, it is important to point out that within these new guidelines outlined in the Letter of Agreement there are, in some cases, issues which are not acceptable and others that have direct cost implications.

With that in mind, I will summarize our response to each of the terms and conditions referencing the number utilized in your Letter of Agreement for clarity.

1. Our offer of June 25th was F.O.B. Penacook, NH and did not include delivery.
2. Same comment as above regarding delivery and other than the choice of color for the fiberglass rafts which Les Hudson gave me in September, there was no other provision made for theming.
3. We have not agreed upon an exclusive territorial agreement.



***O.D. HOPKINS ASSOCIATES, INCORPORATED***
*40 PARK LANE · P.O. BOX 275 · CONTOOCOOK, NH 03229 USA · TEL: 1-603-746-4131 · FAX: 1-603-746-3659*

# FAX TRANSMITTAL



*amusement rides world-wide*

4. All of our drawings and components are "U.S. sized" materials.
5. Accepted as written.
6. The last line of this paragraph should be deleted. This is very time consuming and in some cases impossible.
7. It is our intention to have a signed Purchase Agreement for the Riverside River Raft Ride. In our Purchase Agreement we have clear language dealing with termination.
8. We provided for a specific amount of onsite assistance in our Purchase Agreement. If additional assistance is required we can add costs for this.
9. Our standard warranty is for twelve months from acceptance of the ride.
10. We build our rides to the highest standard used in the amusement ride industry.
11. The ninety-day period is way too long. Twenty-one days is acceptable.
12. Accepted as written.
13. Accepted as written.
14. We will agree to a penalty of $500 per day for late deliveries. Based on where we stand today, I have adjusted the ship dates in Exhibit "A" based on us having the deposit by December 4, 1998.
15. We ask that we are able to include Premier Parks on our customer list.
16. The principles of Hopkins will not unconditionally guarantee everything in our agreement with their personal assets.
17. Accepted as written.

I have attached an amended Exhibit "A" that now reflects the new ship dates based upon us receiving a deposit by December 4, 1998. As I have mentioned previously, the pumps and electrical control centers are long lead items and their ship dates to Hopkins are reflected in these new delivery dates.

We will work in good faith to conclude an acceptable Purchase Agreement, but I respectfully request the deposit to be sent so the current ship dates can be met.

If you need to get a hold of me after business hours my home phone number is (603) 746-2128 and my cell phone number is (603) 496-5938.

Sincerely,

Jim Glover
VP Sales & Marketing



**O.D. HOPKINS ASSOCIATES, INCORPORATED**
*40 PARK LANE · P.O. BOX 275 · CONTOOCOOK, NH 03229 USA · TEL: 1-603-746-4131 · FAX: 1-603-746-3659*

EXHIBIT "A"

RIDE:                          River Raft Ride

PARK:                          Riverside Park

PURCHASE PRICE:                $1,057,000, F.O.B. Penacook, New Hampshire

PAYMENT TERMS:

| | |
|---|---|
| 25% | Upon Execution |
| 10% | Upon Delivery of the Drawing Package |
| 20% | Upon Shipment of Loads #1 & 2 |
| 20% | Upon Shipment of Loads #3 & 4 |
| 20% | Upon Shipment of Loads #5 & 6 |
| 5% | Upon Acceptance |

Allocation of Purchase Price to Design and Engineering:   25%

Target Dates, which, if missed, trigger Penalty Payments, Payable with Respect to the Ride:

| | |
|---|---|
| Concrete Drawing Package: | December 18, 1998 |
| Delivery of load nos. 1 and 2: | January 16, 1999 |
| Delivery of load nos. 3 and 4: | February 12, 1999 |
| Delivery of load nos. 5 and 6: | April 16, 1999 |

Based upon the initial deposit being received by December 4, 1998. Ship dates will be extended equally so to coincide with the date deposit is received.

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

SUPERIOR COURT
DEPARTMENT OF THE
TRIAL COURT
CIVIL ACTIONNO011494B

ERNEST MESSIER and SUSAN
MESSIER, JOHN PASCONE and
KIMBERLY PASCONE, Individually
and as parents and next friends of
JONATHAN PASCONE, ANGELICA
PASCONE; GERALD PESCARO and
KIMBERLY PESCARO,
          Plaintiffs,

V.

SIX FLAGS, INC., RIVERSIDE PARK
ENTERPRISES, INC., PREMIER
PARKS, INC., O.D. HOPKINS
ASSOCIATES, INC., MARTIN
FLORES and CHARLES FLORES,
          Defendants

## AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY

### PARTIES

1.    The plaintiffs, Ernest and Susan Messier are residents of 6 Lawnwood Drive,

Coventry, Rhode Island and have resided there at all times material to this litigation. (Unless

otherwise indicated, Ernest Messier and Susan Messier, will be collectively referred to as "the

Messiers").

2.    The plaintiffs, John Pascone and Kimberly Pascone, are the lawful parents and

next friends, of Jonathan Pascone and Angelica Pascone. The plaintiffs are residents of 930

Bailey Hill Road, Dayton, CT, and have resided there at all times material to this litigation.

{H PA·Lit\1o215-0090\A0475436.DOC}

(Unless otherwise indicated, John Pascone and Kimberly Pascone, individually, and as parents and next friends of Jonathan Pascone and Angelica Pascone will be collectively referred to as "the Pascones").

3.     The plaintiffs, Kimberly Pescaro and Gerald Pescaro, reside at 16 Roberts Street in Shrewsbury, Worcester County, Massachusetts, and have resided there at all times material to this litigation. (Unless otherwise indicated, Kimberly Pescaro and Gerald Pescaro will be collectively referred to as "the Pescaros").

4.     The defendant, Six Flags, Inc. ("Six Flags"), is a corporation organized under the laws of Oklahoma with a principal place of business located at 11501 Northeast Expressway, Oklahoma City, Oklahoma.

5.     The defendant, Riverside Park Enterprises, Inc. ("Riverside"), is a corporation organized under the laws of Massachusetts with a principal place of business located at 1623 Main Street, Agawam, Hampden County, Massachusetts.

6.     The defendant, Premier Parks, Inc. ("Premier"), is a corporation organized under the laws of Oklahoma with a usual place of business located at 11501 Northeast Expressway, Oklahoma City, Oklahoma.

7.     The defendant, O. D. Hopkins Associates, Inc. ("Hopkins"), is a corporation organized under the laws of New Hampshire with a principal place of business located at 2 Whitney Road, Penacook, New Hampshire.

8.     The defendant, Charles Flores, is a resident of 70 Chestnut St., Springfield, Massachusetts.

- 2 -

9.     The defendant, Martin Flores, is a resident of 70 Chestnut St., Springfield,

Massachusetts.

## **JURISDICTION**

10.    Jurisdiction over Six Flags, Premier and Hopkins arises from the defendants:

   a.     transacting business in the Commonwealth of Massachusetts;

   b.     contracting to supply services or things in the Commonwealth of
          Massachusetts;

   c.     causing tortious injury by an act or omission in the Commonwealth of
          Massachusetts;

   d.     causing tortious injury in the Commonwealth of Massachusetts by an act
          or omission outside of the Commonwealth of Massachusetts and regularly
          doing and soliciting business, and engaging in other persistent courses of
          conduct, and deriving substantial revenue from goods used or consumed or
          services rendered in the Commonwealth of Massachusetts; and/or;

   e.     being registered to do business in Massachusetts.

## **FACTS**

11.    On or about August 7, 1999 the defendants Six Flags, Riverside and Premier

owned, operated, controlled and/or administered the daily affairs of an amusement park in

Agawam, Massachusetts which now does business as Six Flags New England ("Six Flags"). On

or about August 7, 1999, the amusement park was known as Riverside Amusement Park.

12.    On or about August 7, 1999, the defendant, Charles Flores, was employed by Six

Flags. At or about 9:15 – 9:30 p.m. on that day, Charles Flores was responsible for supervising

the loading and unloading of passengers for the Blizzard River Ride ("the Ride"). (See the

Agawam Police Department Incident Report, p. A6, attached hereto as **Exhibit A**).

- 3 -

{H :PA\Lit\16215\00001\A0475436.DOC}

13.     On or about August 7, 1999, the defendant, Martin Flores, was employed by Six Flags. At or about 9:15 – 9:30 p.m. on that day, Martin Flores was responsible for operating and supervising the ride. (Police Report **Exhibit A** at p. A6).

14.     On August 7, 1999, the plaintiffs purchased tickets for admission into The Riverside Amusement Park.

15.     On August 7, 1999, the Pescaros were attending an outing at Riverside Park with Why Me Inc., an organization dedicated to helping children with cancer as well as cancer survivors. The Pescaros were members of Why Me Inc. because Kimberly Pescaro is a cancer survivor.

16.     On August 7, 1999, Susan Messier was several months pregnant with her son Daniel Messier.

17.     At approximately 9:15 - 9:30 p.m., the plaintiffs got in line to board the newly installed Blizzard River raft ride. No signs were posted to inform people in line that there was any risk that the rafts would capsize. In fact, the ride was widely and extensively advertised and described as "The family rafting ride."

18.     At no time were any of the plaintiffs given any instructions regarding proper weight distribution when boarding the raft.

19.     After boarding the raft, Mr. Messier and Mr. Pascone sat next to each other. The two men had a combined weight of more than six hundred pounds.

20.     After the Messiers and Pascones boarded the ride, the attendant then boarded the Pescaros. The only seats available were two seats located on the side of the raft near Mr. Messier and Mr. Pascone. As a result, Mr. Pescaro, who weighed approximately 250 pounds, sat on the

- 4 -

same side of the raft as Mr. Messier and Mr. Pascone. At no time did any ride attendant or operator indicate that there was anything wrong with the seating arrangement. The three men had a combined weight of more than eight hundred and fifty pounds.

21.     After all of the plaintiffs were boarded, the raft was dispatched from the loading area toward a conveyor belt that carried the raft up and into the rapids. Due to the uneven distribution of the weight in the raft, the raft became stuck on the conveyor belt.

22.     After the raft became stuck, a ride attendant and maintenance worker came over to the raft. Mr. Messier suggested that the weight of the raft was unevenly distributed and offered to sit on the other side of the raft. Mr. Messier was instructed to remain in his seat. (Police Report, **Exhibit A** at pp. A36, A38 and A39-40). The maintenance man then kicked the raft and it continued up the conveyor belt and into the rapids.

23.     As the raft progressed through the curves and straightaways of the rapids, it took on water and rotated very little. (Police Report, **Exhibit A** at pp. A36, A38 and A39-40).

24.     As the raft progressed through the final stretch of the ride, the side of the raft with the three adult males dipped low in the water, completely submerging Mr. Messier, Mr. Pascone and Mr. Pescaro. The opposite side of the raft then rose slowly into the air and eventually tipped over completely. As a result, all of the plaintiffs, still strapped into their seat-belts, were completely submerged in rushing water, trapped under the large raft. (Police Report, **Exhibit A** at pp. A36, A38 and A39-40).

25.     Mr. Messier was trapped underwater but was eventually able to release the seat belt mechanism and rise to the surface to take a breath. Upon rising to the surface he immediately realized that his pregnant wife was still trapped under the water. He screamed for

- 5 -

{H:\PA\Lit\16215\00001\A0475436 DOC}

help and then began to attempt to right the raft and find his wife. (Police Report, **Exhibit A** at pp. A36 and A37). As a result of the incident, Mr. Messier suffered permanent physical and severe psychological injuries.

26.    Mrs. Messier was unable to free herself from her seatbelt. After she could no longer hold her breath, Mrs. Messier swallowed a large amount of water and lost consciousness. She was eventually pulled from the water but was not breathing. (Police Report, **Exhibit A** at pp. A36 and A37). Rescue workers administered CPR and, after a period of time, Mrs. Messier began to breathe. She was hospitalized for six days. As a result of her injuries, Mrs. Messier's treating physicians expressed concern as to the health of the Messiers then unborn child. As a result of the incident, Mrs. Messier suffered severe physical and psychological injuries as well as permanent cognitive deficits.

27.    The Plaintiff, Kimberly Pascone, was trapped under water for a period of time but was able to free herself from her seat belt and was carried away from the submerged raft by the current. She was transported by ambulance to Baystate Medical Center where she received treatment and subsequently received treatment from other physicians and psychologists for the injuries she received, as well as for the trauma and mental suffering she sustained because of the injuries to her husband John, as well as her children Angelica and Jonathan.

28.    The Plaintiff, Jonathan Pascone, age 4 at the time of this incident, was also submerged under water for a period of time, during which he swallowed large amounts of water and lost consciousness. When he was brought to safety, he received CPR for approximately 5 minutes and was taken to Baystate Medical Center by ambulance and admitted. He sustained

- 6 -

{H PA Lit 16215 00001 A0475436 DOC}

several abrasions and lacerations and suffered some amnesia as a result of the accident. He has received extensive medical and psychological treatment as a result of this incident.

29.    The Plaintiff, Angelica Pascone, age 9 at the time of the accident, was trapped underwater for approximately 3 or more minutes after the raft turned over. She was removed from the raft and transported to the Baystate Medical Center and admitted. She suffered some immediate amnesia, as well as a fractured right scapula along with other injuries and abrasions. She was hospitalized for three days and has subsequently come under the care of several physicians, psychologists, clinical neuropsychologists and speech therapists as a result of the traumatic injuries she sustained from this incident.

30.    The Plaintiff, John Pascone, was unable to free himself from his seatbelt after being submerged and had to be released by bystanders. He was under water for several minutes, received CPR, as well as chest compression upon his release. Upon arrival of ambulance personnel, he was intubated and brought to Baystate Medical Center where he was given the last rites of the Catholic Church and where he remained on ventilatory support for seven days. Upon his discharge he came under the treatment of several physicians, psychologists, clinical neuro-psychologists and others for his injuries, which treatment has continued to the present.

31.    The Plaintiff, Gerald Pescaro was trapped under water for a long period of time during which he struggled to release himself from his seat-belt. Eventually, Mr. Pescaro was able to free himself and swim out from under the raft. After rising to the surface, Mr. Pescaro then began to frantically search for his wife, Kimberly, and to assist in the rescue effort. After helping to extricate his wife from beneath the raft, Mr. Pescaro was transported by ambulance to Mercy Hospital where he was treated for a deep laceration to his arm and other injuries.

- 7 -

{H :P.A:Ltt:16215\00001\A0475436.DOC}

Mr. Pescaro subsequently received treatment from other physicians and psychologists for the physical and severe emotional injuries he sustained as a result of this incident.

32.    The Plaintiff, Kimberly Pescaro, was trapped under water for a long period of time. After a struggle, Mrs. Pescaro was finally able to free herself from her seat-belt and survived by finding an air pocket underneath the raft. After some time, Mrs. Pescaro was finally freed from the raft. She was transported by ambulance to Mercy Hospital where she received treatment for a head injury and other injuries. Mrs. Pescaro subsequently received treatment from other physicians and psychologists for the physical and severe emotional injuries she sustained as a result of this incident.

33.    The incident was investigated by the Massachusetts Department of Public Safety ("MDPS"). In its preliminary report, the MDPS suggested that, based on its review of the available evidence, the raft was not loaded evenly. (See Preliminary Investigative Report of the Massachusetts Department of Public Safety, p. B1, attached hereto as **Exhibit B**). The MDPS further suggested that the accident probably occurred when the heavily loaded side of the raft dipped low into the water trough and got caught on guide rods on the bottom of the trough which prevented the raft from returning to a safe horizontal position. (MDPS Preliminary Report, **Exhibit B** at p. B2). The raft was then pushed further down stream by the water flow and capsized. *Id.*

34.    The MDPS also noted in its Preliminary Investigation report that earlier in the same year, a raft on a similar ride at Six Flags in Arlington, Texas capsized killing one passenger and injuring several others. (MDPS Preliminary Report, **Exhibit B** at p. B2). As a result of that incident, the report suggests that Six Flags New England allegedly installed emergency stop

- 8 -

devices on its raft ride and trained ride personnel in water rescue techniques. *Id*. The report does not suggest that any modifications were made to the water flow, the guide rods or loading procedures or to any other aspect of the ride.

35.     In late March of 2000, the manufacturer of the ride, Hopkins, distributed a Service Bulletin to all parks that had purchased one of its raft rides. The Service Bulletin referred to the death that resulted when a raft capsized in Texas and warned that failure to make safety modifications and adhere to specified safety procedures could result in serious injury or death. (See Service Bulletin, p. C1, attached hereto as **Exhibit C**). The Service Bulletin also stated that, as indicated in another Service Bulletin distributed in 1994, boat loads must be balanced and recommended that large individuals should sit across from each other. (Service Bulletin, **Exhibit C** at p. C2).

36.     Interviews of Six Flags personnel and patrons after the incident revealed that there had been problems with the ride in the recent past, and on the very same day that the plaintiffs were injured. Approximately one week prior to the day of the incident, a safety check was being performed on the ride and one of the rafts capsized in the same area where the plaintiffs were injured. (Police Report, **Exhibit** A at pg. A15). Earlier on the day of the incident, the ride computer indicated a problem. (Police Report **Exhibit** A at p. 11). Shortly before the incident that injured the plaintiffs, a raft became stuck on the same turn and the emergency stop mechanism on the ride was activated so that passengers could be evacuated (Police Report, **Exhibit** A at pg. A 16 and A 28). Despite these events, Six Flags continued to operate the ride and make it accessible to the general public.

- 9 -

{H :PA\Lit\1621500001 A0475436 DOC}

37.     In its final report, the MDPS concluded that it was only after this incident that Six Flags made several design modifications to the ride which would prevent a similar incident. (See MDPS Report, p. D1, attached hereto as **Exhibit D**). Some of the changes made included modifications of the water flow and modifications to the guide rails. (MDPS Report, **Exhibit D** at p. D2). Each of the modifications was technically feasible prior to the accident that injured the plaintiffs and should have been implemented to prevent the incident from occurring.

## COUNT I
## (Negligence - Six Flags)

38.     The plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 37.

39.     The defendant Six Flags was negligent and careless in that it knew or should have known that the ride was developed, designed, manufactured, assembled, inspected, operated and maintained in such a way that rafts in the water trough were likely to capsize and thereby trap passengers beneath the water. Nevertheless Six Flags advertised the ride to the general public as "The family rafting ride" and continued to operate the ride in a condition that it knew or should have known was unreasonably dangerous and likely to cause serious injury or death.

40.     The defendant Six Flags was also negligent in that it knew or should have known of the dangerous, unstable nature of the ride and failed to implement adequate and reasonable safety procedures to prevent serious injury to unsuspecting passengers.

41.     Six Flags was further negligent in its failure to warn of the danger created by the dangerous and unstable condition of the ride and in its failure to adequately train and supervise ride attendants, operators and maintenance staff regarding proper operating procedures.

- 10 -

42.     As the direct and proximate result of Six Flag's negligence and complete disregard for the safety of the public, the plaintiffs were caused to suffer severe and permanent personal injuries and emotional distress.

WHEREFORE, the plaintiffs demand judgment against the defendant Six Flags in an amount which will fairly and adequately compensate them for their injuries and all other relief available under the law.

## COUNT II
### (Negligence – Riverside)

43.     The plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 37.

44.     The defendant Riverside was negligent and careless in that it knew or should have known that the ride was developed, designed, manufactured, assembled, inspected, operated and maintained in such a way that rafts in the water trough were likely to capsize and thereby trap passengers beneath the water. Nevertheless Riverside advertised the ride to the general public as "The family rafting ride" and continued to operate the ride in a condition that it knew or should have known was unreasonably dangerous and likely to cause serious injury or death.

45.     The defendant Riverside was also negligent in that it knew or should have known of the dangerous, unstable nature of the ride and failed to implement adequate and reasonable safety procedures to prevent serious injury to unsuspecting passengers.

46.     Riverside was further negligent in its failure to warn of the danger created by the dangerous and unstable condition of the ride and in its failure to adequately train and supervise ride attendants, operators and maintenance staff regarding proper operating procedures.

- 11 -

{H PA·L·t·16215-00001:A0475436 DOC}

47.     As the direct and proximate result of Riverside's negligence and complete
disregard for the safety of the public, the plaintiffs were caused to suffer severe and permanent
personal injuries and emotional distress.

WHEREFORE, the plaintiffs demand judgment against the defendant Riverside in an
amount which will fairly and adequately compensate them for their injuries and all other relief
available under the law.

### COUNT III
### (Negligence - Premier)

48.     The plaintiffs incorporate herein by reference the allegations contained in
paragraphs 1 through 37.

49.     The defendant Premier was negligent and careless in that it knew or should have
known that the ride was developed, designed, manufactured, assembled, inspected, operated and
maintained in such a way that rafts in the water trough were likely to capsize and thereby trap
passengers beneath the water. Nevertheless Premier advertised the ride to the general public as
"The family rafting ride" and continued to operate the ride in a condition that it knew or should
have known was unreasonably dangerous and likely to cause serious injury or death.

50.     The defendant Premier was also negligent in that it knew or should have known of
the dangerous, unstable nature of the ride and failed to implement adequate and reasonable safety
procedures to prevent serious injury to unsuspecting passengers.

51.     Premier was further negligent in its failure to warn of the danger created by the
dangerous and unstable condition of the ride and in its failure to adequately train and supervise
ride attendants, operators and maintenance staff regarding proper operating procedures.

{H :P.A:Lt·16215 00001:A0475436 DOC}

52.     As the direct and proximate result of Premier's negligence and complete disregard for the safety of the public, the plaintiffs were caused to suffer severe and permanent personal injuries and emotional distress.

WHEREFORE, the plaintiffs demand judgment against the defendant Premier in an amount which will fairly and adequately compensate them for their injuries and all other relief available under the law.

## COUNT IV
## (Negligence – Hopkins)

53.     The plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 37.

54.     The defendant Hopkins was negligent and careless in that it knew or should have known that the ride was developed, designed, manufactured, assembled, inspected and maintained in such a way that rafts in the water trough were likely to capsize and thereby trap passengers beneath the water.

55.     The defendant Hopkins was also negligent in that it knew or should have known of the dangerous, unstable nature of the ride and failed to establish adequate and reasonable safety procedures and/or adequate instructions to prevent serious injury to unsuspecting passengers.

56.     Hopkins was further negligent in its failure to warn of the danger created by the dangerous and unstable condition of the ride.

57.     As the direct and proximate result of Hopkins' negligence and complete disregard for the safety of the public, the plaintiffs were caused to suffer severe and permanent personal injuries and emotional distress.

- 13 -

{H PA\Lit\16215\0000T\A0475436 DOC}

WHEREFORE, the plaintiffs demand judgment against the defendant Hopkins in an amount which will fairly and adequately compensate them for their injuries and all other relief available under the law.

## COUNT V
### (Negligence – Martin Flores)

58.     The plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 37.

59.     On August 7, 1999 the defendant Martin Flores was responsible for the operation and supervision of the ride while the plaintiffs were passengers on the ride.

60.     Martin Flores owed the plaintiffs a duty to operate and supervise the ride in a reasonably safe manner.

61.     Martin Flores failed to operate and supervise the ride in a safe and reasonable manner.

62.     As a direct and proximate result of Martin Flores' negligence, the plaintiffs were caused to suffer severe and permanent personal injuries and emotional distress.

WHEREFORE, the plaintiffs demand judgment against Martin Flores in an amount which will fairly and adequately compensate them for their injuries and all other relief available under the law.

## COUNT VI
### (Negligence – Charles Flores)

63.     The plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 37.

- 14 -

{H :PA\Lit\16215\00001\A0475436 DOC}

64. On August 7, 1999 the defendant Charles Flores was responsible for the operation and supervision of the ride while the plaintiffs were passengers on the ride.

65. Charles Flores owed the plaintiffs a duty to operate and supervise the ride in a reasonably safe manner.

66. Charles Flores failed to operate and supervise the ride in a safe and reasonable manner.

67. As a direct and proximate result of Charles Flores' negligence, the plaintiffs were caused to suffer severe and permanent personal injuries and emotional distress.

WHEREFORE, the plaintiffs demand judgment against Charles Flores in an amount which will fairly and adequately compensate them for their injuries and all other relief available under the law.

## COUNT VII
### (Breach Of Warranties - Six Flags)

68. The plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 37.

69. The defendant Six Flags sold tickets to the plaintiffs and charged them admission to the Riverside Amusement Park which conferred upon them limited rights to use and enjoy the rides and facilities therein. Six Flags expressly and impliedly warranted that the rides therein, including the ride that caused plaintiffs' injuries, were "merchantable" and "safe" and "fit for the particular purpose of safely transporting passengers."

70. The ride and it's component parts, including the procedures for operation and warnings, were defective and therefore the ride was not in fact "merchantable," "safe" and "fit" as warranted by the defendant. Six Flags, therefore breached these warranties to the plaintiffs.

- 15 -

{H \PA\Lit\16215\00001\A0475436.DOC}

71.   Six Flags further breached the warranties of merchantability and fitness for a

particular purpose with respect to the plaintiffs in that the ride was unreasonably dangerous

because, among other things:

> a.   The ride was designed and manufactured such that rafts in the water
> trough were likely to capsize and trap passengers under the water;
>
> b.   The procedures for operation of the ride were inadequate to protect against
> the known danger of overloading and creating imbalanced loads on the
> rafts such that they were likely to capsize while in the water trough;
>
> c.   Training and supervision of ride operators was inadequate to prevent
> improper loading of passengers or to ensure that ride operators would be
> able to recognize dangerous circumstances that were likely to lead to an
> accident;
>
> d.   Monitoring procedures and safety devices on the ride were inadequate to
> recognize conditions which were likely to result in rafts capsizing in the
> water trough;
>
> e.   The ride did not have adequate, effective warnings and instructions for
> passengers in light of the dangers associated with its operation; and
>
> f.   The ride and operating procedures were inadequately tested, developed
> and designed to allow the ride to operate such that passengers were not
> exposed to unreasonable dangers.

72.   As the direct and proximate result of the defendant's breaches of warranties, the

plaintiffs were caused to suffer severe and permanent personal injuries and emotional distress.

WHEREFORE, the plaintiffs demand judgment against the defendant Six Flags in an

amount which will fairly and adequately compensate them for their injuries and all other relief

available under the law.

## COUNT VIII
## (Breach Of Warranties – Riverside)

73.   The plaintiffs incorporate herein by reference the allegations contained in

paragraphs 1 through 37.

- 16 -

{H:\PA\Lit\16215 00001\A0475436 DOC}

74. The defendant Riverside sold tickets to the plaintiffs and charged them admission to the Riverside Amusement Park which conferred upon them limited rights to use and enjoy the rides and facilities therein. Riverside expressly and impliedly warranted that the rides therein, including the ride that caused plaintiffs' injuries, were "merchantable" and "safe" and "fit for the particular purpose of safely transporting passengers."

75. The ride and it's component parts, including the procedures for operation and warnings, were defective and therefore the ride was not in fact merchantable, safe and fit as warranted by the defendant. Riverside therefore breached these warranties to the plaintiffs.

76. Riverside further breached the warranties of merchantability and fitness for a particular purpose with respect to the plaintiffs in that the ride was unreasonably dangerous because, among other things:

> a. The ride was designed and manufactured such that rafts in the water trough were likely to capsize and trap passengers under the water;
>
> b. The procedures for operation of the ride were inadequate to protect against the known danger of overloading and creating imbalanced loads on the rafts such that they were likely to capsize while in the water trough;
>
> c. Training and supervision of ride operators was inadequate to prevent improper loading of passengers or to ensure that ride operators would be able to recognize dangerous circumstances that were likely to lead to an accident;
>
> d. Monitoring procedures and safety devices on the ride were inadequate to recognize conditions which were likely to result in rafts capsizing in the water trough;
>
> e. The ride did not have adequate, effective warnings and instructions for passengers in light of the dangers associated with its operation; and
>
> f. The ride and operating procedures were inadequately tested, developed and designed to allow the ride to operate such that passengers were not exposed to unreasonable dangers.

- 17 -

77.    As the direct and proximate result of the defendant's breaches of warranties, the plaintiffs were caused to suffer severe and permanent personal injuries and emotional distress.

WHEREFORE, the plaintiffs demand judgment against the defendant Riverside park in an amount which will fairly and adequately compensate them for their injuries and all other relief available under the law.

## COUNT IX
## (Breach Of Warranties – Premier)

78.    The plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 37.

79.    The defendant Premier sold tickets to the plaintiffs and charged them admission to the Riverside Amusement Park which conferred upon them limited rights to use and enjoy the rides and facilities therein. In selling such tickets and charging admission, Premier expressly and impliedly warranted that the rides therein, including the ride that caused plaintiffs' injuries, were "merchantable" and "safe" and "fit for the particular purpose of safely transporting passengers."

80.    The ride and it's component parts, including the procedures for operation and warnings, were defective and therefore the ride was not in fact merchantable, safe and fit as warranted by the defendant. Premier, therefore breached these warranties to the plaintiffs.

81.    Premier further breached the warranties of merchantability and fitness for a particular purpose with respect to the plaintiffs in that the ride was unreasonably dangerous because, among other things:

> a.    The ride was designed and manufactured such that rafts in the water trough were likely to capsize and trap passengers under the water;

- 18 -

{H:\PA\Lit:16215\00001\A0475436.DOC}

    b.    The procedures for operation of the ride were inadequate to protect against the known danger of overloading and creating imbalanced loads on the rafts such that they were likely to capsize while in the water trough;

    c.    Training and supervision of ride operators was inadequate to prevent improper loading of passengers or to ensure that ride operators would be able to recognize dangerous circumstances that were likely to lead to an accident;

    d.    Monitoring procedures and safety devices on the ride were inadequate to recognize conditions which were likely to result in rafts capsizing in the water trough;

    e.    The ride did not have adequate, effective warnings and instructions for passengers in light of the dangers associated with its operation; and

    f.    The ride and operating procedures were inadequately tested, developed and designed to allow the ride to operate such that passengers were not exposed to unreasonable dangers.

82.    As the direct and proximate result of the defendant's breaches of warranties, the plaintiffs were caused to suffer severe and permanent personal injuries and emotional distress.

WHEREFORE, the plaintiffs demand judgment against the defendant Premier in an amount which will fairly and adequately compensate them for their injuries and all other relief available under the law.

## COUNT X
## (Breach Of Warranties – Hopkins)

83.    The plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 37.

84.    Hopkins designed and manufactured the Blizzard River Ride at the Riverside Amusement Park. Hopkins expressly and impliedly warranted that the Blizzard River Ride at Riverside Park was "merchantable" and "safe" and "fit for the particular purpose of safely transporting passengers."

- 19 -

{H:\PA:Lit\16215\00001\A047543o DOC}

85.   The ride and it's component parts, including the procedures for operation and

warnings, were defective and therefore the ride was not in fact "merchantable," "safe" and "fit"

as warranted by the defendant. Hopkins, therefore breached these warranties to the plaintiffs.

86.   Hopkins further breached the warranties of merchantability and fitness for a

particular purpose with respect to the plaintiffs in that the ride was unreasonably dangerous

because, among other things:

> a.   The ride was designed and manufactured such that rafts in the water
> trough were likely to capsize and trap passengers under the water;
>
> b.   The procedures for operation of the ride were inadequate to protect against
> the known danger of overloading and creating imbalanced loads on the
> rafts such that they were likely to capsize while in the water trough;
>
> c.   Training and supervision of ride operators was inadequate to prevent
> improper loading of passengers or to ensure that ride operators would be
> able to recognize dangerous circumstances that were likely to lead to an
> accident;
>
> d.   Monitoring procedures and safety devices on the ride were inadequate to
> recognize conditions which were likely to result in rafts capsizing in the
> water trough;
>
> e.   The ride did not have adequate, effective warnings and instructions for
> passengers in light of the dangers associated with its operation; and
>
> f.   The ride and operating procedures were inadequately tested, developed
> and designed to allow the ride to operate such that passengers were not
> exposed to unreasonable dangers.

87.   As the direct and proximate result of the defendant's breaches of warranties, the

plaintiffs were caused to suffer severe and permanent personal injuries and emotional distress.

WHEREFORE, the plaintiffs demand judgment against the defendant Hopkins in an

amount which will fairly and adequately compensate them for their injuries and all other relief

available under the law.

- 20 -

{H:\PA\Lit\16215\00001\A0475436.DOC}

## COUNT XI
### (Violation of M.G.L. c. 93A - Six Flags)

88.    The plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 37.

89.    Counsel for the plaintiffs sent to Six Flags a Chapter 93A demand letter, making demand for settlement of plaintiffs' claims based upon the aforementioned negligence, gross negligence and breach of warranties which constituted unfair and deceptive trade practices. Six Flags failed to respond with a reasonable offer of settlement despite notice supplied by the plaintiffs of the violations. As a result of the aforementioned negligence, gross negligence and breach of warranties, and its failure to respond with a reasonable settlement offer, Six Flags has knowingly violated Mass. Gen. L. c. 93A.

90.    In addition to notice provided by plaintiffs, Six Flags, through its employees and agents, was on actual notice of the defective condition of the Blizzard River Ride prior to the plaintiffs' injuries but failed to take steps to prevent the plaintiffs from being exposed to known risk making its violation of c. 93A knowing and willful. Such conduct also constitutes gross negligence.

WHEREFORE, the plaintiffs demand multiple damages against Six Flags pursuant to M.G.L. c. 93A, including costs and attorneys' fees.

## COUNT XII
### (Violation of M.G.L. c. 93A - Premier)

91.    The plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 37.

- 21 -

{H :PA·Lit\16215\00001\A0475436 DOC}

92.     Counsel for the plaintiffs sent to Premier a Chapter 93A demand letter, making demand for settlement of plaintiffs' claims based upon the aforementioned negligence, gross negligence and breach of warranties which constituted unfair and deceptive trade practices. Six Flags failed to respond with a reasonable offer of settlement despite notice supplied by the plaintiffs of the violations. As a result of the aforementioned negligence, gross negligence and breach of warranties and its failure to respond with a reasonable settlement offer, Premier has knowingly violated Mass. Gen. L. c. 93A.

93.     In addition to notice provided by plaintiffs, Premier, through its employees and agents, was on actual notice of the defective condition of the Blizzard River Ride prior to the plaintiffs' injuries but failed to take steps to prevent the plaintiffs from being exposed to known risk making its violation of c. 93A knowing and willful. Such conduct also constitutes gross negligence.

WHEREFORE, the plaintiffs demand multiple damages against Premier pursuant to M.G.L. c. 93A, including costs and attorneys' fees.

## COUNT XIII
### (Violation of M.G.L. c. 93A - Riverside)

94.     The plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 37.

95.     Counsel for the plaintiffs sent to Riverside a Chapter 93A demand letter, making demand for settlement of plaintiffs' claims based upon the aforementioned negligence, gross negligence and breach of warranties which constituted unfair and deceptive trade practices. Riverside failed to respond with a reasonable offer of settlement despite notice supplied by the plaintiffs of the violations. As a result of the aforementioned negligence, gross negligence and

- 22 -

:H PA\Ln\16215\00001'A0475436 DOC;

breach of warranties and its failure to respond with a reasonable settlement offer, Riverside has knowingly violated Mass. Gen. L. c. 93A.

96.     In addition to notice provided by plaintiffs, Riverside, through its employees and agents, was on actual notice of the defective condition of the Blizzard River Ride prior to the plaintiffs' injuries but failed to take steps to prevent the plaintiffs from being exposed to known risk making its violation of c. 93A knowing and willful. Such conduct also constitutes gross negligence.

WHEREFORE, the plaintiffs demand multiple damages against Riverside pursuant to M.G.L. c. 93A, including costs and attorneys' fees.

## COUNT XIV
### (Violation of M.G.L. c. 93A - Hopkins)

97.     The plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 37.

98.     Counsel for the plaintiffs sent to Hopkins a Chapter 93A demand letter, making demand for settlement of plaintiffs' claims based upon the aforementioned negligence and breach of warranties which constituted unfair and deceptive trade practices. Hopkins failed to respond with a reasonable offer of settlement despite notice supplied by the plaintiffs of the violation. As a result of the aforementioned negligence, gross negligence and breach of warranties, and its failure to respond with a reasonable settlement offer, Hopkins has knowingly violated Mass. Gen. L. c. 93A.

WHEREFORE, the plaintiffs demand multiple damages against Hopkins pursuant to M.G.L. c. 93A, including costs and attorneys' fees.

## COUNT XV

- 23 -

## (Loss of Consortium – All Defendants)

99.    The plaintiffs incorporate herein by reference the allegations contained in

paragraphs 1 through 98.

100.    As a direct and proximate result of defendants' negligence, breaches of

warranties, and violation of the Massachusetts Consumer Protection Statute, each plaintiff

individually was deprived of the care, comfort, society, companionship, consortium, advice,

guidance and support of his or her family members injured in the August 7, 1999 incident.

WHEREFORE, the plaintiffs demand judgment against the all defendants in an amount

which will fairly and adequately compensate them for their loss of the care, comfort, society,

companionship, consortium, advice, guidance and support of his or her family members injured

in the August 7, 1999 incident.

## DEMAND FOR TRIAL BY JURY

The plaintiffs hereby demand a trial by jury on all counts so triable asserted above.

ERNEST MESSIER and SUSAN MESSIER,
Individually and as parents and next friends
of DANIEL MESSIER

GERALD PESCARO and KIMBERLY
PESCARO

By their attorneys,

By their attorneys,

Warren E. Fitzgerald, BBO #169360
Jonathan E. Tobin, BBO# 641509
MEEHAN BOYLE BLACK
& FITZGERALD, P.C.
2 Center Plaza, Ste. 600
Boston, MA 02108
(617) 523-8300

Edward C. Bassett, Jr., BBO #033060
Matthew P. McCue, BBO#565319
MIRICK, O'CONNELL DeMALLIE
& LOUGEE, LLP
100 Front St.
Worcester, MA 01608
(508) 791-8500

- 24 -

JOHN PASCONE and KIMBERLY PASCONE,
Individually and as parents and next friends of
JONATHAN PASCONE, ANGELICA PASCONE

By their attorney,

*Edward V. Leja*

Edward v. Leja, BBO# 292880
MORIARTY, DONOGHUE & LEJA, P.C.
1331 Main St.
Springfield, MA 01103
(413) 737-4319

Date:   7. 2c · ᴜ |

{H :PA\Lit'16215-00001\A0475436.DOC}

A



**Incident #: 99-1140-OF**
**Call #: 99-10734**

```
           Date/Time Reported: 08/07/1999 2131
           Report Date/Time: 08/08/1999 2036
               Occurred On: 08/07/1999 2131
                    Status: Incident Open
         Reporting Officer: Lieutenant Steven Draghetti
         Approving Officer: Lieutenant Steven Draghetti
                 Signature:
```

| # | OFFENSE(S) | | A/C | CHAPTER | | SECTION |
|---|---|---|---|---|---|---|

LOCATION TYPE: Other/Unknown          Zone: SOUTH AGAWAM
1623 MAIN ST
AGAWAM MA 01001

| 1 | AMUSEMENT RIDE ACCIDENT | | C | | | |

| # | VICTIM(S) | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|
| 1 | **PASCONE, JOHN** | M | W | 31 | **NOT AVAIL** | **860-774-4405** |

930 BAILEY HILL RD
DAYVILLE CT 06241
DOB: 08/09/1967
INJURIES: Possible Internal Injuries, Other Major Injury, Unconsciousness
ETHNICITY: Not of Hispanic Origin
TAKEN TO: BAY STATE MEDICAL
VICTIM CONNECTED TO OFFENSE NUMBER(S): 1

| 2 | **PASCONE, KIMBERLY** | F | W | 32 | **NOT AVAIL** | **860-774-4405** |

930 BAILEY HILL RD
DAYVILLE CT 06241
DOB: 09/24/1966
INJURIES: Apparent Minor Injury
ETHNICITY: Not of Hispanic Origin
TAKEN TO: BAY STATE MEDICAL
VICTIM CONNECTED TO OFFENSE NUMBER(S): 1

| 3 | **PASCONE, JONATHAN** | M | W | 4 | **NOT AVAIL** | **860-774-4405** |

930 BAILEY HILL RD
DAYVILLE CT 06241
DOB: 02/10/1995
INJURIES: Possible Internal Injuries, Other Major Injury, Unconsciousness
ETHNICITY: Not of Hispanic Origin
TAKEN TO: BAY STATE MEDICAL
VICTIM CONNECTED TO OFFENSE NUMBER(S): 1

| 4 | **PASCONE, ANGELA** | F | W | 9 | **NOT AVAIL** | **860-774-4405** |

930 BAILEY HILL RD
DAYVILLE CT 06241
DOB: 07/20/1990
INJURIES: Apparent Broken Bones, Possible Internal Injuries
ETHNICITY: Not of Hispanic Origin
TAKEN TO: BAY STATE MEDICAL
VICTIM CONNECTED TO OFFENSE NUMBER(S): 1

| 5 | **MESSIER, SUSAN** | F | W | 27 | **NOT AVAIL** | **401-821-2662** |

6 LAWNWOOD DR
CONVENTRY RI 02916
DOB: 02/10/1972
INJURIES: Possible Internal Injuries, Other Major Injury, Unconsciousness
ETHNICITY: Not of Hispanic Origin
TAKEN TO: BAY STATE MEDICAL
VICTIM CONNECTED TO OFFENSE NUMBER(S): 1

**Incident Report**
08/10/1999

**Incident #: 99-1140-OF**
**Call #: 99-10734**

| | VICTIM(S) | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|
| 6 | MESSIER, ERNEST<br>6 LAWNWOOD DR<br>CONVENTRY RI 02816<br>DOB: 01/14/1967<br>INJURIES: Apparent Minor Injury<br>ETHNICITY: Not of Hispanic Origin<br>TAKEN TO: BAY STATE MEDICAL<br>VICTIM CONNECTED TO OFFENSE NUMBER(S): 1 | M | W | 32 | NOT AVAIL | 401-821-2662 |
| 7 | PESCARO, GERALD<br>16 ROBERTS ST<br>SHREWSBURY MA<br>DOB: 11/08/1968<br>INJURIES: Severe Laceration<br>ETHNICITY: Unknown<br>RESIDENT STATUS: Unknown<br>TAKEN TO: MERCY HOSPITAL<br>VICTIM CONNECTED TO OFFENSE NUMBER(S): 1 | M | W | 30 | 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 | 508-831-7435 |
| 8 | PESCARO, KIMBERLY<br>16 ROBERTS ST<br>SHREWSBURY MA<br>DOB: 05/12/1972<br>INJURIES: Possible Internal Injuries<br>ETHNICITY: Unknown<br>RESIDENT STATUS: Unknown<br>TAKEN TO: MERCY HOSPITAL<br>VICTIM CONNECTED TO OFFENSE NUMBER(S): 1 | F | W | 27 | 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 | 508-831-7435 |

| | PERSON(S) | PERSON TYPE | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|---|
| 1 | BAJOREK, KAREN<br>12 EASTWOOD DR<br>NORTH GRANBY CT 06060<br>DOB: 07/08/1980<br>EMPLOYER: RIVERSIDE PARK · 413-786-9300 | WITNESS | F | U | 19 | 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 | 860-653-4292 |
| 2 | FLORES, MARTIN<br>70 CHESTNUT ST<br>SPRINGFIELD MA<br>DOB: 04/23/1976<br>EMPLOYER: RIVERSIDE PARK · 413-786-9300 | WITNESS | M | W | 23 | 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 | 413-788-8592 |
| 3 | LAGUNOWICH, COREY<br>39 KELLY LN<br>HAMPDEN MA<br>DOB: NOT AVAIL<br>EMPLOYER: RIVERSIDE PARK · 413-786-9300 | WITNESS | M | U | 1530 | NOT AVAIL | 413-566-2166 |
| 4 | RUIZ, JASMIN<br>567 SOUTH CANAL ST<br>HOLYOKE MA<br>DOB: NOT AVAIL<br>EMPLOYER: RIVERSIDE PARK · 413-786-9300 | WITNESS | F | U | 1530 | NOT AVAIL | 413-532-8087 |
| 5 | RUIZ, ANA<br>106 LONGHILL ST<br>SPRINGFIELD MA<br>DOB: NOT AVAIL<br>EMPLOYER: RIVERSIDE PARK · 413-786-9300 | WITNESS | F | U | 1530 | NOT AVAIL | 413-736-4673 |

A2

Agawam Police Department
Incident Report

## Incident #: 99-1140-OF
## Call #: 99-10734

| PERSON(S) | PERSON TYPE | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|
| 6   FLORES, CHARLES<br>70 CHESTNUT ST 510<br>SPRINGFIELD MA<br>DOB: 04/10/1978<br>EMPLOYER: RIVERSIDE PARK · 413-786-9300 | WITNESS | M | W | 21 | 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 | 413-732-6011 |
| 7   GAMBRELL, KEEZIA<br>31 WEBSTER ST 2ND<br>SPRINGFIELD MA<br>DOB: 08/04/1979<br>EMPLOYER: RIVERSIDE PARK · 413-786-9300 | WITNESS | F | U | 20 | 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 | 413-736-2639 |
| 8   STANEK, ALICE<br>1520 MAIN ST 12<br>AGAWAM MA 01001<br>DOB: NOT AVAIL<br>EMPLOYER: RIVERSIDE PARK · 413-786-9300 | WITNESS | F | W | 1530 | NOT AVAIL | |
| 9   EVANS, BARRY<br>1520 MAIN ST 2<br>AGAWAM MA 01001<br>DOB: 01/11/1975<br>EMPLOYER: RIVERSIDE PARK · 413-786-9300 | WITNESS | M | W | 24 | NOT AVAIL | |
| 10  JACOBSON, GAIL B<br>93 HANCOCK ST<br>SPRINGFIELD MA<br>DOB: 01/28/1950<br>EMPLOYER: RIVERSIDE PARK · 413-786-9300 | WITNESS | F | U | 49 | 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 | |
| 11  GOMES, LAURA<br>1461 PAWTUCKET BLVD B-2<br>LOWELL MA<br>DOB: 05/02/1971 | WITNESS | F | U | 28 | 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 | 978-970-4905 |
| 12  CALDERWOOD, DOUGLAS<br>1461 PAWTUCKET BLVD B-2<br>LOWELL MA<br>DOB: 10/27/1948 | WITNESS | M | U | 50 | 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 | 978-970-4905 |
| 13  JANUSKA, MATT<br>78 MICHELE DR<br>SOMERS CT<br>DOB: 01/20/1981 | WITNESS | M | W | 18 | 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 | 860-749-0263 |
| 14  DEIDA, ISRAEL<br>39 ORCHARD ST<br>SPRINGFIELD MA<br>DOB: 10/19/1980<br>EMPLOYER: RIVERSIDE PARK · 413-786-9300 | WITNESS | M | U | 18 | 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 | 413-734-4176 |
| 15  BURCELL, LISA<br>47 MILL ST<br>DRACUT MA<br>DOB: 04/08/1970 | WITNESS | F | U | 29 | 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 | 978-957-6991 |
| 16  SULLIVAN, ROBERT<br>47 MILL ST<br>DRACUT MA<br>DOB: 11/08/1968 | WITNESS | M | U | 30 | 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 | 978-957-6991 |

A3

Agawam Police Department
**Incident Report**

**Incident #: 99-1140-OF**
**Call #: 99-10734**

| | PERSON(S) | PERSON TYPE | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|---|
| 17 | MESSIER, ERNEST<br>6 LAWNWOOD DR<br>CONVENTRY RI 02816<br>DOB: 01/14/1967 | WITNESS | M | W | 32 | NOT AVAIL | 401-821-2662 |
| 18 | PASCONE, KIMBERLY<br>930 BAILEY HILL RD<br>DAYVILLE CT 06241<br>DOB: 09/24/1966 | WITNESS | F | W | 32 | NOT AVAIL | 860-774-4405 |
| 19 | PESCARO, GERALD<br>16 ROBERTS ST<br>SHREWSBURY MA<br>DOB: 11/08/1968 | WITNESS | M | W | 30 | 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 | 508-831-7435 |
| 20 | PESCARO, KIMBERLY<br>16 ROBERTS ST<br>SHREWSBURY MA<br>DOB: 05/12/1972 | WITNESS | F | W | 27 | 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 | 508-831-7435 |

| # | OTHER PROPERTIES | PROPERTY # | STATUS |
|---|---|---|---|
| 1 | PHOTOGRAPHS<br>QUANTITY: 24<br>SERIAL #: NOT AVAIL<br>DATE: 08/10/1999 | VALUE: $0.00 | Evidence (Not Nibrs Reportable) |

A4



**OFFICER'S NARRATIVE REPORT**
**Agawam Police Department**

**Reference: 99-1140-OF**
**Officer: Lieutenant Steven G Draghetti**

Saturday August 7, 1999 I was the officer in charge of a detail at Riverside Park at 1623 Main Street. The detail started at 17:00 hrs and continued until the park closed at approx 12 midnight. As part of my responsibility I am assigned a Riverside Park radio in order to be in radio contact with Riverside Park's operation base. At approx 21:30 hrs I heard radio transmissions on the park radio requesting assistance at the Blizzard River ride on the north side of the park. The ride operator was reporting a 2A which means the ride is stuck with patrons on it and maintaince staff was called to assist. This had occurred earlier in the evening and police detail officers assisted park personnel in evacuating patrons from the ride. Within minutes after the 2A was called I heard other radio transmissions coming over the Riverside Park radio. I was not able to make them out but I thought the person's voice sounded fearful. Officer John Kunasek was teamed up with me for the evening and we started to walk down to the Blizzard River ride. No police assistance was requested from operations base or any other Riverside unit at this time. As I got closer to the Blizzard River ride a radio transmission came over the Riverside Radio instructing everyone on the frequency to clear the channel. Another radio transmission requested all Riverside units to the Blizzard River ride. At that time I instructed Officers Marsh and Dymon and Officer Chmielewski and Camerlin to proceed to the Blizzard River ride. Within a minute or so Officer Chmielewski called me on the Agawam Police radio system and requested assistance. The rest of his radio transmission was inaudible. I received a second radio transmission from Officer Chmielewski stated a boat had overturned, there were a number of injured and people were in the water. I instructed Officers Connor and Conlon to also respond.

As I approached the Blizzard River ride, I observed a very large crowd estimated be over a thousand at the entrance. I radioed to Sgt Curry in the Speedway stadium and instructed him to deploy the officers from the speedway to the Blizzard River ride and clear the crowd. As I got to the staging platform where the patrons enter and off load from the ride I could see a boat upside down in the water. There were approx 25 people in the water. As I got closer and looked down from the platform, I observed a small child being handed to Officers Camerlin and Chmielewski. The child appeared to be unconscious. I observed Officer Chmielewski start CPR on the child (later IDed as Jonathan Pascone). I also observed a large male on the ground (later IDed as John Pascone) and CPR was being performed on him by Officer Camerlin and Riverside park personnel. There was also a woman lying on the ground (later IDed as Susan Messier) and Officer Marsh was attending to her. Some of the persons in the water appeared to be injured and Officer Dymon was attempting to help people over the wall and out of the water.

At this time several patrons were screaming that a 9 year old child was still underwater and not accounted for. I radioed police HQ and requested Agawam Fire Dept to respond rescue units. At this point I climbed down to the victims and Officer Kunasek went into the water in an attempt to rescue the child and assist injured persons. Multiple ambulances were dispatched and Riverside park personnel ran some temporary lights to the scene and put more ladders up and some staging.

All victims were extricated from the site and transported to area hospitals. The site was secured by Agawam Police officers. Officers Chmielewski and Connor were assigned to round up the employees that worked on the ride and obtain statements from them. Police hq notified the Dept of Public Safety and the Agawam building inspector.

Inspector Ricahrd Buseni from the Agawam Building Dept arrived on scene along

A5

**Reference: 99-1140-OF**
**Officer: Lieutenant Steven G Draghetti**

arding the incident. Photographs of the site were taken. Det Pfau was assigned to go to the hospitals and check on the status of the victims. After consulting with State Building Inspector Louise Vera, it was determined a police detail would not be needed to secure the site.

The next day August 8, 1999 I went to Baystate Medical Center and spoke with Kimberly Pascone. She gave me a verbal statement but declined to give a written statement. I also spoke with Ernest Messier and obtained a written statement from him. I returned to Riverside Park and spoke with the State Inspectors again and took more photographs.

Witness reports are as follows:

Witness # 1. Karen BAJOREK is an employee at Riverside Park. She reports seeing a woman being pulled out of the trough area of the Blizzard River ride and noticing the boat capsized. She reports problems were developing on the ride such as the computer giving "station drive" errors and that the ride stopped itself without the operator. (see statement)

Witness # 2. Martin FLORES is an employee of Riverside Park and was operating the ride. He stated several boats were stuck and he stopped the ride and called maintaince. He reports the boats were freed and the ride was "running smooth" when it was called to his attention there was someone in the water. FLORES stated he E-Stopped the ride (emergency stop). He noticed the boat upside down and went over to help. FLORES stated he entered the water and with the help of patrons and me other employees attempted to lift the boat. FLORES reached under the boat felt people still strapped in the boat. He assisted in getting them out of the boat. (see statement)

Witness # 3. Corey Lanunowich is an employee of Riverside Park. He arrived to see a woman in the water being assisted out. He reports getting other Riverside employees to evacute the lnes from the staging platform. Corey Lanunowich refers to an incident that occurred earlier in the week when a Shane Riddles ( park employee) was running the rdie through pre-opening safety checks and a boat flipped in the same location.(see statement)

Witness # 4. Jasmin Ruiz is an employee at Riverside Park and was at one of the checkpoints at the water ride. She reports she did not see the boat tip but reports everything seemed normal. (see statement)

Witness # 5. Ana Ruiz is an employee at Riverside Park reports one of the boats stopped and the patroms were rocking the boat. She reports they were told not to rock the boat. She reports hearing someone calling for help and saw the boat was upside down in the water. She reports it was the same boat the patrons were rocking. (see statement)

Witness # 6. Charles Flores is an employee at Riverside park. He was working the Blizzard River ride loading and unloading the boats. He reports a boat was stuck in the first turn. Charles Flores stated he notified Martin Flores who was the ride operator. The ride operator called maintaince and told the people not to move or shake the boat. Charles Flores states the patrons continued to move the . He reports a short while after he heard someone calling for help and saw one in the water and a boat was upside down. (see statement)

Witness # 7. Keezia Gambrell is an employee at Riverside Park and was working the

**Reference: 99-1140-OF**
**Officer: Lieutenant Steven G Draghetti**

zzard River ride. She reports everything was functioning fine and people had their seatbelts. She reports the boat stopped half way between the tunnel and the loading platform and the boat trailing it hit the first boat and flipped the boat over. (see statement)

Witness # 8. Alice Stanek is an employee at Riverside Park and was working at the sky coaster. She noticed the overtuned boat but not what caused it. Home address is 18 Heaton Crescent, Eldwick, bingley, West Yorkshire BDIG 3DP, England. (see statement)

Witness # 9. Barry Evans is an employee at Riverside Park and was working at the sky coaster. He reports boats being stuck at the Blizzard River ride at approx 9:15 pm. and maintaince personnel freed the boats. He reports noticing the overturned boat 15 minutes later. Home address 32 Hedges Close, Shipton Bellinger, Near Tidworth, HANTS, SP97TJ, England. (see statement)

Witness #10. Gail Jacobson is an employee at Riverside park and was working the Blizzard River ride. She reports no problems and noticed the water being to drain and thought the E-Stop had been pushed. She was advised via phone to stay at her station as there had been an accident. (see statement)

Witness # 11. Laura Gomes was a patron at Riverside Park and was standing in line for the Blizzard River. She reports the ride had stopped at approx 9:30 pm and the ride was restarted in 5 minutes. She states 2 minutes after, a woman came floating in the water and saw the boat overturned. (see statement)

ess # 12. Douglas Calderwood was a patron at Riverside Park and was at the exit to the Blizzard River ride. He reports some police officers and security walked up to the exit and left. He states about 3 or 4 minutes later they came running back but did not see what the problem was. (see statement)

Witness # 13. Matt Januska is an employee at Riverside Park ans was working the Blizzard River ride. He states he saw the water draining and called the main station. He was advised that a boat had flipped over. He went to the location of the overtuned boat and went into the water and searched under the boat and in the water. (see statement)

Witness # 14. Israel Deida is an employee at Riverside Park and was working the sky coaster. She did not see the incident. (see statement)

Witness # 15. Lisa Burcell was a patron at Riverside park and was standing in line for the Blizzard River ride. She states at approx 9:30 pm the ride malfunctioned and an engineer reset the ride. She states she saw a woman floating in the water shortly afterward. (see statement)

Witness # 16. Robert Sullivan was a patron at Riverside Park and was in line at the Blizzard River ride. He states at approx 9:45 pm the ride shut down and personnel starting up the ride. He reports seeing a woman in the water and emplooyees threw life preservers to her. Sullivan reports the pumps were still operating until the employees noticed the boat was upside down. (see statement)

ess # 17. Ernest Messier was a patron at Riverside Park and was on the boat overturned on the Blizzard River ride at Riverside Park. He reports boarding the boat with his wife Susan Messier and the Pescone family. Ernest reports there were 6 of them in the boat and another 2 adults were added to the boat brining it

A7

**Reference: 99-1140-OF**
**Officer: Lieutenant Steven G Draghetti**

boat with his wife Susan Messier and the Pescone family. Ernest reports there
e 6 of them in the boat and another 2 adults were added to the boat brining it
to capacity (8 people). He reports bottoming out and getting stuck after going a
short distance. Ernest Messier states he told the Riverside employee to allow him
to switch seats with one of the Pescone children to better distribute the weight.
The employee told him to stay seated and other employees came over and pushed the
boat free.Ernest Messier states they had ridden the Blizzard River ride early in
the day, but this time they took on more water as they went through the ride. He
reports the water was rougher. Ernest Messier reports that approx 200 feet from
the end of the ride as they were approaching the last rapids. He states they
entered the rapid with the weighted side of the boat and it flipped. He managed
to free himself and attempted to rescue the others in the boat. (see statement)

Witness # 18. Kimberly Pascone was a patron at Riverside Park and was on the boat
that overturned on the Blizzard River ride. She states her family and the
Messiers had ridden the ride early in the day. She stated this time the ride was
more agitated and "wild". She states there was more water splashing around.
Kimberly Pascone stated they all had on their seatbelts and suddenly the boat
flipped. She managed to free herself and the current carried her away from the
boat. (Kimberly Pascone was interviewed at Baystate Medical Center and was very
upset. She declined to give a written statement)

Witness # 19. Gerald Pescaro was a patron at Riverside Park and was on the
overturned boat on the Blizzard River ride. He was interviewed via telephone and
gave the following account. Gerald Pescaro and his wife Kimberly Pescaro got on
the Blizzard River rdie. They were put in a boat with 6 other people 2 adult
s and 2 adult females and 2 children (the Pescone and Messier families).
ald Pescaro sat next to the other two adult males and they all were kidding
they were going to get wet because all the weight was on their side. He states
the ride got stuck in the first turn just before the lift. One of the other adult
males unbuckles his seatbelt and wanted to switch places with one of the
children. The ride attendant told him to stay seated and would not let him change
seats. Several maintaince personnel came over and gave the boat a kick which
freed it and they went up the lift and started the ride. The ride seemed fine and
the three adult males got very wet and splashed a lot. They rode the rode mostly
backwards as the boat didn't spin very much. Gerald Pescaro reports as they got
to the last rapid the boat flipped on it's edge with the three men under the
water. He stated it seemd like it took a little time for the boat to totally flip
over as though in slow motion. He stated he released his seatbelt but was trapped
under the boat. He states the boat was spinning while upside down and the current
pulled him along and he finally came up downstream from the boat. He returned to
the boat and heldpt to free the other trapped people. (see statement)

Witness # 20. Kimberly Pescaro is the wife of Gerald Pescaro and was on the
Blizzard River ride at Riverside Park. While interviewing Gerald Pescaro on the
phone she agreed to the events as described by her husband. She added as the ride
flipped and the men were underwater, the boat was on edge and she was up in the
air before the water current rolled the boat over. (see statement)

THE ABOVE REPORT IS TRUE AND ACCURATE TO THE BEST OF MY KNOWLEDGE.

A8

AGAWAM POLICE DEPARTMENT
*681 Springfield Street*
*Feeding Hills, Ma. 01030*

### STATEMENT AND EVIDENCE SHEET

Page 1 of 3

Inc#_____

Date 8/7/99   Time 10⁵⁵ PM   Place Riverside Security Office

My name is Karen Bajcek, I am the lead over Blizzard
River, Sky Coaster, and Cyclone. About one hour before the
incident I had walked through Bliz Main Station to make
Sure things were running smoothly. They were. I proceeded to
check up on the check point stations. All was going
Smoothly. I continued to Sky Coaster and Cyclone. Each
of my rides was running well, and the operators were
doing their jobs as they should. After I checked Cyclone
I was on my way back to Blizzard. I had no
radio so I did not hear the message about Bliz.
proc. As I was walking towards the exit ramp I
Saw Corey Lagimoneich headed up too, about 20' in front
of me, when I walked in I saw some maintenence men
pulling a woman out of the trough in the station.
He told Martin, the operator, to hit the emergency Stop.
He did. Corey imediately called Blizz. Riv. 2-A (broken
w/ people). Over the radio. I looked out down near the Cannery
building and was not prepared to see what I saw.
One boat was completely capsized, one was tipped,
I don't know about the other(s). All I could make
out was a big mess. I went up to the

Witness: Prank R. Conlon #30   Address: Karen Bajcek (signed)   Tel#

A9

**AGAWAM POLICE DEPARTMENT**
*681 Springfield Street*
*Feeding Hills, Ma. 01030*

**STATEMENT AND EVIDENCE SHEET**

● 2 of 3.

Inc# _____

Date 8/7/99    Time 10⁵⁵    Place Riverside Security office

operators Smith and proceeded to direct the guests in
the queue out the entrance by means of the microphone
while other ride operators helped me assist them out.
I saw that Martin was soaked head to toe, I only
assume he jumped in the water after someone. Once the
guests were cleared from the area I helped escort those
that were being rescued to a place to retain them for
witness statements. During the whole time all I could think
about was how this shouldn't have happened. A few
days prior (I can't remember when) something similar
happened, I was not working that day and only heard
about what happened, Three boats jammed up together
near the cannery and broke, I don't know how.
All I know was that those three boats were
decommissioned. The operator that day got yelled at, I know
it was not his fault. The next day the ride was down
for a while and then opened.
        There were problems slowly arising from the morning
until when it all happened tonight. The first problem being
the situation I described a few days earlier, the computer

Signed Karen Bajorek

Witness: Ptlmn R. Conlon #20        Address:        Tel#

A10

*681 Springfield Street*
*Feeding Hills, Ma. 01030*

### STATEMENT AND EVIDENCE SHEET

3 of 3.

Inc#_____

Date 8/7/99    Time 10⁵⁵    Place Riverside Security Office

at Blizzard has slowly been doing strange things. We get "Station drive" errors, I don't know what that means, but I wish I did. There was also a time where it E-Stopped all by itself. No one hit a button, it just stopped. Today, while I was doing a break at Sky Coaster, in the afternoon or early evening, an e-Stop took place. At that time, someone else was in charge of Blizzard (either Corey or Joel), because I was bound to Sky Coaster for a time, I couldn't do anything help. I had to stay at Sky Coaster. I watched as many maintence men evacuated the people on the Stranded boats. I do not know what caused the e-Stop. I can't recall any other incidents that led up to this, but I had a bad feeling about running the ride ever since I heard about the boat pile-up a few days earlier and how the computer has been acting up. I wish this never happened. It shouldn't have happened, and I regret that it did.

Karen Bajorek    Signed Karen Bajorek    A11

Witness: *Prem R. Cowher #20*    Address: N. Granby, CT 0600 Tel# 860/653-4292.

DOB 7/8/80    SSN# 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

**AGAWAM POLICE DEPARTMENT**
*681 Springfield Street*
*Feeding Hills, Ma. 01030*

### STATEMENT AND EVIDENCE SHEET

e _1_ of _2_                                                            Inc#_____

Date _8-7-99_     Time _1030 PM_  Place _Riverside Park_

I had one boat stuck on the first curve of the ride then for
el thoutly the second boat would set it free but it didn't by
the time I had three stuck I stop the machine. I ask
one of the loaders stay on my post without touching
anything called base 3006 and ask for maintence to come
went out and told everybody to remain calm and to keep
seated (they did) so I went back to my post. maintenc
came back out to the site and let the boat free (at that time
maintece and medical services were there with a blond lady That
acts like a man. everything was running smooth in to somebody
said there's somebody in the water. I look and there was some bo
so medical Ass. pick up some life saver. or douguitsuit and I did
and maintece before I letf I E-stop the machine and the
went behind the med.Ser. we went out I on through on of the
duguit to a person with out one as as soon as that Pewer
had one I kept going. I saw the boat Turn and a lot of
people getting off To help when I got there I ask the
lady in a burgende shirt if I should Jump in she said yes
and I started to help out. I put my hand inside the bot
and I could feel people in there. we kept pushing up to git to the
bot to turn it over. it Touk a long time To turn it but it turn over.
People got out and there was nobody left. I saw my Sup went Tours him

Witness:_____     Address:_____     Tel#_____

A12

**AGAWAM POLICE DEPARTMENT**
*681 Springfield Street*
*Feeding Hills, Ma. 01030*

STATEMENT AND EVIDENCE SHEET

e _2_ of _2_ :                                                                              Inc#_____

Date_____ Time_____ Place_____

he saw me. I went Tours the control pannel after

that I was Told To clear the exit and the lines which I

did. after it was so done the Sup. Told me to stay on entrace

and Tell everybody that it was close.

4-23-76

584456014                              MARTIN ELORES

DO CHESTNUT ST

SPFCD  MA

788-8592

Signed

Witness:_____ Address:_____ Tel#_____ A13

**AGAWAM POLICE DEPARTMENT**
*681 Springfield Street*
*Feeding Hills, Ma. 01030*

**STATEMENT AND EVIDENCE SHEET**

Page 1 of 4

Inc#_____

Date 8/7/99   Time 11:01 PM   Place Riverside Security

I, Corey A. Lagunowich, am a rides lead for Riverside Park. On or about 9:30pm (I'm not really sure of the time) I arrived at the Blizzard River ride by way of the exit ramp. The ride had recently been shut down due to a jam up of boats at the bottom of the lift — I had gotten the call about it over my radio. So I was going to check up on things there.

As I reached the operator's control panel I saw three maintenence personell reaching down into the water and grabbing a middle-aged woman in a white shirt out of the water. I immediately screamed the Operator to Emergency Stop the ride, and then called over the radio — "Blizzard River 2a— E-stop pressed." I looked down the river towards the ice house and saw that a boat was flipped over at the last turn. I reached for my radio to call in the emergency but then realized the area was already swarming with Riverside personel (medics + maintenence). They were tipping the overturned boat back and forth, I guess trying to turn the boat upright, I don't know.

I turned to head back down the exit ramp — but saw Brian and (a manager) and other medical personell coming up, so I stayed in the station.

Signed *Corey A. Lagunowich*

Witness: Primus R Corbon # 20   Address:_____   Tel#_____

A14

AGAWAM POLICE DEPARTMENT
*681 Springfield Street*
*Feeding Hills, Ma. 01030*

*STATEMENT AND EVIDENCE SHEET*

e 2 of 4.                                                                Inc#_____

Date 8/7/99      Time 11:12 pm  Place Riverside Security

    After a few moments of arguing back and forth with my employees about what to do next, Karen Bajorek (another rides lead, who had arrived shortly after I did) and I decided to empty out the queue, which means to have everyone in line exit. So I called over to Ana to start having people exit out of line back the way we came - and sent Charles (both Ana + Charles were working the ride) to stand at the Entrance to tell people to start exiting.

    By this time, the woman whom the three maintenence guys were pulling out of the water when I arrived had jumped back into the water. She was heading out towards the overturned boat. I shouted for her to get out of the water - she kept saying "My Baby's down there! I have to find my baby!" A few men grabbed her and pulled her back out of the water.

    Jorel, the Area Supervisor arrived about this time. He kept saying "They knew this was going to happen." He was talking about an incident earlier in the week, Sunday I think, when Shane Riddles, a ride operator, was running the ride through its pre-opening safety checks and a boat flipped in the exact same spot. I didn't witness that though - Shane

Signed Corey A. Zagmowich

Witness: PAUL R. Conboy          Address:          Tel#

*STATEMENT AND EVIDENCE SHEET*

● 3 of 4:

Inc# _____.

Date _____ Time _____ Place _____

had only told me about it a few days ago. That boat was empty.

Anyway, the ride has also gone Sa (a code for down with people on it) earlier in the evening, 6$^{30}$, 7ish, if I remember right. Martin, who was the operator, had pushed the emergency stop because a boat had gotten stuck in the same turn where the boat flipped over tonight. That boat was jarred loose when the boat behind struck it, and everyone was okay. We simply had to evacuate the boats stranded ● t on the river and then restart the ride.

Returning to ~~that night~~ tonight — the same woman who had been pulled from the water twice now was now at the window facing towards the woods. ~~BA~~ I looked out through another window next to it and saw two policemen carrying a child out towards the midway by walking down below near the fence. The woman said it was "her baby." I lost track of her after that.

By this time, Kurt, the main rides supervisor, was down at the bottom of the exit ramp doing crowd control. I started clearing people off the exit ramp; various curious onlookers

Signed *Cory C. Zagnowich*

Witness: P. Hus R. Q. L. #50    Address: _____    Tel# _____    A16

AGAWAM POLICE DEPARTMENT
**681 Springfield Street**
**Feeding Hills, Ma. 01030**

● 4 of 4.

*STATEMENT AND EVIDENCE SHEET*

Inc#_____

Date 8/7/99 Time 11:33 pm Place Riverside Security

and bystanders, I guess. I looked out towards the
lift and saw guests standing on the emergency exit ramp
that is on the lift, and so I called out to Jorel and
told him I was going to get them off.

People were in the water now, treading along, searching
for someone or something and I went to the lift and
got the people there back to the midway At this point,
I just planted myself near the lift, and from that
point on just helped with crowd control.

● The people in the water searched all the way to
the lift and then hopped out and headed back to the station.
From here on, I just helped with crowd control —
getting people out of the North half of the park,
which Jorel told me was shut down + needed to be
emptied.

Signed Corey A. Lagunowich

Witness: Trevor R. Conlon #30    Address: 39 Kelly Lane, Hampden, MA Tel# (413) 566-2166

A17

Case 1:05-cv-11444-NMG   Document 1-5   Filed 07/08/2005   Page 45 of 92

**AGAWAM POLICE DEPARTMENT**
*681 Springfield Street*
*Feeding Hills, Ma. 01030*

## STATEMENT AND EVIDENCE SHEET

_1_ of _1_                                               Inc# _____

Date _8/7/99_    Time _1030_    Place _RiverSide Park_

Ruiz Jasmin   567 S. Canal St #231   Holyoke MA 01040   2-17-74   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

My name is Jasmin Ruiz I was standing in check point 3 when the first bout got stuck people were taken out of the bout and everything was checked we contined to have people ride when everything was back to normal as i was standing in check point 3 i could see how some boats would hit a souting section cever and tip a littel but everything was okay when I whent to boate I so dudnt See we the bout tip over all I heard was the sreoning and crying of the people asting for help help and when they pulled some of the people out may god bless them all

Signed _____              A18

Witness: _Jasmin Ruiz_        Address: _567 So Canal St Hlyoke_  Tel# _532 8087_

**AGAWAM POLICE DEPARTMENT**
*681 Springfield Street*
*Feeding Hills, Ma. 01030*

**STATEMENT AND EVIDENCE SHEET**

e _1_ of _1_ :                                                    Inc# _____

Date _8-7-99_    Time _10:40_    Place _Blizzard River_

I Ana Ruiz was Grouping
Suddley 3 boat stop. One of the
boat that stop they were Rocking
the boat. The Opearter told then please
don't Rocki the boat. So then the
3 boat left. They Suddley I hear
"Help","Help". I told the loader some-
body is in the water that fall. So
when we look the whole boat was
upide down. it was the same boat that
the people was rocking. So when
I saw the people told the loader
Call 3200. And tell them was going
on. They starter to come police,
freefigt, etc. And the starter to take
out the people from the water and boats.
And Searching for more body in the water.

                                        Signed _Ana Kui_ -Ana Ruiz

Witness: _____    Address: _116 Longhill St_    Tel# _736-4623_
                                 _Springfield Mt 01108_

A19

*AGAWAM POLICE DEPARTMENT*
*681 Springfield Street*
*Feeding Hills, Ma. 01030*

### STATEMENT AND EVIDENCE SHEET

● 1 of 1 ·                                                     Inc#_____

Date 8-7-99   Time 1020PM   Place RIVERSIDE PARK   1623 MAIN ST
SPRINGFIELD 01103                        4-10-78
FLORES, Charles D   70 CHESTNUT ST #510   732-6011   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

I was loading and unloading the boats when
one of the boats got stock in the first
curve under the Bridge. and I told
Martin who was the operator by then that
one of the boats got stock he walked
over there and told the peoples not to
Shake or moove the boat, thats when
Martin called Maintenance, when maintenance
●as fixing the ride the peoples in the
boat kept mooving the boat they did not
listen to martin, they move the boat
in to they got it out, like a little
while after that y heard somebody
screaming "HELP, HELP" thats when I told
martin the operator that it was somebody
inside the water and he press t. Stop
right away we went over there and I
saw one boat facing down and ~~some~~
I ran in to the station and call Emergencie
●and they send sombody to the ~~~~ ride
Witness: Edward B Comm #17   Address: X Charls Flos   Tel#

A20

**AGAWAM POLICE DEPARTMENT**
*681 Springfield Street*
*Feeding Hills, Ma. 01030*

### STATEMENT AND EVIDENCE SHEET

_ 1 of 4 .

Inc#_____

Date 8/7/99    Time 10.50 PM    Place Riverside Park

I cannot tell you the approximate
time, that this all occurred but prior to
the boat accident, I was at station 3 at
Blizzard River and the boats were passing
by fine. People were seated accordingly:
seatbelts and so on. The first boat that was
involved in the accident went by my
station fine. As the boat flowed through
the tunnel, it [boat] 1st stopped half way in
between the tunnel and Blizzard Main
station. The second boat that was trailing
behind the first boat passed by my
station fine. The first boat that was stopped
was struck by the second boat which resulted
in the first tilting towards its left side.
There was screaming because someone had
fell out of the boat. The people in the second
boat stood up in order to help, which only
made things worse, because their weight
[the second boat] made the first boat turn
over. Before the — Signed Keezia Gambrell

Witness: Edward B Comm #17    Address:_____    Tel#____

A21

681 Springfield Street
Feeding Hills, Ma. 01030

**STATEMENT AND EVIDENCE SHEET**

e 2 of 4 :                                                                              Inc#_____

Date_____ Time_____ Place_____

first boat turned over, I saw the unloader
& in Blizzard main station run toward
the operator. I had got on the phone but
the phone was busy. I told the next
two boats coming to remain calm and
do not get out because a boat had turned
over. These last two boats were so into the
side that they either didn't hear me
or understood what I said. It is very
difficult for the boats to understand what
I am saying because it is very loud at my
point. So the last two boats enter & through
the tunnel and hit the first two boats.
Everyone is standing on their boats - I am
yelling to everyone to remain seated, but
everyone is trying to help these people in
the water get out. By this time supervisors
and managers & are out there with their
flashlights trying to help these people get
out. I am watching this little child getting
help out of the        Signed  Reezia Ganhull

Witness:_____ Address:_____ Tel#_____

A22

MGA POLICE DEPARTMENT
*681 Springfield Street*
*Feeding Hills, Ma. 01030*

### STATEMENT AND EVIDENCE SHEET

⬤ _3_ of _4_ .

Inc#_____

Date_____ Time_____ Place_____

water and this child's mom or relative is
hugging) and crying. Until that point, I
didn't realize) that this was that serious
until I saw that. This child, was in shock,
and I thought that this kid was unconscious.
I get on the phone again and my supervisor
tells me to stay at my station. People from
the first boat are still in the water by this
point. Medical people are there, and it is
just pure chaos) and no emergency ambulance.
Some people are out the water but there is
at least 2 or 3 people still in the water.
People from the last 3 boats are still
standing) jumping) in the other boats. Super-
visors), security, medical people are helping
these people out of the boats and the water.
The first boat although, is still turned over.
Ambulance come) and I saw them take an
older man out in a stretcher and then all of
the people are out of the boats. I watched
supers, meds, and sec - Signed _Reggie Gambrell_

Witness:_____ Address:_____ Tel#_____

A23

**681 Springfield Street**
**Feeding Hills, Ma. 01030**

### STATEMENT AND EVIDENCE SHEET

4 of 4.

Inc#_____

Date_____ Time_____ Place_____

-urity trying to get theom morture alert boat
that turned over on the right side. It was
chaotic.

Keezia Gambrell                    736 2639
3) Webster St. 2nd fl              8/4/79
Springfield, Mass. 01104           248695870

Signed _Keezea Gambrell_

Witness:_____ Address:_____ Tel#_____

A24

**AGAWAM POLICE DEPARTMENT**
681 Springfield Street
Feeding Hills, Ma. 01030

### STATEMENT AND EVIDENCE SHEET

e 1 of 1                                                                          Inc#_____

Date 8/7/99     Time 9.50 pm   Place Riverside Security Office

I was working on the Sky Coaster at Riverside Park as assistant controller. At around 9.50pm the site controller and I noticed that Blizzard River had a boat up turned on the re-entry to the main station. I could not see any people in the boats besides the upturned boat, but I noticed Matt from ste checkpoint(1) Run down towards the far side of the ride to the path which leads to the far side of the Blizzard River. We continued to operate our ride until given further instructions from a supervisor, therefore I didn't see any changes in the scene "Scene" at Blizzard River, then the emergency services arrived a few minutes later.

Home Address:- 18 Heaton Crescent,
Eldwick,
Binsley.
West Yorkshire.
BD16 3DP
ENGLAND

Print R. Conlon #20

18th November 1978.     Signed _____

Witness: Alice Stanek     Apartment 12, 1520 Main Street, Ferruccios,
Address: Agawam, MA 01001. Tel#___

A25

AGAWAM POLICE DEPARTMENT
**681 Springfield Street**
**Feeding Hills, Ma. 01030**

*STATEMENT AND EVIDENCE SHEET*

Page 1 of 2

Inc#_____

Date 8/7/99    Time 9:50    Place Riverside Park Security Office

I am Site Controller at Sky coaster at riverside park. During the evening 8/7 I was working on H. sky coaster. At approximatly 9:15 I noticed the boats were stuck at beginning of the ride on the blizzard river. Maintainence arrived 5 mins later, freed the boats and the ride continued. Approximatly 15 mins after this I again saw the boat had stopped at the beginning of the ride and on the left. I then looked back towards the end of the ride and noticed a boat was upturned and boats were stacked up behind this. Shortly after this I saw people being pulled from the boats behind and people in the water. (There were lots of people around and I was unable to make out who were staff and who were guests) After all the preceeding boats were emptied I noticed people pulling/lifting the boats around and one boat dropp further into the now drained river. I carried on opperating the Sky coaster untill approximatly

Signed _____

D.oB 1/11/75    Ap 2, ferncias

Witness: BARRY EVANS    Address: 1520, Main St, Agawam Tel#_____

A26

**AGAWAM POLICE DEPARTMENT**
*681 Springfield Street*
*Feeding Hills, Ma. 01030*

**STATEMENT AND EVIDENCE SHEET**

Page 2 of 2                                                          Inc#_____

Date 8/7/99   Time 9:50   Place Riverside Park Security Office

15 mins later until Cory came and told us
to evacuate the area.


Barry Evans
32, Hedges Close,
Shipton Bellinger,
Near Tidworth,
HANTS
SP9 7TS
ENGLAND


PLM R Corbin # 20          Signed [signature]
                    DOB 1/11/75
Witness: BARRY EVANS   Address: Apartment 2, Ferrucias, 1528, Main St, Agawam  Tel#          A27

**681 Springfield Street**
**Feeding Hills, Ma. 01030**

*STATEMENT AND EVIDENCE SHEET*

Inc#_____

Page 1 of 2

Date 8-7-91   Time_____   Place Blizzard River Check point 2

I was at Checkpoint 2 at Blizzard River. It was extremely difficult to see due to excessive mist. (I've worked this before, the mist has never been this bad.) I had climbed up on a rock so that I could see a little bit. & I saw a girl twirling a blue shirt around. She was not whipping it & was seated. From what I could see her seat belt was fastened. Everyone was sitting down.

I fleetingly thought of reporting this (our job is to report any dangerous behavior) but there really seemed to be no problem. Then the water began to drain. I realized that Emergency Stop had been pressed. At the time, I was annoyed: this was the second such occurrence in less than two hours.

My phone rang: all of the checkpoint people are on one line. I picked it up to hear excited voices, screaming, etc. I had no idea who was calling or whom they were calling

Signed (Bobbi Jacobson / Gail Barbara Jacobson )

Witness: Edward B Conn   Address 97 Hancock St Spfld   Tel# none

A28

*681 Springfield Street*
*Feeding Hills, Ma. 01030*

*STATEMENT AND EVIDENCE SHEET*

e 2 of 2

*Inc#*_____

*Date*_____ *Time*_____ *Place*_____

Somewhere abo in this period, Kleijin from checkpoint 3 said there had been an accident, someone was unconscious, and to clear the line, I hung up. However, my phone is broken. Fearing it hadn't hung up + cleared, I dialed 2200 (Emergency #) + reported what I'd been told. They already had the report. I called in to Main Station & was told to clear line, stay at station ", I did so.

Shortly thereafter, Matt from Checkpoint 1 came by. I told him there had been an accident and someone might be someone unconscious. He showed ME roughly and screamed, "Fuck you," and continued running,

I know no more, other than hearsay.

Jacobson GAIL B         1-28-50

93 HANCOCK ST #2      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

SPFLD MA 01109

Signed (Bobbi Jacobson
Gail Barbara Jacobson)

*Witness:*          *Address:* 93 Hancock St, Spfld   *Tel#* none

A29

# AGAWAM POLICE DEPARTMENT
### 681 Springfield Street
### Feeding Hills, Ma. 01030

## STATEMENT AND EVIDENCE SHEET

Page 1 of 1 :                                                                 Inc#_____

Date Aug 7, 1999   Time 10:30 PM   Place Riverside Marketing Office

I was standing in line for the Blizzard River Ride around 9:30 P.M. I was Going to Go on the Next boat. About 5 minutes before that they had stopped the ride and anounced it would be about 20 to 25 minutes til it would start going again. In only about 5 minutes the ride was restarted. About 2 minutes later a women came floating down the rapids screaming. the workers running the ride threw life perservers to her, then I looked down the ride futher and saw one of the rafts completly over turned. I started screaming there's a boat upside down. A few minutes later Police + other park workers arrived and started to rescue the people trapped. Originally when the ride was stopped they only checked things for a few minutes and then restarted the ride, it appeared they only checked the front boat and the boat that flipped was the last boat.

Signed Paula Jomes
034504387
5/2/71
1461 Pawtucket Blvd B-2
Witness: Ptrm R. C. L. #20    Address: Lowell MA 01854   Tel# (978) 970-4905

**AGAWAM POLICE DEPARTMENT**
*681 Springfield Street*
*Feeding Hills, Ma. 01030*

### STATEMENT AND EVIDENCE SHEET

___ / ___ of ___ / ___                                                    Inc# _____

Date 8/7/99   Time 10:30   Place Reverside

I was at the Exit wating for the Ride to
Stop and I Noticed some police and Searit
People Come up to the Crit and Leve and
about three or Four minites Later they
Came Runing Back so I knew there
was a problem. But I did Not Know
what

PTLMN R. Conlon #20            Signed _____

Witness: Douglas T Calderwood   Address: 146 Riverlet t Bul tel# 979.970.490?

10/27/1948            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                    A31

**AGAWAM POLICE DEPARTMENT**
*681 Springfield Street*
*Feeding Hills, Ma. 01030*

**STATEMENT AND EVIDENCE SHEET**

Riverside                          Inc#_____

_1_ of _1_

Date 08-07-99  Time 10:00  Place ~~~~~~~~~~~~

I ~~~~~~~~ saw the water drain
out I called in to main station
they told me a boat flipe over
I ran from my station at check
point one) ~~past~~ I ran past points
2 and 3. Tward where the fliped Boat
I got there and got 7 people
Kept screamming that a (9) Nine year
old ~~g~~ black girl was missing
so I took off my shirt and shoes
and jumped in the water and
started searching under Boats
to try and find any one that might
Be stuck under there I found
no one under the Boats so I unloaded
the last boat of strandees then
I got out of the water and got
dressed and came here.

Print R. Cabe # ~~~~
Matt Janusson          01-20-81    045-74/717
                    Signed
                    79 Michae DR
Witness:            Address: Somers CT    Tel# 860 749 021

A32

# AGAWAM POLICE DEPARTMENT
### 681 Springfield Street
### Feeding Hills, Ma. 01030

## STATEMENT AND EVIDENCE SHEET

_1_ of _1_

Inc# _____

Date _9-7-99_   Time _10.48 pm_ Place _Riverside Park_

I Isrrel Deida was the flight suifer at the Sky Coaster on Saturday the 6th of August. I was suiting people in to get on the ride when I heard people saying that one of the boats at blizzard river had tipped over, and couldn't find one of guest, Then I heard the firetrucks Ambulances. Once I heard that then I considered it true. So I just kept doing my until my seperviser come over and shut the ride down.

DOB        S.S.

Israel Deida, 11-19-80 , 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

Signed _Israel Deida_

**AGAWAM POLICE DEPARTMENT**
681 Springfield Street
Feeding Hills, Ma. 01030

### STATEMENT AND EVIDENCE SHEET

____e ____ of ____                                    Inc# _____

Date __8/7/99__ Time __10:30pm__ Place __Riverside Marketing__

At about 9:30 or so was next in line for Blizzard River raft ride. Witnessed the whole thing. The ride malfunctioned about 5 minutes before -- nothing was checked at all -- engineer came over and just reset the ride.. we saw a woman floating down -- the boat upside down -- the kids operating the ride threw floats at her -- nothing else. The officers responding to the scene walked slowly down at 1st.. it appeared they turned back away from scene then 3 minutes later ran to scene. There was really no way Casity to respond but the workers didnt respond to the injureds needs in a timely manner at all

Lisa. Burcell

Signed __Lisa Burcell__                    A34

Witness: __Frank R. Cullen #30__    Address: __47 mill st. Dracut MA 01826__ Tel# __978 952 6991__

DOB __4-8-70__    034502848 SS#

AGAWAM POLICE DEPARTMENT
*681 Springfield Street*
*Feeding Hills, Ma. 01030*

STATEMENT AND EVIDENCE SHEET

_____ of _____          Inc# _____

Date 8 - 7 - 99   Time 10:30   Place Riverside Marketing Office

Witnessed accident that occured at Blizzard River at approximately 9:45 PM on 8-7. Witnessed ride shutting down. and personel trying to start up ride without investigating reason for shutdown. With all rafts that came in with ride shutdown, last raft was ready to go out from pile up a woman came floating into dock. There was no immediate response to problem and after life preservers were thrown no one gave her a hand getting out. Meanwhile pumps continued running until after the employees noticed raft upside down in water.

Operators of ride were children (teenagers) not properly taught incase of problems like this occured.

Frank R. Carlone #20

Signed _____

Witness: Robert A Sullivan Jr   Address: 47 Mill St  Agawut Tel# 978- 957-6991
                                                              MA
                                                              01826
11-8-68   SS# 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                                     A35

**AGAWAM POLICE DEPARTMENT**
*681 Springfield Street*
*Feeding Hills, Ma. 01030*

### STATEMENT AND EVIDENCE SHEET

Page 1 of 2

Inc# _____

Date 8/8/99    Time 1:15 pm    Place BAYSTATE MEDICAL CENTER

I, ERNEST MESSIER, WAS AT RIVERSIDE PARK ON

SATURDAY AUGUST 7, 1999. WITH MY WIFE SUSAN AND FRIENDS

John PASCONE HIS WIFE KIMBERLY AND THEIR TWO CHILDREN.

WE WERE RIDING THE BLIZZARD RIVER RIDE AT ABOUT 9:35 pm

WE LOADED ONTO THE BOAT AND TWO OTHER ADULT PASSENGERS

WERE ADDED INTO OUR BOAT. THE BOAT WAS AT

CAPACITY WITH EIGHT PEOPLE. WE STARTED TO GO A SHORT

DISTANCE AND WE STOPPED, BOTTOMED OUT. I, ERNEST

MESSIER TOLD THE RIVERSIDE EMPLOYEE FOR THE RIDE TO

ALLOW ME TO SWITCH SIDES TO HAVE A BETTER DISTRIBUTION

OF THE WEIGHT. AT THAT TIME HE TOLD ME TO STAY

SEATED AND OTHER EMPLOYEES CAME OVER AND PUSHED US

TO GET US GOING AGAIN. WHEN WE WERE STUCK IT WAS

ON MY SIDE. DURING THE RIDE WE TOOK ON MORE WATER

THAN THE FIRST TIME WE RODE IT. THE WATER WAS ROUGHER,

ABOUT 20' FEET FROM THE END OF THE RIDE WE WERE

APPROACHING THE LAST RAPID MY BACK WAS TO IT AND I

WAS LOOKING OVER MY SHOULDER. I COULD SEE THE

DIP IN THE WATER AND COULD FEEL US GOING OVER. I

RELEASED MY SEAT BELT WHILE UNDERWATER AND CAME UP TO

Signed Ernest G Messier

Witness: [signature]    Address: 6 LAWNWOOD Rd Coventry R.I. 02816

Tel# 401-821-2062

A36

**AGAWAM POLICE DEPARTMENT**
*681 Springfield Street*
*Feeding Hills, Ma. 01030*

### STATEMENT AND EVIDENCE SHEET

ge 2 of 2                                                              Inc#_____

Date  8/8/99    Time  1:15 pm    Place  BAY STATE MEDICAL CENTER

THE SURFACE. THE RAPIDS PULLED ME AWAY FROM THE BOAT,

I WAS SCREAMING FOR HELP. OTHER PATRONS FROM THE

OTHER RAFTS JUMPED INTO THE WATER TO HELP. WE WERE

ABLE TO GET THE RAFT LIFTED ENOUGH TO GET THE OTHER

PEOPLE OUT. JONATHAN AND SUSAN WERE UNCONSCIOUS.

WE GOT THE PEOPLE OVER THE WALL

Signed  _Grant E Messer_

Address: 6 Townwood Rd Coventry  RI. 02816   Tel# 401-821-7662

Witness: _____

A37

08/11/99    07:22    AGAWAM POLICE DEPT → 15083932060    NO.273    D02

**AGAWAM POLICE DEPARTMENT**
**681 Springfield Street**
**Feeding Hills, Ma. 01030**

### STATEMENT AND EVIDENCE SHEET

Page 1 of 2    Inc#_____

Date 8/12/99    Time 1:45 pm    Place My Home

We boarded the ride approx. 9:15 pm. There were already six people seated in the raft when we were told by the attendant to get on that raft. We went approx 15-20 ft before on the raft, just before the incline to bring you up and drop you in the rapids we got stuck. It seemed to be stuck on the side where there were 2 large men and my husband. One man stood up and said he was going to switch seats with one of the children. An attendant came over to us on the side of the ride and told the man to sit down it has nothing to do with the weight distribution he said "It's my ass on the line if we get hurt." He said he had called maintenance and that they were on there way it would only be a few minutes. Maintenance showed up looked over the wall at the raft and kicked it which unstuck us immediately and sent us on our way. The ride was pretty routine except that the raft was not spinning around as it had on our previous rides, and the mans side was constantly getting soaked because they were the ride backwards almost the entire time.

— continued —

Signed _____

Witness: _____    Address: _____    Tel# _____

A38

08/11/99    07:22    AGAWAM POLICE DEPT → 15083392060    NO.273    P02

**AGAWAM POLICE DEPARTMENT**
**681 Springfield Street**
**Feeding Hills, Ma. 01030**

**STATEMENT AND EVIDENCE SHEET**

Page __2__ of __2__    Inc# _____

Date __8/12/99__    Time __1:45 pm__ Place __my Home__

We had come almost to the end when we saw this
"hole" in the waters and the mens side hit it first
and the boat immediately tilted into the "hole".
The boat stood straight up on its side and we went
over. I started to shimee out of my seat belt but
my foot got stuck, meanwhile the water was
still rushing in along because I was getting tossed
all around under the boat. Then the water seemed
to calm, I was able to get an air pocket under the
boat a couple times before I was knocked under again.
I then popped up (still in darkness) I thought
maybe I had found the inside of the raft. I then
remember something coming down and pushing me
back under. The next thing I remember was seeing
light and hearing screaming and looking up
and seeing an asian man pulling me out asking
if I was o.k. I then began screaming for my
husband, but I did not know he was already
~~even~~ out on the other side of the boat. He then
jumped up on the wall and into the water where
I was standing    Signed __Kimberly A Ascaio__    8/12/99

Witness: _____    Address: __16 Roberts St__    Tel# __508-831-7435__
Shrewsbury, Ma

A39

Riverside Accident    **AGAWAM POLICE DEPARTMENT**    Jerry Pescaro
**681 Springfield Street**
**Feeding Hills, Ma. 01030**

**STATEMENT AND EVIDENCE SHEET**

Page 1 of 4                                                Inc#_____

Date Aug. 15, 1999 Time 10:00 pm Place Home

we had handicapped bracelets because we were part of a
cancer organization that day, which allowed us to go on
the rides w/out waiting in line. There were 6 people already
seated on raft so we were told to sit in the 2 empty seats
on that ride. We were joking that we are going to get wet on the
heavy side, then talked about the blue bracelets Kim and I
were wearing (handicapped bracelets) Then we got stuck at
the beginning of the conveyer belt, sat there, got bumped by
the next raft, then they got bumped by the next one. Then
the 300lb guy got up to change seats with one of the little
kids because he thought it was the weight of the 3 guys
together. The attendant said to sit down you can't get up
on a ride. He sat right down. The attendant said it had
nothing to do with the weight, the maintenance people are
on their way. It's my butt on the line is you get hurt so stay
seated." So we waited talking + laughing w/ each other. The
maintenance people came. one got on the wall to look over
at the boat, he then kicked it and we went up the conveyor
belt and started the ride. Me and the heavy guys were
always looking backwards at the ride (we weren't turn on

*written by Jerry Pescaro
*copied over by Kim Pescaro ) Signed Jerry R Pes_____
(so it could be read)
Witness: Kim Pescaro    Address: 116 Roberts St    Tel# 508-831-7435

Shrewsbury MA

A40

Riverside Accident                                          Jerry Pescaro

**AGAWAM POLICE DEPARTMENT**
*681 Springfield Street*
*Feeding Hills, Ma. 01030*

**STATEMENT AND EVIDENCE SHEET**

Page 2 of 4                                                    Inc# _____

Date 8/15/99 ____ Time _____ Place _____

like we had done the previous rides before) The heavy side
was getting soaked. Got to the last rapid saw a big hole
in the water, just thought we were going to get soaked. Then
the me and the heavy guys went under water immediately.
The boat flipped over and we were going upside down still
in our seatbelts spinning and going down the rapids.
Kept thinking I'm going to get my head ripped off, saying
to myself this is a ride. It's got to flip back over, said to
myself "This is how I am going to go." Thought of my seatbelt
undid it and still could not get out, kept bouncing off the
boat and rails. Then my arm got caught on something and
then I gave up (said goodbye to my family) and then
don't know if I passed out or the rapids were shut off
because it got very calm and somehow I floated out from
under the boat. I came up near the beginning of the
convex belt to get off ride, came to and went to help
lift boat up, but couldn't lift it very much. Dropped
it, more people jumped in water from other raft and
helped lift up boat (young Asian kids) An Asian kid
pulled my wife out on the other side of the boat, she said.

Signed _____ R. Reu____

Witness: _____ Address: _____ Tel# _____

A41

Pesaro

3 of 4

8/15/99

still could not find her until I heard her screaming my name hysterically. I was still on the other side of the boat. I climbed the wall and jumped back in the water on the other side, hugged her and made sure she was O.K. She was in shock and just kept mumbling. Went back to help the people in the water. I had someones body under the water, I tried to get the seatbelt undone, it would not release. Then more people came and said they could handle it, then I went back to my wife. Then I helped to lift out the 400 lb guy over the wall. Then helped my wife and I. Her legs were very weak, then I asked her if I was bleeding and she looked very concerned so I lifted my shirt (which we later saw was all red on the right side) there was a big deep hole under my armpit area so she got hysterical again. Then an EMT came by and help us climb the rest of the walls to get out, then we had to climb through a hole to get out where the attendants were. We were brought to an ambulance after stepping over 2 bodies they were working on. As we were walking to the ambulance, the mother and 2 children (who were on a stretcher) were at the ambulance next to ours. The mother looked over and said "Thank god you two are all right, Have you seen my husband?" My wife thought to say "no, they rushed us out". Knowing we had just stepped over her husbands lifeless body. Then we went into the ambulance, got blankets, some guy then came over and said "Did you guys swallow any water?" We said 'yes'. Then he said "we must go to the hospital immediately because our lungs could fill up and shut down. Within an hour." No Vivendi employee ever came over the entire time we were in the back of the ambulance w/ the doors open. Went to emergency room. Called family to let them

signed: _____

pg. 4 of 4

8/15/99

know we were alive . we got checked in, seen by doctor
then they stitched me up. a rep from Riverside
called the nurses station to see if we needed a
ride back to park to get our car. (about 12:45 am
we said, "NO" family was driving from Northboro to
get us . we then were discharged and waited in
waiting area for our family to pick us up. Two
reps from Riverside showed up. one of them
talked (Eric Fluet - sales coordinator) said he had
heard about the accident, they had called him
down from Hampton, said he was glad to see
we were O.K . and handed us his business card
and said to be in contact w/ them he had
written down a name on the back of who we
should be in contact with (Tom Edgar) if we
needed anything. Kept saying "please be in contact.")
Our family showed up, we were getting directions
to go home and the Agawam detective showed
up and said he just needed our names, address,
phone # and social security #'s and said he
would be in contact w/ us in a couple days.
He said he didn't want us to have to re-live
the accident so soon. went to Riverside to pick
up our truck (someone drove it home for us), ⬛⬛⬛⬛
my brother.
    * Lost wallet in water during accident.            )
    * No-one from Riverside has even called us         )
       or been in contact with us.                     ⬋

                                        * called several
                                          times, say they
                                          don't have it.

                     signed : _Judd R Ree_

A43

Ana Ruiz
106 Longhill St #3A
Springfield MA
Telephone:                01108
           736-4623

Jasmin Ruiz
567 so canal St
Holyoke mass 01040
      532 8087

Ride op



·POLICE DEPT.

R. S. P.

✳ CALL RECEIVED BY OPS BASE    2127
✳ R.S.P.   AMBULANCE   ARRIVED    2134
✳ R.S.P.   AMR AMBULANCE  DISP.   2130
✳ A.M.R.  AMB ARRIVED ON SCENE   2140
✳ A.F.D.   ARRIVED AT R.S.P.      2134

A44

CHUCK DAVIS
DIRECTOR MAINT.

Field Notes

Blizzard River Post
OFC. FAIRCHILD, ERIC 1084
8-07-99
Upon my arrival @
2315 the following persons
were present:
- Chief Cambell (APD)
- Mark Phan (APD)
- LT Drewlithi (APD)
- Det. Poggi (APD)
- Det Diamond (APD)
- Chuck Davis (Maint Dir) RSP
During my Tour the
following Persons Arrived
- Rick Bosini (Blds Dept)
- Sgt. Carry (APD)

Blizzard River Post Page 2
8-07-99 Incident Log
- Jason Freeman (RSP)
- Tom Edgar
- Brian Conner (APD)
- Conlon (APD)
- Cory Rowan RSP Amatos

Charles Flores
70 Chestnut st  # 510
Spfld. Ma  01103
413 - 732 - 6011

Martin A. Flores
70 CHESNUT ST. #521
Spfld MA. 01103

413 - 788 8592

RIDE OP

A45

Harvey Gregory    11-1-81
R-y  Sn. Lawrence    7-15-80
Darling, Floyd    3-14-63
11:50 P.M.

couple { John Pascave    one cat        *
         Kin Pascane

couple { S. Messier    over cat    PR *
         E. Messier -

Bill Shratton ppsame    5    note    o.k.
fd Stradble Angelin    Pascane    a    Abithel

Cheetham
        Mercy            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
Ampr { Pesearo, Jerry    11-8-68    H   Discardthy
        Prscare, Kinbury    5-12-71    W
        Patterson                    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
        16 Roberts St.
        Shrewsbury, MA
        508-831-7435

9:45pm

A46

Louise Vera — State Building Insp.

Henry Gedyk — State Engineer

Henry Moire — State Engineer

Richard Bussani — Actnam Building Insp.


Victims @ BSNC                    8-9-67

* John Pascone        code victim    4209              930 Bailey Hill Rd
  Kim Pascone         minor inj.   9-24-66             Dayville, CT 06241
  Jonathan Pascone  age 5  2-10-95  4162               860-774-4405
  Anabela Pascone      7-20-90      4162


* Sue Messier   2-10-72              6 Longwood DR.
  Eddie Messier  1-14-67             Coventry, RI 02816
                                     401-821 2662

Kimberly Pascone        @ BMC    8/8/99

previous Ride   earlier in day
the 2nd Ride   more agitated   "wild" Active
All persons were briefed
everything Seemok
Boat just Flipped
Freed herself

_____

ERNEST    Messier        @BMC

Boat GOT Stuck Before the lift  "Bottomed o::
thought there was too much weight on one side
Asked Ride personel to switch seats
   was told NO   stay in seat
employees pushed Boat Along
could see water curl at 1st Rapid
Approached Heavy side to Rapid was
looking over shoulder
Boat flipped when entering Rapid

~~Kimberee~~
ERnest ~~Messier~~
Kim Pascone
John Pascone
Susan Messier

plus 2 unk Adults
same side

2 Pascone children

A48

16 Roberts St

RT Arm
- Bruises
- Concussion
- Bruises

Gerard Pescaro
Kimberly Pescaro
1/h 508-393-2060

Handicap passes          went in exit

6 people on Raft    +
we are going to get all water this side
All men sitting together
Struck @ 1st turn before lift
other person unbuckled & wanted to
change seats.
Attendant told them to stay Seated
Maintaince people. Gave Kick
went up conveue
Ride seemed fine  A lot water splashed
Got to last Rapid   & Flipped on
    stood sitting up
edge   & seemed like slow motion
came over on top.
Released seat belt not Able to
get out was Stuck
current carried away
lifted Boat up to free Boat
Helped Free people.
transport to    Hospital

A49

| | 09:00 - 15:30 | 15:30 - Close | | 22:00 - 02:00 | 20:00 - 02:00 |
|---|---|---|---|---|---|
| P5 | 1) Lottermoser | 1) Aux | | 1) Aux | 1) Aux |
| P6 | 1) Pfau | 1) Aux | | | |
| P7 | 1) Poggi | 1) Aux | | | |

| | 12:00 - 16:00 | 16:00 - Close |
|---|---|---|
| ● P5 | 1) Ceccarini | 1) Aux |

| | 13:00 - 17:00 | |
|---|---|---|
| Mid | 1) S/ Gallerani | 2) Chmielewski |

| | 13:00 - 19:00 |
|---|---|
| I/K | 1) Niles |

| | 15:00 - Close |
|---|---|
| Mn Gate | 1) Parrelli    2) Fairchild |

**17:00 - Close**

Mid   1) Lt Draghetti 2) Dymon 3) Marsh 4) Chmielewski
5) Camerlin 6) Connor 7) Conlon 8) S. Grasso
9) Brown 10) Kunasek

G'std   1) S/ Curry 2) Burke 3) Gillis

Pits   1) Brunelle   2) A. Grasso



Chm / Carneeln

2ng Mrzs h/ Dy. May

1A  S. GRASSO
    Brown

2A  Connor
 B  Conlon

3A  Chmielewski
 B  Camerlin

4A  Dymon
 B  Marsh

enter  5/53  KUNASEK

MINGATE A  Parelli
        B  Fairchild

5A  Aux Scoville
 B  Aux Wheeler

6 ●  Aux Dorvah

7   Aux Porier

IK — Niles

STADIUM  A  S/ Curry
         B  Burke
         C  Gillis

Pits    A  Brunelle
        B  (A. Grasso)

Chmielewski
Ride Opers.

Connor
Statements

Dymon
security

Build INSP — notify
Scott Pole — notify

① 3 injured

② Small child — cpr   STAH

③

A50

Chm / Canechi

Jason / Greg
absent

Problem - Rise 90.
Help

Chm
Canechi
CDR

PFAU Barnes for FATSAY

Luis Vera

DPS

Henry Moore

Kunasek — water

Quo-Tom incident

Chm
Canechi
Conlon

Bennello
Burke
Fairchild
Gill
Connor

A51

B

*The Commonwealth of Massachusetts*

*Department of Public Safety*
*One Ashburton Place, Room 1301*
*Boston, Massachusetts 02108-1618*
*Phone (617) 727-3200*
*Fax (617) 727-5732*

ARGEO PAUL CELLUCCI
Governor

JANE SWIFT
Lieutenant Governor

JANE PERLOV
Secretary

JOSEPH S. LALLI
Acting Commissioner

August 10, 1999

To:     Joseph S. Lalli, Acting Commissioner

From:   Mark F. Mooney, Assistant Chief of Inspections

RE:     Preliminary Investigative Report
        Riverside Park River Raft Ride Accident

On Saturday, August 7, 1999 at 9:29 p.m. a raft on the Blizzard River ride flipped over at
Riverside Park, Agawam. Local Police made calls to the State Police to request assistance of the
Department of Public Safety in the investigation of the accident. State Building Inspector Louise
Vera, District Engineering Inspectors Henry Geryk and Ralph Moore responded to the park that
evening.

Six of the eight occupants of the raft were rushed to the hospital with injuries ranging from
critical to two who were treated and released. The passengers were floating down an artificial
river in a large round raft, which have eight (8) seats attached to the inner edge. Towards the end
of the ride, the raft approached two final turns where the fiberglass and rubber raft overturned.
The occupants of the raft were immediately trapped upside down in approximately two and a half
(2 ½) feet of water. The ride operator witnessed the accident and immediately activated the ride's
emergency stop switch and called for assistance.

On Monday, August 9,1999, myself, State Building Inspectors Joseph McEvoy and Louise Vera
and District Engineering Inspector Ralph Moore visited the site for a followup visit to determine
additional facts surrounding the accident.

Estimated Weight Distribution

The Department has not been able to reach the ride
operators/mechanics or victims to obtain statements. We are also
awaiting the Agawam Police report for additional information
regarding the victims.



Based on second hand information and a preliminary review of the
accident site, it appears that the occupants of the ride were not
loaded evenly as shown to the right. Because actual weights are
not available at this time, this can only be speculated.

Below is a diagram of the section of the ride where the accident occurred, with a probable schematic of the path of the raft. It appears that on the last banking turn the raft rode high on the bank due to the suspected unbalanced loading. As the raft began to decend off the bank, late in the turn, it appears to have been prevented from returning to normal horizontal position due to the raft guide rails located on the floor of the trough in the last section of the ride. Although interview with the victims will produce the actual details it appears that the force of the water pushed the vertical raft further downstream causing the raft to roll slightly until the center of gravity was raised to the point where the raft tipped over.



In March 1999, another river raft ride inverted in Texas killing one person. In response to that accident, Riverside officials instituted the following changes in an attempt to prevent a similar accident:

1. Ride operator stations throughout the ride were equipped with emergency stop buttons.
2. Water stabilization indicator lights to tell the operator when it is safe to enter the water after an e-stop has been hit were installed.
3. Water rescue equipment was purchased for each operator station. This included life jackets, 1 ring buoy, 1 life hook, 1 rescue can, and 1 rescue bag.
4. Shallow water line search chain procedures were instituted.
5. Training for all team members on the use of all equipment and on all procedures pertaining to a water rescue.

Riverside Park has closed the ride pending testing with weights to replicate the accident to determine actual cause. The Department will provide assistance and guidance as requested.

A final report with photos will be written when final determination of the cause is made.

C



| | Issuing Entity: | Bulletin No.: ODHA 00-1  rev. |
| --- | --- | --- |
| **HOPKINS**<br>*amusement rides world wide* | O.D. Hopkins Associates, Inc.<br>2 Whitney Road<br>Penacook, NH 03303<br>USA<br>Phone (603) 753-1012<br>Fax (603) 753-1109 | 1<br>Release Date:  3/28/00<br>Effective Date: 3/28/00<br>Supersedes:<br>Completion Date:  3/28/00<br>Page:                    1 of 2 |

# SERVICE BULLETIN

**Ride Manufacturer:** O.D. Hopkins Associates, Inc.    **Affected Production Dates:**  1988-
**Present   Ride Name:**  River Raft Rides      **Affected Serial Nos.:**  19001-19019
**Abstract Of Issue:**    Steps to be taken in order to help reduce the possibility of rafts becoming hung
up on the ride and potentially overturning.

**Reason for Release:**   During the 1999 operating season, several incidents occurred on raft rides
where rafts carrying guests turned over on the course of the ride.  One incident, not involving a
Hopkins ride, resulted in a fatality.  The other incidents, one of which occurred on a Hopkins' raft
ride, did result in injuries.

**Action To Be Taken: (Inspection, Modification, Replacement, NDT, Order Parts, Manual
Revision, Procedural Change, etc.)**  See information, text and drawings set out below.

## Detail Of Issue:
## (Text/Drawings/Schematics)

Effective immediately, all owners and operators of Hopkins raft rides are directed to adhere to the
following operating procedures and to make modifications to their ride equipment as applicable.
Failure to comply with the instructions set out in this service bulletin could lead to serious injuries or
death.

Please note that items #1 through #6 were issued as Service Bulletin ODHA 94-2 in August 1994
and are found in Hopkins' Operations Manuals.

1.    In the event a raft becomes hung up or jammed anywhere on the ride, the Emergency Stop
      button MUST be immediately activated.  A stopped raft out on the course of the ride is an
      unusual event that can lead to serious consequences and injury.

2.    Your ride was manufactured in accordance with the American Society of Testing Materials guidelines
      that sets out an average passenger weight of 170 pounds.  The capacity of your

C1

raft is 1,360 pounds for an eight-passenger raft and 1,020 pounds for a six-passenger raft. **DO NOT OVERLOAD YOUR BOATS.**

3. Operators must balance the load in the boats. Adults and other large individuals should be seated across the boat from each other in such a manner as to balance the boat as evenly as possible.

4. It is critical to maintain the original water levels established at the time Hopkins set up your ride. If the ride is run with water levels that are higher or lower than set by the manufacturer, boats can get hung up on trough walls, guides, underwater rails or other equipment. Should you need information regarding the proper water level for your ride, contact Hopkins before running your ride.

   We recommend that you mark the walls of the trough near the main pump pit to clearly show the proper operating and non-operating water levels. A second set of marks should be placed in such a position that they are visible to at least one ride operator in the station area. Water levels must be checked at regular intervals throughout the operating day.

5. With your water level set properly and with the pumps running, verify that all guide rails or other guide devices extend above the water a minimum of eight inches.

6. You must provide a sufficient number of operators stationed around the ride to allow the entire course of the ride to be under observation at all times. Leaving any areas of the ride unobserved, or with blind spots, is unacceptable and could lead to a dangerous situation should an un-ordinary event take place out of view of operations personnel.

7. Lead in ramps should be added to all weirs with a diameter of six inches (15.24 cm) or greater. For all standard length weirs, three such ramps are required. **(See attached schematic.)** The maximum diameter weir allowed on Hopkins' rides is eight inches (20.32 cm). Any weirs larger than eight inches are not supplied by Hopkins and must be removed.

8. The wooden guides on the trough walls must extend to within 12 inches from the bottom of the trough in order to reduce the possibility of rafts lodging under these guides. In addition, to reduce the possibility these of the wooden guides which are anchored to the trough walls from popping out, vertical tie downs, also anchored to the trough walls, must be added. **(See attached schematic.)**

9. Hopkins continues to recommend that seat belts be used on the rafts, even if your rafts are equipped with Hopkins' exclusive "grab bars". We strongly recommend the aviator type seat belt because of its ease of use. Velcro type belts are acceptable. We recommend against the use of "push button" type seat belts. Seat belt extenders for larger patrons should not be used.

Should you have any questions concerning any of the requirements of this service bulletin, or if you are unsure of the applicability of any portion of the bulletin to your particular ride, please contact the Manager of Customer Service at (603) 753-1012.

D

*Department of Public Safety*
*One Ashburton Place, Room 1301*
*Boston, Massachusetts 02108-1618*
*Phone (617) 727-3200*
*Fax (617) 727-5732*

EO PAUL CELLUCCI
Governor

JANE SWIFT
Lieutenant Governor

JANE PERLOV
Secretary

JOSEPH S. LALLI
Acting Commissioner

December 27, 1999

Mirick O'Connell
70 Franklin Street
Boston, MA 02110-1313
Att: Matthew McCue

RE: Riverside Park

Dear Mr. McCue:

In response to your recent request for information, enclosed please find the most recent records the Department has on the Riverside Park accident dated August 7, 1999.

If you have any questions or need further information, please feel free to contact me.

Very truly yours,

Dianne M. Wallace
Director of Administrative Services

Enclosure

D1



• New England's New SuperPark •

Following is a list of changes that were made to the River Rapids "Blizzard River" ride at Riverside Park, Agawam, MA.

1. Changes were made that influence the water dynamics of the ride.

   - Turbulator placement, style, and quantity were adjusted in areas where the trough contours transitioned from fast to slow elements of the ride.
   - A bypass opening was added to divert water from the station approach area.
   - The angle of the trough bottom was altered in two areas to help guide boats through water flow transition areas.

2. Anti-sinking rails mounted in the bottom of the trough were adjusted to provide better transition to the station approach and lift approach areas.

   - The rail starting point was moved further downstream into a deeper and less turbulent area of the trough.
   - Lead in ends for the rails were changed to have a lower pitch angle terminating as close as practical to the trough bottom.
   - A third rail was added to the curved section approaching the station.
   - The rails were adjusted to improve the water depth over the rails

3. Guide fences in the flow transition areas were altered to provide better directional control of the boats.

   - Fences were repositioned to have a lower pitch angle relative to the water flow.
   - Additional lower guide boards were added.
   - Smooth plastic facing was added to the guide boards.

4. Additional enhancements were made to assist operations and maintenance.

   - An additional sensor was added to monitor operational water level in the station.
   - Guards protecting the turbulators were changed to an OEM design.
   - Ride control software was modified to include the station water level sensor.
   - Observation cameras were added to allow operators to monitor the ride area.
   - Signage was reviewed for content and clarity.

11-02-99 08:05   TO:DEPARTMENT OF PUBLIC SAFETY   FROM:14134431853

D2