## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| **SIX FLAGS, INC. and** | ) |
| **TIG INSURANCE COMPANY,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )    **Civil Action No. 05-11444 NMG** |
| | ) |
| **STEADFAST INSURANCE COMPANY,** | ) |
| | ) |
| **Defendant.** | ) |

_____)

### AFFIDAVIT OF PETER G. HERMES IN SUPPORT OF STEADFAST INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

I, Peter G. Hermes, am an attorney admitted to the bar of the Commonwealth of Massachusetts and the bar of the United States District Court of Massachusetts. I represent Defendant Steadfast Insurance Company ("Steadfast"), in the above-referenced case. True and accurate copies of the following documents in support of Steadfast's Motion for Summary Judgment are attached hereto:

1.      Copies of relevant portions of the Deposition of James F. Glover ("Depo. of Glover"), which was taken the action entitled <u>Messier, *et. al.* vs. Six Flags, Inc., *et. al.*</u>, Worcester Superior Court, No. SUCV2001-01494B (hereinafter "the Underlying Actions"), and a complete copy of which was included with Plaintiffs Six Flags, Inc. and TIG Insurance Company's Initial Disclosures in the present action.

2.      A true and complete copy of the "Ride Description and Specifications" document, which was marked as Exhibit 2 at the Depo. of Glover, and which was included with Plaintiffs Six Flags, Inc. and TIG Insurance Company's Initial Disclosures in the present action.

3.      A true and complete copy of the "Payment Terms" document, which was marked as Exhibit 3 at the Depo. of Glover, and which was included with Plaintiffs Six Flags, Inc. and TIG Insurance Company's Initial Disclosures in the present action.

4.      A true and complete copy of the "Fax Transmittal" dated October 27, 1998 from Jim Glover to Gary Story, which was marked as Exhibit 8 at the Depo. of Glover, and which was included with Plaintiffs Six Flags, Inc. and TIG Insurance Company's Initial Disclosures in the present action.

5.      A true and complete copy of the Letter Agreement Proposed By Six Flags, Inc., which was marked as Exhibit 4 at the Depo. of Glover, and which was included with Plaintiffs Six Flags, Inc. and TIG Insurance Company's Initial Disclosures in the present action.

6.      A true and complete copy of the "Fax transmittal" dated November 25, 1998 from Jim Glover to Gary Story, which was marked as Exhibit 5 at the Depo. of Glover, and which was included with Plaintiffs Six Flags, Inc. and TIG Insurance Company's Initial Disclosures in the present action.

7.      A true and complete copy of Steadfast Insurance Company Policy No. SCO 3776164-00 issued to O.D. Hopkins Associates, Inc. for the policy period July 1, 1999 to July 1, 2000, which was marked as Exhibit 6 at the Depo. of Glover, and which was included with Plaintiffs Six Flags, Inc. and TIG Insurance Company's Initial Disclosures in the present action.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 20th DAY OF APRIL, 2006.


/s/ Peter G. Hermes
Peter G. Hermes

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 20, 2006,

/s/ Eric C. Hipp
Eric C. Hipp

G:\ECH\Zurich\OD Hopkins\Pleadings\Affidavit of Peter Hermes.doc

1

1   COMMONWEALTH OF MASSACHUSETTS
2   WORCESTER, SS.        SUPERIOR COURT
                          CIVIL ACTION NO. 011494B
3

    ERNEST MESSIER and SUSAN
4   MESSIER, JOHN PASCONE and
    KIMBERLY PASCONE, Individually
5   and as Parents and Next
    Friends of JONATHAN PASCONE,
6   ANGELICA PASCONE, GERALD PESCARO,
    and KIMBERLY PESCARO,
7
            Plaintiffs,
8
9   vs.
10  SIX FLAGS, INC., RIVERSIDE PARK
    ENTERPRISES, INC., PREMIER PARKS,
11  INC., O.D. HOPKINS ASSOCIATES,
    INC., MARTIN FLORES, and CHARLES
12  FLORES,
13          Defendants.
14  _____/
15
                    - - -
16
            DEPOSITION OF THE WITNESS
17              JAMES F. GLOVER
            TAKEN BY THE PLAINTIFFS
18
                    - - -
19
            1800 Centrepark Drive East
20          West Palm Beach, Florida
            Thursday, January 13, 2005
21          9:50 a.m. - 11:55 a.m.
            Before Janette P. Hert, RPR, RMR, CRR
22          and Notary Public, State of Florida
23
24  APPEARANCES on Page 2.
25

James J.  Glover

55

1      Q.  You know what indemnification provisions
2  mean, don't you?
3      A.  Yes, I believe so.
4      Q.  Okay.  You sold the Blizzard River Ride
5  to Six Flags in 1998, did you not?
6      A.  Yes.
7      Q.  And you got commission for that, did you
8  not?
9      A.  That's correct.
10     Q.  Had you ever sold a ride to the Six
11  Flags organization prior to this one?
12     A.  Yes, I had.
13     Q.  How many others?
14     A.  One, maybe two -- no, probably one ride
15  at that point.
16     Q.  Okay.  Which ride was that?
17     A.  Give me a moment, please.
18         I really don't recall.
19     Q.  Okay.  In 1998 -- strike that.
20         Did you sell this ride to Six Flags in
21  1998?
22     A.  Yes.
23     Q.  And tell me how the transaction came
24  about.
25     A.  The CEO of the company, Gary Story, had

James J.  Glover

56

1    called me and expressed an interest of doing a

2    river raft ride at Riverside Park.

3         Q.  Would that have been during the summer

4    of '98?

5         A.  I don't recall the timing.

6         Q.  Had you ever spoken to Mr. Story and/or

7    met him prior to that date?

8         A.  Yes.

9         Q.  Okay.  And did you two know each other

10   personally?

11        A.  Yes, we did.

12        Q.  And had you dealt with him on a

13   commercial basis prior to that?

14        A.  Yes, I had.

15        Q.  In selling this other ride?

16        A.  Yes.

17        Q.  And when you sold the other ride, did

18   you sign that contract?

19        A.  No.

20        Q.  Did you sign a letter agreement?

21        A.  Did I sign a letter agreement?  No.

22        Q.  Did you sign the proposal?

23        A.  No.

24        Q.  Did you sign anything?

25        A.  I wrote letters.

James J.  Glover

63

1            (Deposition Exhibit No. 8 was marked

2    identification by the reporter and retained by

3    Mr. Graceffa.)

4            MR. SHEEHAN:  Just let him ask the

5    question; then you can review them.

6        Q.  (BY MR. GRACEFFA)  Okay.  If you'll just

7    give those all back to me, we'll move through

8    this.

9        A.  You want these back (indicating)?

10       Q.  Yes.

11       A.  Okay.

12           (Hands documents.)

13           MR. GRACEFFA:  Okay.  While we marked

14   the exhibits, I gave Mr. Glover a brief time to

15   just start looking through the documents.

16       Q.  (BY MR. GRACEFFA)  And you did that,

17   sir, did you not, not completely, but have you

18   peeked at them?

19       A.  I did take a peek, yes.

20       Q.  Okay.  And does a general review of

21   these documents refresh your recollection on when

22   you were negotiating the final aspects of this

23   ride?

24       A.  To some degree.

25       Q.  Okay.  And can you tell me what your

James J.  Glover

64

1    memory is?

2        A.  Basically that I worked with Gary Story

3    in good faith.  We began manufacturing this ride

4    in good faith, doing the ride layout, getting that

5    accepted; and it was a pretty fast-paced project,

6    so we moved forward in good faith, and my

7    recollection was always that we had moved forward

8    based on previous sales that we had done with Gary

9    Story.

10       Q.  Okay.  And who was the person from

11   Hopkins during the August, September, October time

12   period interfacing back and forth with

13   Mr. Story?

14       A.  I would have been.

15       Q.  Okay.  And Hopkins was moving ahead with

16   the project based upon your understanding that Six

17   Flags was moving along with the project in good

18   faith also; is that correct?

19       A.  Yes.

20       Q.  And you were reporting that same back to

21   your superiors at Hopkins, correct?

22       A.  Yes.

23       Q.  And you did that; you began ordering and

24   manufacturing and moving on this thing?

25       A.  O.D. Hopkins did.

James J.  Glover

65

1     Q.  Yes?

2     A.  Yes.

3     Q.  And Exhibits 2 and 3 are dated August

4  17th, 1998, and do they comport in general with

5  your memory of Mr. Pendleton's acknowledgement of

6  the general parameters of the project as

7  envisioned in August of 1998?

8     A.  Yes, they do.

9     Q.  Okay.  And you were moving along in the

10  fall of 1998 in general pursuant to the general

11  parameters set forth in Exhibit 2?

12     A.  That's correct.

13     Q.  Okay.  Did you have anything to do with

14  the actual manufacturing and the detail process

15  other than once you sold the ride and you got

16  things moving, went out and looked at the site,

17  did you tend to move away from the project and

18  leave that to the manufacturing and the technical

19  staff at that stage?

20     A.  Very much so.

21     Q.  So Mr. Becht, Mr. Nason, and

22  Mr. Newfarmer were doing the drawings, and their

23  staff would then run with the project in

24  conjunction with the owner, who would actually

25  start bringing in the contractors?

James J.  Glover

67

1      Q.  You have limited memory, or they were
2  limited phone calls?
3      A.  Limited phone calls.
4      Q.  Okay.  Less than ten phone calls?
5      A.  Correct.
6      Q.  Okay.  Did you maintain any records of
7  these telephone calls?
8      A.  No.
9      Q.  Did you ever deal with any other person
10  in regard to this ride during that period other
11  than Mr. Story at the Six Flags end?
12      A.  At his corporate office, yes.  He had an
13  assistant that he asked me to deal with.
14      Q.  Now was an actual full, written contract
15  prepared during the fall in regard to this?
16      A.  Yes.  We refer to it as a purchase
17  agreement.
18      Q.  Okay.  And do you have a copy of that?
19      A.  No, I do not.
20      Q.  Have you ever seen a copy of that?
21      A.  Yes, back at the time we were producing
22  it.
23      Q.  Okay.  And was that document executed?
24      A.  No, it was not.
25      Q.  All right.  I'm sorry the numbers on the

James J.  Glover

68

1    exhibits are a little out of order.

2              This is Exhibit Number 8.

3         A.  Okay.

4         Q.  And do you recall sending this out?

5         A.  No.

6         Q.  Are you "JG/pea"?

7         A.  Yes.

8         Q.  Who is "pea"?

9         A.  It would have been my office assistant

10   at that time.

11        Q.  In regard to the contents of this --

12   this is dated October 27th, 1998 -- it indicates

13   that a considerable amount of work has been going

14   on with the ride.

15              Do you agree with that?

16        A.  Yes.

17        Q.  And that it's based upon a conversation

18   you had with Gary back in August.

19              Do you agree with that?

20        A.  Yes.

21        Q.  So you're telling him that Hopkins is

22   proceeding in good faith on the conversations that

23   you, Glover, and Story had in August; you're

24   telling him that again?

25        A.  Yes.

James J.  Glover

69

1      Q.  You told him, in fact, that you began

2  building the rafts?

3      A.  Yes.

4      Q.  And you finalized the overall ride

5  layout, correct?

6      A.  That is correct.

7      Q.  And you're writing this to discuss the

8  status of the contract; you're noting that you've

9  done a lot of work and you can't order vendor

10  components until you have an executed contract; is

11  that correct?

12      A.  Yes.

13      Q.  And were you ever given a signed

14  contract?

15      A.  No.

16      Q.  But based upon the letters and the

17  conversations back and forth between you and

18  Mr. Story, Hopkins continued in good faith to

19  build this ride?

20      A.  That is correct.

21      Q.  Okay.  And did you continue to press Six

22  Flags --

23          (Cellular telephone interruption.)

24          MR. GRACEFFA:  Excuse me.

25          Let's take a five-minute break.

James J.  Glover

70

1          (A recess was taken at 11:04 a.m.)

2          (Back on the record at 11:12 a.m.)

3     Q.  (BY MR. GRACEFFA)  Just to finish with

4  Exhibit 8, although you have no memory,

5  Mr. Glover, in regard to actually sending this

6  document all these years later, will you agree

7  with me that it was something that -- the contents

8  as you and I have discussed before the break were

9  accurate; is that correct?

10     A.  Yes.

11     Q.  And it would have been your custom and

12  practice to have sent out a document like this in

13  or around that time; is that correct?

14     A.  Which, you mean the letter or --

15     Q.  Correct.

16     A.  Yes.

17     Q.  In regard to this particular project and

18  the sale of this project from August up through

19  November or December, you were the point person on

20  behalf of Hopkins dealing with Mr. Story; is that

21  correct?

22     A.  Yes.

23     Q.  And you were dealing generally in an

24  autonomous way on this with him back and forth

25  getting this thing moving; is that correct?

James J.  Glover

76

```
 1        A.   No, I don't.

 2        Q.   As a result of your receipt of that

 3   letter, what, if anything, did you do?

 4        A.   I wrote a letter back to them not

 5   agreeing with what they had outlined here.

 6        Q.   Okay.  And did you compose that letter

 7   in your offices in New Hampshire?

 8        A.   That, I'm not aware of.

 9        Q.   Okay.  You might have done it at home;

10   you might have done it on the road; you might have

11   done it --

12        A.   Correct.

13        Q.   But it would have been physically

14   processed through the New Hampshire office; is

15   that correct?

16        A.   Yes.

17        Q.   Okay.  And I also showed you earlier

18   what's been serially marked as Hopkins 13, Smith

19   2, and now Glover 5.

20             Is that a copy of the letter that you

21   responded to Mr. Story with?

22        A.   I'm not sure if it's a copy of my

23   response to the preceding exhibit you gave me.

24        Q.   Okay.

25        A.   There's not a time or a date.  I don't
```

James J. Glover

84

1       Q.  And your letter accepts the Story

2   Paragraph 5; is that correct?

3           MR. SHEEHAN:  Again, I object.  There is

4   no correlation between Exhibits Number 4 and 5.

5   He's not accepting anything in the Story letter.

6           MR. GRACEFFA:  I'm sorry, Mr. Sheehan,

7   you're not testifying.

8           MR. SHEEHAN:  I'm reserving my

9   objection.

10          MR. GRACEFFA:  Well, you're going to

11  necessitate another deposition if you don't -- the

12  deposition is -- your objection is noted.  That's

13  all you're supposed to do.

14          MR. SHEEHAN:  Well, you told me I need

15  to --

16          MR. GRACEFFA:  I understand you have a

17  continuing objection to all of these questions.

18          THE WITNESS:  Please repeat the

19  question.

20      Q.  (BY MR. GRACEFFA)  Do you respond to

21  Story Paragraph 5 by accepting it?

22      A.  I'm unsure.

23      Q.  On what basis are you unsure?

24      A.  I'm unsure of your context of

25  "accepted."  In negotiations, everything is

James J. Glover

85

1   continually changing until something is
2   finalized.
3         Q.  Fair enough.
4              In response to the bullet number 5 on
5   the Story letter, you wrote what?
6         A.  "Accepted as written."
7         Q.  Okay.  And your proviso on that is that,
8   as negotiations continued, that might change?
9         A.  Correct.
10        Q.  All right.  Mr. Story has indicated in
11  his letter that the ride in bullet 9 will be
12  warranted by the seller for a period of 18 months,
13  and then there's some other things that follow
14  that.
15             Do you see that.
16        A.  Which bullet, please?
17        Q.  Number 9.
18        A.  Yes.
19        Q.  Okay.  You respond to that in your
20  bullet 9 by saying what?
21             MR. SHEEHAN:  Objection.
22        Q.  (BY MR. GRACEFFA)  Why don't you read it
23  in?
24        A.  "Our standard warranty is for 12 months
25  from acceptance of the ride."

James J. Glover

88

1      A.  Yes.

2      Q.  Okay.  I'm just going to read 13 in.

3  Mr. Story's Paragraph 13 on Glover 4 states as

4  follows:  Seller will maintain a minimum of $5

5  million per occurrence of comprehensive general

6  liability, contractual liability, and products

7  liability insurance in form and substance and

8  issued by insurers reasonably satisfactory to

9  Premier at all times prior to the end of the

10  warranty period, each of which insurance shall

11  name Premier as an insured party.

12          Did I read that correctly, Mr. Glover?

13      A.  Yes.

14      Q.  Okay.  And Glover 5, Paragraph 13, your

15  response to Story Paragraph 13 was what?

16          MR. SHEEHAN:  Objection.

17          THE WITNESS:  "Accepted as written."

18      Q.  (BY MR. GRACEFFA)  Okay.  As vice

19  president of sales and marketing on behalf of O.D.

20  Hopkins, as the point person of O.D. Hopkins, on

21  November 25th, 1998, you accepted a proposal by

22  Six Flags that Six Flags be named as an additional

23  insured on Exhibit Number 6; is that correct?

24      A.  As I suggested earlier, I was

25  negotiating any of these points, and I maintain

James J. Glover

89

1  that.

2      Q.  Okay.  With the proviso that this was an

3  ongoing negotiation, as of November 25th, 1998,

4  you accepted the Six Flags proposal as set forth

5  in the Story letter in Paragraph 13; is that

6  correct?

7          MR. SHEEHAN:  Objection.

8          THE WITNESS:  Repeat your question,

9  please.

10     Q.  (BY MR. GRACEFFA)  As of November 25th,

11  1998, with your proviso that negotiations were

12  ongoing, you accepted in Paragraph 13 of your

13  letter the Story proposal in Paragraph 13 of his

14  letter; is that correct?

15     A.  Yes.

16     Q.  And you also accepted numbers 12 and 17

17  in your bullet points; is that correct?

18          MR. SHEEHAN:  Objection.

19          THE WITNESS:  Let me read them.

20     Q.  (BY MR. GRACEFFA)  Okay.

21     A.  Point number 12, that is correct.  And

22  you said 17?

23     Q.  17, I think, was the last one.

24     A.  Okay.  That is correct in both cases,

25  also with the comment I made earlier about it was

James J.  Glover

91

1    Kuteman and J. Pendleton; is that correct?

2        A.   Yes.

3        Q.   And who is R. Kuteman?

4        A.   The Six Flags representative from

5    corporate.

6        Q.   Okay.  And who is J. Pendleton?

7        A.   Jerry Pendleton.

8        Q.   So that wouldn't have been John; that

9    would have been Jerry?

10       A.   That's correct.

11       Q.   Jerry was the president of the company;

12   is that correct?

13       A.   That is correct.

14       Q.   So when you sent out your response to

15   the Story letter, this document purports that you

16   copied Mr. Pendleton; is that correct?

17       A.   Yes, it does.

18       Q.   And did Mr. Pendleton speak to you on or

19   after this date about this letter?

20       A.   I don't recall.

21       Q.   Did you ever send a letter of retraction

22   out which in any way retracted any of the

23   provisions of Glover 5?

24       A.   I don't recall.

25       Q.   Did Mr. Pendleton ever tell you that you

James J.  Glover

92

1  didn't have the authority to send this letter?

2       A.  No, I don't believe so.

3       Q.  Okay.  And to the best of your

4  knowledge, he received a copy of it; is that

5  correct?

6       A.  To the best of my knowledge, yes.

7       Q.  And that is your signature; is that

8  correct?

9       A.  Yes.

10      Q.  Mr. Sheehan has pointed out, and you

11 have too, that no fully executed contract was ever

12 entered into in regard to this project; is that

13 correct?

14      A.  To the best of my knowledge.

15      Q.  Hopkins completed the project and

16 certified and commissioned it and turned it over

17 to Six Flags; is that correct?

18      A.  Yes.

19      Q.  And you were paid for the ride; is that

20 correct?

21      A.  Well, I don't know if we were paid a

22 hundred percent of it, but we certainly received

23 the majority of the monies owed.

24      Q.  Okay.  So on or after your letter of

25 November 25th, 1998, Hopkins was proceeding

James J.  Glover

94

1  you on that.

2      Q.  (BY MR. GRACEFFA)  On or after the

3  documents that we've been discussing as Exhibits 4

4  and 5, was there any other agreements, letters,

5  contracts entered into, to the best of your

6  knowledge, on behalf of either Six Flags or O.D.

7  Hopkins?

8          MR. SHEEHAN:  Same objection.

9      Q.  (BY MR. GRACEFFA)  You can answer that

10 one?

11     A.  No.

12          MR. GRACEFFA:  I have nothing else.

13

14              CROSS-EXAMINATION

15 BY MR. SHEEHAN:

16     Q.  I have a few questions.

17         Mr. Glover, you've testified that you

18 did not have authority to enter into a contract

19 with Six Flags for the sale of the Blizzard River

20 Ride; is that correct.

21     A.  That's correct.

22     Q.  And did anyone from Six Flags ever ask

23 if you had authority to bind O.D. Hopkins during

24 the negotiations for the Blizzard River Ride?

25     A.  No.

James J. Glover

95

1      Q.  Did anyone at Six Flags ask you why

2  Jerry Pendleton was submitting documents such as

3  your Exhibit 2 and Exhibit 3 which had

4  Mr. Pendleton's initials instead of yours?

5      A.  Can you repeat the question?

6          MR. SHEEHAN:  Can you read that back,

7  please?

8          THE REPORTER:  Sure.

9          (The indicated portion of the record was

10  read back by the reporter as follows:

11          "Q.   Did anyone at Six Flags ask you

12                why Jerry Pendleton was submitting

13                documents such as your Exhibit 2

14                and Exhibit 3 which had

15                Mr. Pendleton's initials instead

16                of yours?")

17          THE WITNESS:  No.

18      Q.  (BY MR. SHEEHAN)  Does the fact that

19  Exhibits 2 and 3 have -- strike that.  Let me

20  rephrase that.

21          Does the fact that Exhibits 2 and 3

22  contain Jerry Pendleton's initials indicate to you

23  that Jerry Pendleton had direct contact with Six

24  Flags?

25      A.  Yes.

James J. Glover

96

1    Q.  And if there was a final agreement

2  between O.D. Hopkins and Six Flags for the

3  Blizzard River Ride, you would anticipate that

4  Jerry Pendleton's signature would be on those

5  documents; is that correct?

6    A.  YesMR. GRACEFFA:  Objection.

7        THE WITNESS:  Yes.

8    Q.  (BY MR. SHEEHAN)  You testified earlier

9  that you could not correlate Exhibit 5, which is

10  your letter to Gary Story, with Exhibit 4, a

11  letter from Six Flags.

12        Do you recall that testimony?

13    A.  I believe I said that I was unsure if my

14  letter of November 25th was a direct response to

15  Mr. Story's letter.

16    Q.  Okay.  So all those leading questions

17  that you were asked whether points in your letter

18  responded to Mr. Story's letter was based on

19  counsel's representation that those two correlated

20  with each other; is that correct?

21        MR. GRACEFFA:  Objection.

22        THE WITNESS:  That's correct.

23    Q.  (BY MR. SHEEHAN)  I'd like to refer you

24  to the second page of Exhibit Number 5.  I would

25  like you to read the next to the last paragraph

CONFIDENTIA

## EXHIBIT "A"

O.D. Hopkins Associates, Inc.
River Raft Ride
Ride Description and Specifications
for
Riverside Park
Agawam, Massachusetts



<u>Section    1.0    General Description of the Project</u>

The project consists of supplying certain equipment to complete a River Raft Ride in accordance with the following specifications.

<u>Section    2.0    General Specifications</u>

2.1    Overall length of ride is approximately 1500 feet, including lift conveyor.

2.2    Ride cycle time is approximately 310 seconds, including station.

2.3    Theoretical ride capacity is 1600 passengers per hour with seventen (17) rafts.

2.4    Dispatch interval is 18 seconds at 1600 passengers per hour.

2.5    Trough width is 11.5 feet at the bottom of the trough with a 20 degree sloped side.

2.6    Maximum water speed is approximately 13 feet per second except in curves, lakes or slow areas, and at the entrance to the lift conveyor where the water slows to 4 feet per second.

2.7    Nominal water depth is 18 inches at 11 feet per second.  Water is deeper at slower speeds, shallower at faster speeds.

2.8    All specifications are subject to the final approved layout.

<u>Section    3.0    Materials, Services and Equipment to be Supplied by Seller</u>

3.1    <u>Rafts</u> - Twenty (20) 8-passenger rafts with molded polyurethane foam seats, fiberglass hull, seat belts, padded grab bar and urethane flotation ring.  Boats are delivered with seat backs and flotation ring unassembled.  Purchaser to specify fiberglass color at time of order.

Δ π  **EXHIBIT** 2
Deponent CLOVER
Date 1/13/05  Rptr. JPt
DEPOBOOK

Buyer's Initials _____

Seller's Initials _____

000508

CONFIDENTIAL

3.2    Lift Conveyor - One (1) fabricated steel, hot dip galvanized lift conveyor with 50 HP shaft mounted adjustable speed gearmotor; two (2) 30 inch wide, 220 piw rubber conveyor belts with mechanical splice; pneumatic belt tensioning; and hot dip galvanized, fabricated steel supports. This conveyor is designed to transport rafts carrying guests.

3.3    Station Conveyor - One (1) continuously moving, fabricated steel, hot dip galvanized, load/unload station conveyor with 7.5 HP shaft mounted adjustable speed gearmotor; two (2) 30 inch wide, 220 piw rubber conveyor belt with mechanical splice and mechanical belt tensioning. The conveyor moves at a variable speed ranging from 0.3 to 1.25 feet per second.

3.4    Pneumatic Assembly - Consisting of all necessary valves and filter-regulator-lubrications to operate conveyor belt tensioners.

3.5    Main Pumps - Consisting of three (3) 480 volt, 3 phase, 60 Hz, Cascade vertical propellor pumps rated at 37,000 gallons per minute at 16 foot static lift. Pump discharge tubes are to be concrete and supplied by the Purchaser.

3.6    Electrical and Ride Control - One (1) electrical and ride control assembly consisting of:

(1)    All motor controls for supplied equipment including breakers, reduced voltage motor starters and conveyor motor starters supplied in a Motor Control Center (MCC) cabinet.
        (a)    Main pump motors shall utilize reduced voltage transformer motor starters.
        (b)    The station conveyor and lift conveyor drive motors shall have an across-the-line motor starter.

(2)    An Allen-Bradley programmable controller (SLC 500) with interfacing modem, isolation or line conditioning transformer is supplied in a pre-wired custom built Ride Control Center (RCC) cabinet. Note: It is suggested that the Purchaser install a dedicated phone line in the control room for a modem hookup.

(3)    One (1) pedestal mounted operator control panel to be located in the loading station area.

(4)    All necessary raft sensors, proximity switches, and air pressure switches.

(5)    Incoming power shall be 480 volt, 3 phase, 60 Hz.

CONFIDENTIAL

(6)   This proposal <u>does</u> <u>not</u> <u>include</u> main entrance disconnect, motor safety disconnects or any connection wiring.

(7)   One (1) diagnostics display unit.

3.7   <u>Guides and Guards</u> - Consisting of:

(1)   One (1) set of raft guides for load and unload stations and lift conveyor entrance.

(2)   One (1) set of pump safety guards and trash screens.

(3)   All necessary lake guide supports.  Any necessary wood guides shall be supplied by the Purchaser.

(4)   One (1) lot of cast-in-concrete weir mounts.

3.8   <u>Geyser Assemblies</u> - Six (6) geyser assemblies.

3.9   <u>Harbor Gates</u> - One (1) set boat harbor gates and guides.

3.10   <u>Assembly Drawings</u> - Three (3) sets of assembly drawings for supplied equipment. These may be used for installation and future maintenance of the equipment.

3.11   <u>Manuals</u> - Three (3) sets of operation and maintenance manuals.

3.12   <u>Concrete Drawings & Loads</u> - Three (3) sets of concrete <u>shape</u> drawings, including ride layout dimensions, elevations and footing loads.

3.13   <u>Transportation</u> - F.O.B. Penacook, New Hampshire.

3.14   <u>Start-Up and Testing Assistance</u> - There are up to thirty (30) man days, including travel time, of on-site start-up and testing assistance included in this proposal. The Purchaser shall be responsible for all travel and living expenses. The Seller will, at the request of the Purchaser, supply additional assistance as required at the daily cost of Five Hundred dollars ($500.00) plus reasonable travel and living expenses. The Seller requests at least four (4) weeks notice to schedule on-site visits.

<u>Section   4.0   Materials, Service and Equipment to be Supplied by Purchaser</u>

Materials, service and equipment to be supplied by the Purchaser include, but are not limited to, the following.

Buyer's Initials _____                                          Seller's Initials

EQ1372/Raft/A                                  3                                  8/17/98

CONFIDENTIAL

CONFIDENTIA

4.1    All concrete, materials, labor, equipment and forms, including anchor bolts, nuts and washers, and detailed concrete drawings necessary for the installation of all concrete.

4.2    All excavating, grading or landscaping necessary.

4.3    All on-site construction, including installation of all equipment supplied by the Seller.

4.4    All electrical wire, conduit, fittings, transformers, main and motor disconnects, modem connection, labor and supplies necessary to install electrical equipment furnished by the Seller.

4.5    All buildings, decks, station exit stairways and ramps, railings, fences, queue lines, signs, ticket booths, and water supply.  As a part of the testing process, it may become necessary to drain and refill the ride water.  To expedite this process, fill pipes and drains should be sized to accomplish this in a reasonable time.

4.6    Any soil testing necessary.

4.7    All finish painting of components normally painted.

4.8    All ride and site lighting.

4.9    Water filtration system.

4.10   All water piping not specifically called out in Section 3.

4.11   Air compressor and all pipe, hose, and fittings necessary to connect pneumatically operated devices.

4.12   All weir material normally installed in trough bottom to create waves/rough water.

4.13   All necessary wood for lake guides.

4.14   An as-built concrete survey must be supplied prior to installation of equipment.

4.15   Since the Seller is not familiar with the Purchaser's plans for such items as buildings, theming, landscaping and issues unrelated to the actual ride, it is impossible for the Seller to list each and every material, service and equipment that may be necessary. However, to the best of the Seller's knowledge, the items listed above are those required to complete an operational ride.

Buyer's Initials _____

4

Seller's Initials _____

8/17/98

CONFIDENTIA

Section    5.0    Design Specifications

5.1    Drawings and Manuals

(1)    Drawings and manuals will provide the Purchaser with comprehensive documentation on how to install and maintain the equipment.

(2)    The manuals will include, at least, the following:
    (a)    Erection sequence/how to install the equipment.
    (b)    Preventive maintenance to be performed.
    (c)    Operating instructions which clearly illustrate and explain the proper and sequential operation of the ride.
    (d)    Recommended spare parts list with current selling prices.

(3)    The drawing package will contain, as a minimum, the following:
    (a)    Ride layout and elevation details, including accuracy tolerances.
    (b)    Dimensional assembly drawings of the equipment, including electrical, hydraulic and pneumatic schematics, mechanical and structural plans and other technical documents necessary for review purposes in reproducible form.  This does not include manufacturing detailed drawings.
    (c)    Erection drawings (as opposed to fabrication drawings), including electrical installation drawings.
    (d)    Concrete shape drawings and footing loads, including anchor bolt dimensions and specifications.
    (e)    Vehicle dimensions and clearance envelope for passenger safety.

(4)    The Seller will supply design calculations and drawings necessary, and will cooperate fully to assist in obtaining any required approvals or permits for the construction and operation of the ride, but it will be the responsibility of the Purchaser to obtain, and to pay any costs or fees in obtaining, any required approvals or permits, including Professional Engineering fees if required to certify and seal drawings.

Design calculations shall include all, but only, the following:
•    tower and structure stresses including seismic, wind, static and dynamic loads;
•    vehicle stresses including static and dynamic loads;
•    footing loads including shear, tension, compression and bending moments;
•    material and mechanical component specifications.

The Seller shall supply to the Purchaser necessary drawings, calculations and other information necessary to document the loads and stresses on supplied structural components to allow the Purchaser to obtain permission and approvals from the local authorities.  This shall not include manufacturing drawings.  The Seller further agrees to support the Purchaser in obtaining such approvals.

Buyer's Initials _____

Seller's Initials _____

EQ1372/Raft/A                    5                    8/17/98

CONFIDENTIAL

CONFIDENTIAL

(5)    The design and manufacture of the ride will meet the ASTM Standards on Amusement Rides and Devices (latest edition).

5.2    Connections

(1)    All connections for main structure members are to be made with plated SAE Grade 5 fasteners. A five percent (5%) overage of all fasteners used in erection will be supplied.

(2)    A prescribed "Erection Sequence" will be supplied before the equipment arrives at the Purchaser's site. Specific alignment requirements and allowable deviation from ideal will be indicated along with the method of determination or measurement.

5.3    Structural Components

(1)    Steel used for major structural members will be of a grade indicated by the engineering calculations.

(2)    Specific welding procedures will be supplied for all field welded connections (if required).

(3)    Each major structural component drawing will indicate the approximate weight of the piece or assembly for use during erection.

5.4    Corrosion Protection

All structural steel parts and other steel parts manufactured by the Seller shall be hot dip galvanized in accordance with ASTM Specification #A123. Hot dip galvanized surfaces are, by their nature, not smooth. If the Purchaser plans to paint these surfaces, considerable preparation will be necessary. The Seller assumes no responsibility for any such costs.

Section    6.0    Design and Equipment Changes

6.1    This proposal is based on furnishing the Seller's equipment as noted in Section 3. Changes in the Seller's standard designs will result in additional engineering costs, possible changes in equipment costs and delays in delivery. Should the Purchaser request changes, the Seller will advise the Purchaser of cost and time delays in the completion of the design phase to evaluate proposed changes. If changes result, the Seller will advise the Purchaser of cost of changes in writing, broken down by engineering charges and equipment costs, and the Purchaser will approve of and pay for such costs prior to the Seller proceeding with manufacturing.

Buyer's Initials _____

Seller's Initials _____

EO1372/Raft/A                                    6                                    8/17/98

CONFIDENTIA

In the event that the Seller's designs require changes to meet the local standards, costs for making any such changes will be charged to the Purchaser in accordance with the charges outlined in this section.

(1)    Engineering charges will be invoiced at Ninety dollars ($90.00) per hour for engineering time, Fifty dollars ($50.00) per hour for drafting time.

(2)    Engineering travel expenses will be invoiced at cost plus 10%.

(3)    Equipment price increases will be invoiced at cost plus a 25% administrative fee.

(4)    Any decrease in equipment costs resulting from such change will result in a corresponding decrease in the contract price.

(5)    Any such extra charges will be invoiced upon completion of extra work and payment shall be due within thirty (30) days from date of invoice.

(6)    This proposal does not assume costs associated with attendance at design review meetings, bidders conferences, or preparation for such meetings. It is assumed that the Purchaser will advise the Seller of any such meetings that may be required and that the Seller will be reimbursed for any costs associated with such meetings in accordance with the charges outlined in this section.

At the time of the estimate of costs, the Seller will also advise the Purchaser of any delays in delivery.

6.2    The Purchaser understands that this is a custom designed and manufactured amusement ride that requires extensive assembly and adjustments on the ride site. The Purchaser should expect to perform a reasonable level of routine modification as part of the installation. While the Seller accepts full responsibility for design and manufacturing errors, the Seller will not assume back charges for work associated with such routine field modifications or adjustments. Further, minor variations in concrete footing locations and elevations, errors in field assembly, improper shipping and handling and other causes may cause misalignment of structural steel members, which in turn may require modification of these structural steel members to facilitate proper assembly. The Seller shall not be liable for any costs associated with any such modifications.

Should field modifications be necessary to correct a manufacturing or design error clearly caused by the Seller, the following procedure must be strictly followed:

(1)    The Purchaser will immediately notify the Seller by telephone or fax, with confirmation in writing, of any defect or modification necessary.

Buyer's Initials _____                                        Seller's Initials

CONFIDENTIAL

(2)   The Purchaser shall notify the Seller in writing of the labor and material costs
necessary to make necessary repairs and the contractor the Purchaser proposes
to use to make such repairs.  The Seller shall then have the option of (a)
utilizing the contractor proposed by the Purchaser at the costs stated in the
Purchaser's notice, or (b) engaging a contractor selected by the Seller, or (c)
making the repairs utilizing the Seller's own personnel, or (d) furnishing the
Purchaser with replacement components as required.

The Seller shall not accept any back charge of any type without prior approval of
such charge by the Seller's Engineering or Project Manager.

Section    7.0    Quality Control

Equipment to be furnished for this project will be manufactured in accordance with the
Seller's Quality Assurance Manual dated December 1987 and the Seller's Specification #W-
1-88, Process and Quality Requirements for Fusion Welds, which are made a part of this
Agreement by reference.

Buyer's Initials _____                          Seller's Initials 

CONFIDENTI

## EXHIBIT "B"

O.D. Hopkins Associates, Inc.
River Raft Ride
Payment Terms
for
Riverside Park
Agawam, Massachusetts

### Section   1.0   Contract Price

The Seller agrees to sell all equipment described in Exhibit A, Section 3, FOB Penacook, New Hampshire for the price stated below and subject to the terms and conditions hereinafter provided.  The Purchaser promises to pay to the Seller for the equipment and services the agreed price of One Million Fifty-Seven Thousand dollars ($1,057,000.00).

### Section   2.0   Payment Schedule

The Purchaser promises to pay to the Seller the said price punctually in accordance with the following schedule:

2.1   $211,400.00 shall be paid upon the signing of this Agreement.

2.2   $105,700.00 shall be paid upon shipment of the drawing package called out in Section 4.1.

2.3   $229,025.00 shall be paid upon shipment of equipment as called out in Section 4.2.

2.4   $229,025.00 shall be paid upon shipment of equipment as called out in Section 4.3.

2.5   $229,000.00 shall be paid upon shipment of equipment as called out in Section 4.4.

2.6   $52,850.00 shall be paid upon acceptance as defined in Section 8.1 of the Equipment Purchase Agreement.

### Section   3.0   Payment Terms

3.1   All payments shall be made in U.S. dollars wire transferred to O.D. Hopkins Associates, Inc. account number 0308854301 with Bank of New Hampshire, 163 North Main Street, Concord, New Hampshire 03301, bank number 011400071, telephone number 603-225-4500.

Δ π EXHIBIT 3
Deponent GLOVER
Date 1/13/05 Rptr. JPH
DEPOBOOK

Buyer's Initials _____

Seller's Initials _____

1

8/17/98

CONFIDENTI 

3.2    Payments more than twenty (20) days late from the invoice date shall be subject to interest at the rate of 1 1/2% per month and may be reason for delays to the shipping schedule as defined in Section 4.0.

## Section    4.0    Shipping Schedule

Based on acceptance of final ride layout by September 1, 1998.

4.1    Footing location and loads and concrete shape drawings shall be shipped no later than October 16, 1998.

4.2    Loads #1 and 2 shall be shipped no later than January 8, 1999.

4.3    Loads #3 and 4 shall be shipped no later than February 12, 1999.

4.4    Loads #5 and 6 shall be shipped no later than March 26, 1999.

Early shipments are allowed.

Buyer's Initials _____                                         Seller's Initials _____

8/17/98

# *FAX TRANSMITTAL*



*amusement rides world-wide*

| | | | |
|---|---|---|---|
| DATE: | October 27, 1998 | SUBJECT: | Riverside River Raft Ride |
| ATTENTION: | Gary Story | FROM: | Jim Glover, Sales Manager |
| COMPANY: | Premier Parks | PAGES: | 1 |
| FAX NO: | 405-475-2526 | COPIES TO: | |

Dear Gary:

I have already begun a considerable amount of work on the Riverside River Raft Ride. This was based upon our conversation back in August and at this point I have many tasks ongoing.

We have begun building the twenty rafts per Premier's color selection. We have just about finalized the overall ride layout. Les Hudson has approved it and this week Jason Freeman is hopefully in a position to approve it.

I am writing you today to discuss the status of the contract I had sent you in August. Although we have begun much of the in house work, I cannot order outside vendor components until we have an executed contract. My immediate concern is the lead-time of 18-20 weeks for the pumps. In the very near future this will have a major impact on the delivery.

Could you please advise me of the status of our contract? I want for this project to be a terrific finished product in all manners including a timely delivery.

Thank you for your consideration and your appreciated business. I look forward to seeing you in Dallas.

Best regards.


JG/pea



Δ π EXHIBIT 8
Deponent GLOVER
Date 1/13/05 Rptr. JPH
DEPOBOOK



**O.D. HOPKINS ASSOCIATES, INCORPORATED**
*40 Park Lane · P.O. Box 275 · Contoocook, NH 03229 USA · TEL: 1-603-746-4131 · FAX: 1-603-746-3659*

00081





**Six Flags**
A Subsidiary of Premier Parks Inc.

11501 N.E. Expressway
Oklahoma City, OK 73131
405-475-2500
Fax 405-475-2555

O.D. HOPKINS ASSOCIATES, INCORPORATED
40 Park Lane
Contoocook, New Hampshire  03229

Attn:  James Glover

Dear Sirs:

This letter agreement will confirm, on the terms and conditions set forth herein, our agreement to invest in the development of and to purchase from you, and your agreement to develop and sell to us, free and clear of all liens, the ride more fully described in <u>Exhibit A</u> and <u>Exhibit B</u> hereto (the "Ride").

O.D. HOPKINS ASSOCIATES, INCORPORATED ("Seller") and Premier Parks Inc. ("Premier") agree to proceed in good faith to finalize a definitive purchase agreement relating to the Ride ("Agreement") no later than November 30, 1998. The parties agree that the failure of Seller to negotiate in good faith to enter into an Agreement that conforms to the provisions of this letter agreement prior to such date shall constitute a material default of the provisions hereof.  The substantive terms and conditions of development and sale of the Ride will be as follows:

1.  Seller will design, engineer, prototype (as required), test, refine, document and deliver the Ride to Riverside Park (the "Park") that meets the specifications, considerations and standards outlined herein and in <u>Exhibit B</u>.

2.  The purchase price for the Ride will be as indicated on <u>Exhibit A</u>, which purchase price includes all freight and other transportation costs to the Park and the cost of theming the Ride in accordance with Premier's instructions as integral components thereof.  The parties agree to allocate the purchase price between the manufacture and delivery of the Ride and the services to be provided by Seller in respect of the design, engineering and testing thereof (the "Services") as provided in <u>Exhibit A</u>.

3.  In recognition of the obligations of Premier hereunder, Seller agrees that neither Seller nor any subsidiary or affiliated company or person thereof, nor any successor or assignee thereof, shall sell, solicit the sale of, or take orders for, or construct or otherwise agree to construct a ride which is substantially similar to the Ride, to be located within a 400-mile radius of the Park if such ride would be ready for public opening prior to December 31, 2000.



Δ π EXHIBIT___
Deponent GLOVER
Date 1/13/05 Rptr. JP
DEPOBOOK

O.D. HOPKINS ASSOCIATES, INCORPORATED
Page 2 of 4

4.  All plans will be provided to Premier with metric dimensions.  U.S. manufactured components will specify "U.S. sized" materials.  Plans/documentation to be provided to Premier will include any and all drawings, design information, specifications and other data necessary for the installation, safe operation, servicing and inspection of the Ride and related equipment.  The Ride shall be designed and fabricated in accordance with the highest quality technological practices and shall meet or exceed all requirements set forth in all applicable state, local and U.S. laws, codes and regulations, all applicable standards of the American Society of Testing and Materials and the specifications specified in Exhibit B.  All final plans will be accurate and free from any material errors and will be subject to Premier's prior written approval.

5.  Plans/documents will include but not be limited to:  Layout, Foundation drawings, Foundation orientation, Foundation loads, Mechanical drawings, Electrical drawings, Vehicle drawings, Control system drawings, Control panel drawings, Repair instructions, Spare parts list, Design calculations, Engineering plans, Structural drawings, Test requirements, Erection drawings, Installation instructions, Assembly instructions, Disassembly instructions, Maintenance instructions, Operating instructions and Operating/Maintenance manuals.

6.  Prior to the Ride's installation and operation, Seller will provide progress reports to Premier upon its request and permit Premier reasonable access to Seller's facilities and documents.  To secure its obligations, Seller hereby grants to Premier a first lien in all materials, components and other assets constituting a part of, or used in the manufacture of, the Ride.  Prior to any scheduled payment, Seller will deliver to Premier evidence of payment of all amounts then owed by Seller to subcontractors or a waiver by all applicable subcontractors of all liens that can arise out of nonpayment of such amounts.

7.  Premier shall have the right to terminate this letter agreement (or the Agreement) upon (i) the reasonable determination by Premier, using U.S. operating standards, that the Ride will not be capable of meeting, in a substantially complete manner, the specifications set forth in the preliminary drawings included or referred to in Exhibit B or (ii) a material default by Seller hereunder (or thereunder) that continues for 10 (ten) days following notice thereof to Seller; provided that such termination shall be in addition to, and not in lieu of, all other remedies available to Premier.  In the event of such termination, and in addition to all remedies of Premier referred to above, Seller shall promptly return to Premier all amounts paid by Premier to Seller hereunder and under the Agreement to the date of termination, plus, in the case of a willful or material default by Seller hereunder, interest thereon at a rate per annum of 2% in excess of the prime rate of Citibank N.A. (New York branch).

8.  All supervisory personnel reasonably required for installation, pre-opening inspection, training of Park personnel and manufacturers certification and commissioning of the Ride at the Park will be provided by Seller.

O.D. HOPKINS ASSOCIATES, INCORPORATED
Page 3 of 4

9.   The Ride will be warranted by Seller for a period of eighteen (18) months from the date opened to the public. All Ride components subjected to cyclic loading will be designed for a minimum of two million cycles. Seller will timely provide replacement parts for the Ride during the applicable warranty period referred to above at Seller's expense and thereafter at Premier's expense.

10.  The Ride will be of first class quality and fit and safe for its intended use and, in its capacity as independent contractor/manufacturer, Seller will protect, indemnify, defend and save Premier and its affiliates harmless from any losses or damages other than lost profits sustained by Premier or any such affiliate which arise directly or indirectly through or on account of defective design, engineering, construction, manufacture, material or workmanship incorporated in the Ride, the breach by Seller of its obligations hereunder (or under the Agreement) or any infringement or unauthorized use by Seller (or its agents or subcontractors) of patents or intellectual property rights of others. Premier will have no liability for items delivered to it in a damaged condition or in a condition not in compliance with the terms hereof, other than storing or returning such items to Seller at Seller's cost and in accordance with Seller's instructions.

11.  Goods delivered to or received by Premier will be accepted only if accompanied by a detailed shipping list or by a copy of a detailed invoice. Following delivery, Premier will have a minimum of ninety days, or longer if such time is reasonable, to inspect for shipment of a complete Ride system. Partial payment or payment in full prior to completion of inspection does not waive Premier's right of rejection as non-conforming goods.

12.  The Ride will be designed with redundant and/or fail safe systems in all critical areas.

13.  Seller will maintain a minimum of $5,000,000 (Five Million Dollars), per occurrence, of comprehensive general liability, contractual liability and products liability insurance in form and substance and issued by insurers reasonably satisfactory to Premier at all times prior to the end of the warranty period, each of which insurance shall name Premier as an insured party.

14.  Seller agrees to pay to Premier a penalty of $3000 per day for each day, if the target dates with respect to the Ride listed on Exhibit A are missed, it being agreed that time is of the essence in this letter agreement.

15.  Seller agrees that it and its affiliates shall have no right to use, and shall not use, the name of Premier or any other intellectual property of Premier (including, without limitation, the name "Six Flags") in any advertising, publicity, promotion or other use not contemplated hereby.

16.  Seller's obligations and performance under this letter agreement and the Agreement shall be unconditionally guaranteed by any controlling person or entity of Seller.

O.D. HOPKINS ASSOCIATES, INCORPORATED
Page 4 of 4

17. This letter agreement may not be assigned by Seller without the prior written consent of Premier. Each party hereto submits to personal jurisdiction in the State of New York and submits to the jurisdiction of any federal court sitting therein in connection with any action arising out of or relating to this letter agreement and, in any such action, the prevailing party shall be entitled to have its reasonable attorney's fees and expenses and related costs paid by the other party.

If any provision of this letter agreement is determined by a court competent jurisdiction to be invalid or illegal, the validity or legality of all other provisions shall not be affected thereby. This letter agreement sets forth the binding agreement of the parties hereto and shall continue in full force and effect until the execution and delivery of the Agreement with respect to the Ride. The terms of this letter agreement shall be governed by the internal laws of the State of New York. The Exhibits hereto are incorporated herein by reference.

If the foregoing meets with your approval, please sign this letter agreement in the space provided below and return a copy to Premier by telecopier at (405) 475-2555.

We look forward to working with you on this exciting and challenging project.

Very truly yours,

PREMIER PARKS INC.


_____    Date:_____
Gary Story
President and Chief Operating Officer



AGREED AND ACCEPTED:

O.D. HOPKINS ASSOCIATES, INCORPORATED


_____    Date:_____
Name:
Title:

# EXHIBIT A

**Ride:**              River Raft Ride

**Park:**              Riverside Park

**Purchase Price:**    $1,057,000 F.B.O. the Park

**Payment Terms:**

- Upon execution:  20%
- Upon shipment of load nos. 1 and 2:  23.3%
- Upon shipment of load nos. 3 and 4:  23.3%
- Upon shipment of load nos. 5 and 6:  23.4%
- 30 days following satisfactory public operation of the Ride:  10%

**Allocation of Purchase Price to Design and Engineering:**    25%

**Target dates which, if missed, trigger penalty payments, payable with respect to the Ride:**

- Delivery of load nos. 1 and 2:        January 8, 1999
- Delivery of load nos. 3 and 4:        February 12, 1999
- Delivery of load nos. 5 and 6:        March 26, 1999
- Ride ready for testing:               April 1, 1999
- Open the Ride to the public:          April 7, 1999

# FAX TRANSMITTAL



*HOPKINS*

*amusement rides world-wide*

| | | | |
|---|---|---|---|
| **DATE:** | November 25, 1998 | **SUBJECT:** | Riverside Letter of Agreement |
| **ATTENTION:** | Gary Story | **FROM:** | Jim Glover, VP Sales & Marketing |
| **COMPANY:** | Premier Parks | **PAGE(S):** | 3 |
| **FAX NUMBER:** | 405-475-2526 | **COPIES TO:** | R. Kuteman, J. Pendleton |

Δ π EXHIBIT 5
Deponent *GLOVER*
Date *1/13/05* Rptr *JPH*
DEPOBOOK

Dear Gary:

Just prior to my departure to Dallas on November 14, 1998, I received a fax from Mr. Russell Kuteman outlining a Letter of Agreement. There are issues within this Letter of Agreement that we take exception to and are contrary to our offer dated on June 25, 1998. It was my understanding that our offer was the basis for agreement when you gave me a verbal commitment on August 16, 1998. I had hoped to discuss this with you during the Trade Show but unfortunately we did not have the needed time together.

Our respective companies have worked together in the past using our contract that contained specific language you were normally comfortable with. Our offer of June 25, 1998 was based upon our past business dealings. While I certainly understand as your company grows that different demands and considerations are to be generated, this Letter of Agreement is a radical departure from the manner in which we have worked in the past.

At this point in time, the Letter of Agreement/Intent does not provide Hopkins with what we need so to purchase outside vendor components. Since you gave me a verbal commitment in August I have been doing an extensive amount of work on this ride based upon intent. The rafts are built, much of the lift and station frames completed and we are at the point that by early next week the final layout will be approved by Riverside. We need to have a signed contract, or at the very least, the deposit, so we can get outside components ordered.

While we will attempt to work in a manner that is acceptable to you, it is important to point out that within these new guidelines outlined in the Letter of Agreement there are, in some cases, issues which are not acceptable and others that have direct cost implications.

With that in mind, I will summarize our response to each of the terms and conditions referencing the number utilized in your Letter of Agreement for clarity.

1. Our offer of June 25th was F.O.B. Penacook, NH and did not include delivery.
2. Same comment as above regarding delivery and other than the choice of color for the fiberglass rafts which Les Hudson gave me in September, there was no other provision made for theming.
3. We have not agreed upon an exclusive territorial agreement.

*Hopkins* 10/10/03
Exhibit No. 13
LISA A. MOREIRA



***O.D. HOPKINS ASSOCIATES, INCORPORATED***
*40 PARK LANE · P.O. BOX 275 · CONTOOCOOK, NH 03229 USA · TEL: 1-603-746-4131 · FAX: 1-603-746-3659*



EXHIBIT

11/25/98 WED 15:31 [TX/RX NO 9142]

# FAX TRANSMITTAL



*amusement rides world-wide*

4. All of our drawings and components are "U.S. sized" materials.

5. Accepted as written.

6. The last line of this paragraph should be deleted. This is very time consuming and in some cases impossible.

7. It is our intention to have a signed Purchase Agreement for the Riverside River Raft Ride. In our Purchase Agreement we have clear language dealing with termination.

8. We provided for a specific amount of onsite assistance in our Purchase Agreement. If additional assistance is required we can add costs for this.

9. Our standard warranty is for twelve months from acceptance of the ride.

10. We build our rides to the highest standard used in the amusement ride industry.

11. The ninety-day period is way too long. Twenty-one days is acceptable.

12. Accepted as written.

13. Accepted as written.

14. We will agree to a penalty of $500 per day for late deliveries. Based on where we stand today, I have adjusted the ship dates in Exhibit "A" based on us having the deposit by December 4, 1998.

15. We ask that we are able to include Premier Parks on our customer list.

16. The principles of Hopkins will <u>not</u> unconditionally guarantee everything in our agreement with their personal assets.

17. Accepted as written.

I have attached an amended Exhibit "A" that now reflects the new ship dates based upon us receiving a deposit by December 4, 1998. As I have mentioned previously, the pumps and electrical control centers are long lead items and their ship dates to Hopkins are reflected in these new delivery dates.

We will work in good faith to conclude an acceptable Purchase Agreement, but I respectfully request the deposit to be sent so the current ship dates can be met.

If you need to get a hold of me after business hours my home phone number is (603) 746-2128 and my cell phone number is (603) 496-5938.

Sincerely,

Jim Glover
VP Sales & Marketing



**O.D. HOPKINS ASSOCIATES, INCORPORATED**
*40 Park Lane · P.O. Box 275 · Contoocook, NH 03229 USA · TEL: 1-603-746-4131 · FAX: 1-603-746-3659*

# EXHIBIT "A"

| | |
|---|---|
| RIDE: | River Raft Ride |
| PARK: | Riverside Park |
| PURCHASE PRICE: | $1,057,000, F.O.B. Penacook, New Hampshire |

PAYMENT TERMS:

| | |
|---|---|
| 25% | Upon Execution |
| 10% | Upon Delivery of the Drawing Package |
| 20% | Upon Shipment of Loads #1 & 2 |
| 20% | Upon Shipment of Loads #3 & 4 |
| 20% | Upon Shipment of Loads #5 & 6 |
| 5% | Upon Acceptance |

Allocation of Purchase Price to Design and Engineering:     25%

Target Dates, which, if missed, trigger Penalty Payments, Payable with Respect to the Ride:

| | |
|---|---|
| Concrete Drawing Package: | December 18, 1998 |
| Delivery of load nos. 1 and 2: | January 16, 1999 |
| Delivery of load nos. 3 and 4: | February 12, 1999 |
| Delivery of load nos. 5 and 6: | April 16, 1999 |

Based upon the initial deposit being received by December 4, 1998. Ship dates will be extended equally so to coincide with the date deposit is received.

# Steadfast Insurance Company

DOVER, DELAWARE

Administrative Offices - 1400 American Lane, Schaumburg, Illinois 60196-1056

## Commercial General Liability Declarations
## Occurrence Coverage

**Policy Number**
SCO 3776164-00       from

**Policy Period**
7/1/1999     to   7/1/2000

**Named Insured and Mailing Address**
O.D. Hopkins Associates, Inc.
# 2 Whitney Road
Penacook, NH  03303

**Producer Name and Address**
Cooney, Rikard & Curtin, Inc.
Birmingham, AL

**Producer Number 18435000**

The Policy Period begins and ends on the dates stated above at 12:01 A.M. Standard Time at your mailing address as stated above.

IN RETURN FOR THE PAYMENT OF PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

## LIMITS OF INSURANCE

This policy provides for the Limits of Insurance below:  See Section III for definition of Limits of Insurance

| | | |
|---|---|---|
| Each Occurrence Limit | $ 5,000,000 | |
| Personal and Advertising Injury Limit | $ 5,000,000 | Any One Person or Organization |
| Fire Damage Limit | $    50,000 | Any One Fire |
| Medical Expense Limit | $     1,000 | Any One Person |
| General Aggregate Limit (Other Than Products/Completed Operations) | $ 5,000,000 | |
| Products/Completed Operations Aggregate Limit | $ 5,000,000 | |

Form of Business:    ☐ Individual     ☐ Partnership     ☐ Joint Venture     ☒ Organization (Other than Partnership or Joint Venture)

Business Description:    Amusement Ride Mfg.

Location of all Premises you own, rent or occupy:   # 2 Whitney Road, Penacook, NH  03303

For Classifications, Codes, Premium Basis, Rates, and Advance Premium,
See attached Schedule of Operations

**Total Policy Premium:**    $55,000    Minimum & Deposit
**Premium payable at inception is:**    $55,000

Forms and Endorsements attached to this policy: See attached Forms and Endorsement Schedule.

Δ π EXHIBIT _6_
Deponent _GLOVER_
Date _7/13/05_ Rptr. _JPH_
DEPOBOOK

Countersigned this_____day of_____

_Carl R. Chapados_

Authorized Representative

STF-CGL-D-203-A CW (7/98)



**ZURICH**

# Steadfast Insurance Company

**Named Insured:   O.D. Hopkins Associates, Inc.**

| FORMS AND ENDORSEMENT SCHEDULE |
|---|

**Form Numbers**                                                        **Form Names**


STF - CGL - 111 C CW (7/98)                    Commercial General Liability Policy, Occurrence
                                                                           - Defense Costs Outside Limits

### Endorsements

| | |
|---|---|
| STF - CGL - 1003 A CW (7/98) | Cross Liability Suits Exclusion - CGL |
| STF - CGL - 1101 A CW (7/98) | Rating Page - Schedule of Operations |
| STF - CGL - 1201 A CW (7/98) | Self Insured Retention Endorsement |
| STF - CGL - 1221 A CW (8/98) | Service of Suit Clause - All Other States |
| STF - CGL - 1303 A CW (7/98) | Employee Benefits Liability Coverage |
| STF - CGL - 1423 A CW (7/98) | Coverage Territory -  Worldwide |
| STF - CGL - 1432 A CW (7/98) | Total Pollution Exclusion - Products-Completed Operations and Hostile Fire Exception |
| STF - CGL - 1435 A CW (7/98) | Subcontractors Liability |
| STF - CGL - 1516 B SW (8/98) | Designated Professional Services Exclusion |
| STF - CGL - 1530 A (8/98) | Y2K - Exclusion |
| STF - CGL - 1601 A CW (7/98) | Vendors - Broad Form Additional Insured |

**Countersigned** _____
            Authorized Representative

                                                                                STF-CGL-999 A CW (7/98)

**ZURICH**

### Steadfast Insurance Company

# Commercial General Liability Policy
## Occurrence - Defense Costs Outside Limits

*Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.*

*Throughout this policy the words "you" and "your" refer to the Named Insured shown in the declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us" and "our" refer to the company providing this insurance.*

*The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (SECTION II).*

*Other words and phrases that appear in quotation marks have special meaning. Refer to DEFINITIONS (SECTION V).*

In consideration of the payment of the premium, and in reliance upon the statements in the declarations and the application, and subject to the limits of insurance, and the terms, conditions and exclusions of this policy, we agree with you as follows:

### SECTION I -- COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as "damages" because of "bodily injury" and "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those "damages." However, we will have no duty to defend the insured against any "suit" seeking "damages" for "bodily injury" or "property damage" to which this insurance does not apply. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for "damages" is limited as described in LIMITS OF INSURANCE (SECTION III); and

      (2) Our right and duty to defend end when the applicable limit of insurance has been:

         (a) used up in the payment of "damages" under Coverages A or B or medical expenses under Coverage C; or

         (b) deposited in a court of competent jurisdiction.

      (3) If the limit of insurance is exhausted prior to settlement or judgment of any pending "suit," we have the right to withdraw from further defense of the "suit" by tendering control of the "suit" to the insured, and the insured agrees as a condition to the issuance of the policy to accept such tender.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS - COVERAGES A AND B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

      (2) The "bodily injury" or "property damage" occurs during the "policy period".

   c. "Damages" because of "bodily injury" include "damages" claimed by any person or organization for care, loss of services, or death resulting at any time from the "bodily injury".

2. **Exclusions.**

This insurance does not apply to:

a. **Expected or Intended Injury**

"Bodily injury" or "property damage" which results from an act that is intended by the insured or can be expected from the standpoint of a reasonable person to cause "bodily injury" or "property damage," even if the injury or damage is of a different degree or type than actually intended or expected. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b. **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay "damages" by reason of assumption of the liability of others in a contract or agreement, whether written or oral. This exclusion does not apply to liability for "damages":

(1) Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

(2) That the "insured" would have in the absence of the contract or agreement.

c. **Liquor Liability**

"Bodily injury" or "property damage" for which an insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

d. **Workers Compensation and Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e. **Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, grandparent, brother or sister of that "employee" of the insured, its parent, subsidiary or affiliate.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation of the insured to indemnify or contribute with another because of "damages" arising out of the "bodily injury."

This exclusion does not apply to liability assumed by the insured under an "insured contract."

f. **Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

(2) Any loss, cost or expense arising out of any:

(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant, or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

g. **Aircraft, Auto or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any "aircraft," "auto," or watercraft or snowmobile or trailer designed to use with a snowmobile owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading." This exclusion does not apply to:

(1) A watercraft while as... on premises you own or rent;

(2) A watercraft you do not own that is:

    (a) Less than 26 feet long; and

    (b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned, rented or loaned to you or the insured; or

(4) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in paragraph f.(2) or f.(3) of the definition of "mobile equipment" (Section V).

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes, without limitation, civil war, insurrection, rebellion or revolution.

**j. Damage to Property**

"Property damage" to:

(1) Property that the insured owns, rents, or occupies;

(2) Premises the insured sells, gives away, abandons, or ceases to have operational control over, if the "property damage" arises out of any part of those premises;

(3) Property loaned to the insured;

(4) Property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on such property.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall of Products, Work or Impaired Property**

"Damages" claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate

limit of insurance applies to this coverage as described in LIMITS OF INSURANCE (Section III).

o.  **Asbestos**

Any obligation of ours:

(1) To investigate, settle or defend any claim or "suit" against any insured alleging actual or threatened injury or damages of any nature or kind, including loss of use to persons or property, which arises out of or would not have occurred but for:

(a) Exposure to asbestos; or

(b) Manifestation of any disease relating to the exposure to asbestos during the policy period or at any time prior to the policy period;

(2) To pay, contribute or indemnify another for any injury or damage resulting in judgments, settlements, loss, costs or expenses awarded or incurred that:

(a) Arises out of any such claims or "suit"; or

(b) Arises due to compliance with any action authorized by law relating to such injury or damage.

p.  **Employment Related Practices**

"Bodily injury" to:

(1) A person arising out of any:

(a) Refusal to employ that person; or

(b) Termination of that person's employment; or

(c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in paragraphs (a), (b) or (c) above is directed.

This exclusion applies:

(3) Whether the insured may be liable as an employer or in any other capacity; and

(4) To any obligation to share damages with or repay someone else who must pay damages because of the injury;

q.  **Nuclear Liability**

"Bodily injury" or "property damage":

(1) with respect to which the insured is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability-Property Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; (b) the insured is, or, had this policy not been available, would be entitled to indemnity from the United States of America or any agency thereof, with any person or organization; or

(3) Under any liability coverage, resulting from the "hazardous properties" of "nuclear material," if;

(a) the "nuclear material" (i) is at any "nuclear facility" owned by the insured or operated by the insured or on the insured's behalf, or (ii) has been discharged or dispensed therefrom;

(b) the "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported, or disposed of by the insured or on the insured's behalf; or

(c) the "bodily injury" or "property damage" arises out of the furnishing by the insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion, (3) applies only to "property damage" to such "nuclear facility" and any property threat.

(4) As used in this exclusion:

(a) "hazardous properties" includes radioactive, toxic or explosive properties;

(b) "nuclear material" means "source material," special nuclear material" or "by-product material";

(c) "source material," "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or any law amendatory thereof;

(d) "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

(e) "waste" means any waste material (a) containing "by-product material" other than the tailing or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content and (b) resulting from the operations by any person or organization of a "nuclear facility" included within the definition of "nuclear facility" below;

(f) "nuclear facility" means

(i) any "nuclear reactor";

(ii) any equipment or device designed or used for [1] separating the isotopes of uranium or plutonium, [2] processing or utilizing "spent fuel", or [3] handling, processing or packaging "wastes";

(iii) any equipment or device used for the processing, fabricating, or alloying of "special nuclear material" if at any time the amount of such material in your custody at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235.

(iv) any structure, basin, excavation, premises or place prepared or used for storage or disposal of "waste" and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

(g) "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

(h) "property damage" includes all forms of radioactive contamination of property

## COVERAGE B. PERSONAL INJURY AND ADVERTISING INJURY LIABILITY

### 1. Insuring Agreement.

a. We will pay those sums that the insured becomes legally obligated to pay as "damages" because of "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those "damages." However, we will have no duty to defend the insured against any "suit" seeking "damages" for "personal injury" or "advertising injury" to which this insurance does not apply. We may at our discretion investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for "damages" are limited as described in LIMITS OF INSURANCE (Section III); and

(2) Our right and duty to defend end when the applicable limit of insurance has been:

(a) used up in the payment of "damages" under Coverages A or B or medical expenses under Coverage C; or

(b) deposited in a court of competent jurisdiction.

(3) If the Limit of Insurance is exhausted prior to settlement or judgment of any "suit" we will have the

right to withdraw from further defense of the suit by rendering control of such defense to the insured, and the insured agrees as a condition to the issuance of this policy to accept such tender.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS - COVERAGES A AND B.

b. This insurance applies to:

(1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

(2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services;

but only if the offense was committed in the "coverage territory" during the policy period.

### 2. Exclusions

This insurance does not apply to:

a. "Personal injury" or "advertising injury":

(1) **False Publications**

Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(2) **Publications Prior to Policy Period**

Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(3) **Violation of Penal Statutes or Ordinances**

Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured;

(4) **Liability Assumed by Contract**

For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for "damages" that the insured would have in the absence of the contract or agreement;

(5) **Pollution**

(a) Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

(b) Any loss, cost or expense arising out of any:

(i) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

(ii) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant, or contaminant, including smoke, vapors, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

(6) **Asbestos**

Any obligation of ours:

(a) To investigate, settle or defend any claim or "suit" against any insured alleging actual or threatened injury or damages of any nature or kind, including loss of use to persons or property, which arises out of or would not have occurred but for:

(i) Exposure to asbestos; or

(ii) Manifestation of any disease relating to the exposure to asbestos during the policy period or at any time prior to the policy period;

(b) To pay, contribute or indemnify another for any injury or damage resulting in judgments, settlements, loss, costs or expenses awarded or incurred that:

(i) Arises out of any such claims or "suit"; or

(ii) Arises due to compliance with any action authorized by law relating to such injury or damage.

(7) **Employment Related Practices**

To a person arising out of any:

(a) (i) Refusal to employ that person;

(ii) Termination of that person's employment; or

(iii) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, or discrimination directed at that person; or

(b) The spouse, child, parent, brother or sister of that person as a consequence of "personal injury" or "advertising injury" to that person at whom any of the employment-related practices described in paragraphs (a), (b) or (c) above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

b. "Advertising injury" arising out of:

(1) **Breach of Contract**

Breach of contract, other than misappropriation of advertising ideas under an implied contract;

(2) **Advertised Quality or Performance**

The failure of goods, products or services to conform with advertised quality or performance;

(3) **Wrong Price**

The wrong description of the price of goods, products or services;

(4) **Infringement of Patent or Trademark**

Infringement of patent or trademark, whether direct, contributory or by inducement; or

(5) **Advertising, Broadcasting, Publishing or Telecasting Business**

An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

## COVERAGE C. MEDICAL PAYMENTS

1. **Insuring Agreement**.

   a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

      (1) On premises you own or rent;

      (2) On ways next to premises you own or rent; or

      (3) Because of your operations; provided that:

         (a) The accident takes place in the "coverage territory" and during the policy period;

         (b) The expenses are incurred and reported to us within one year of the date of the accident;

         (c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

   b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

      (1) First aid at the time of an accident;

      (2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

      (3) Necessary ambulance, hospital, professional nursing and funeral services.

2. **Exclusions**.

   We will not pay for expenses for "bodily injury":

   a. To any insured.

   b. To a person hired to do work for or on behalf of any insured or a tenant of any insured.

   c. To a person injured on that part of premises you own or rent that the person normally occupies.

   d. To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or similar law.

   e. To a person injured while taking part in athletics.

   f. Included within the "products-completed operations hazard."

   g. Excluded under Coverage A.

   h. If you are a club, to any of your members.

   i. If you are a hotel, motel or tourist court, to any of your guests.

   j. Arising from or in connection with any medical expenses for services by you, any of your employees or any person or organization under a contract to you to provide such services.

## SUPPLEMENTARY PAYMENTS - COVERAGES A and B

We will pay, with respect to any claim or "suit" we defend:

1. All expenses we incur for investigation, adjustment and defense of claims and "suits," including attorneys' fees, expert and witness fees and court costs;

2. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds;

3. All reasonable expenses incurred by the insured with our prior written consent to assist us in the investigation, adjustment or defense of the claim or "suit," including actual loss of earnings up to $100 a day because of time off work;

4. All costs taxed against the insured in the "suit";

5. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on the period of time after the offer; and

6. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

Supplementary Payments do not include the salaries of your "employees" or our "employees."

These payments will not reduce the limits of insurance.

## SECTION II - WHO IS AN INSURED

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. An organization other than a partnership or joint venture, you are an insured. Your "executive offi-

cers" and directors are insured, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

a. Your "employees," other than your "executive officers," but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, no "employee" is an insured for:

   (1) "Bodily injury" or "personal injury";

      (a) To you, to your partners or members (if you are a partnership or joint venture), or to a co-"employee" while in the course of his or her employment or while performing duties related to the conduct of your business;

      (b) To the spouse, child, parent, grandparent, brother or sister of that co-"employee";

      (c) For which there is any obligation to indemnify or contribute with another who must pay "damages" because of the injury described in (l)(a) or (b) above; or

      (d) Arising out of his or her providing or failing to provide professional health care services.

   (2) "Property damage" to property:

      (a) Owned, occupied or used by,

      (b) Rented to, in the care custody or control of, or over which physical control is being exercised for any purpose by you, any of your "employees," or, if you are a partnership or joint venture, by any partner or member.

b. Any person (other than your "employee"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

   (1) With respect to liability arising out of the maintenance or use of that property; and

   (2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to that person's duties as such. That representative will have all your rights and duties under this policy.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment

along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured but only with respect to liability arising out of the operation of the equipment, and, only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

a. "Bodily injury" to a co-"employee" of the person driving the equipment; or

b. "Property damage" to property owned by, rented to, in charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a joint venture, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization;

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal injury" or "advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

## SECTION III - LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits."

2. The General Aggregate Limit is the most we will pay for the sum of:

a. Medical expenses under Coverage C;

b. "Damages" under Coverage A, except "damages" because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

c. "Damages" under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for "damages" because of "bodily injury" and "property damage" included in the "products-completed operations hazard."

4. Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all "damages" because of all "personal injury" and all "advertising injury" sustained by any one person or organization.

5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

a. "Damages" under Coverage A; and

b. Medical expenses under Coverage C

because of all "bodily injury" and "property damage" arising out of any one "occurrence."

6. Subject to 5. above, the Fire Damage Limit is the most we will pay under Coverage A for "damages" because of "property damage" to premises, while rented to you or temporarily occupied by you with permission of the owner, arising out of any one fire.

7. Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this policy apply separately to each consecutive "policy period." The "policy period" begins with the effective date shown in the Declarations. If the "policy period" is extended after issuance for any additional period, the additional period will be deemed part of the last preceding period for the purpose of determining the limits of insurance.

## SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy.**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this policy.

2. **Duties In The Event of "Occurrence," Offense, Claim or "Suit."**

   a. You must see to it that we are notified promptly of an "occurrence" or an offense which may result in a claim. Notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

Notice of an "occurrence" is not notice of a claim.

b. If a claim is made or "suit" is brought against any insured, you must immediately record the specifics of the claim or "suit" and the date received, and see to it that we receive prompt written notice of the claim or "suit".

c. You and any other involved insured must:

   (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

   (2) Authorize us to obtain records and other information;

   (3) Cooperate with us in the investigation, adjustment or settlement of the claim, in our coverage investigation, and in defense against the "suit"; and

   (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or "damage" to which this insurance may also apply.

d. No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, admit liability or incur any expense other than for first aid, without our consent.

3. **Legal Action Against Us.**

   No person or organization has a right under this policy:

   a. To join us as a party or otherwise bring us into a "suit" asking for "damages" from an insured; or

   b. To sue us on this policy unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial, but we will not be liable for "damages" that are not payable under the terms of this policy or that are in excess of the available limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. **Other Insurance.**

   If other valid and collectible insurance is available to the insured for a loss we cover under Coverage A or B of this Coverage Part, our obligations are limited as follows:

   a. Primary Insurance

      This insurance is primary except when there is other insurance applying on a primary basis. Then b. below applies.

   b. Excess Insurance

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis.

When this insurance is excess, we will have no duty to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under any other insurance.

5. **Premium.**

a. The first Named Insured is responsible for the payment of all premiums, which are due in full 30 days after the policy period begins; and the first Named Insured shall be the payee for any return premium that becomes due.

b. If the premium is a flat charge, it is not subject to adjustment.

c. If the premium is other than a flat charge, it is an advance premium only. The earned premium will be computed at the end of each year in which this insurance is in force at the rate shown in the Declarations, subject to the minimum annual premium.

6. **Review of Records.**

We may examine and audit your books and records as they relate to this insurance:

a. At any time during the "policy period";

b. Up to three years afterwards; or

c. Within one year after final settlement of all claims under this policy.

7. **Inspections and Surveys.**

We have the right but are not obligated to:

a. Make inspections and surveys at any time;

b. Give you reports on the conditions we find; and

c. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. We do not warrant that conditions:

a. Are safe and healthful; or

b. Comply with law, regulations, codes or standards.

8. **Representations and Warranties.**

By accepting this policy, you agree, represent and warrant that:

a. The statements in the Declarations are accurate and complete;

b. The statements in the Declarations are based upon representations you made to us;

c. The statements in the application for this insurance and any supplementary material attached to it are truthful, accurate and complete; and

d. We have issued this policy in reliance upon your representations as contained in (a.) through (c.) above.

9. **Separation of Insureds.**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this policy to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

10. **Transfer of Rights of Recovery Against Others To Us.**

If the insured has rights to recover all or part of any payments we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

11. **Cancellation and Nonrenewal**

a. The first Named Insured shown in the Declarations may cancel this policy by surrendering it to us or our authorized agent or by sending us written notice stating when the cancellation will be effective.

b. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

(1) 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

c. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

STF-CGL-111-C CW (7-98)

d. Notice of cancellation will be the effective date of cancellation. The policy period will end on that date.

e. If the policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. We may adjust the premium either when cancellation becomes effective or as soon as practicable thereafter, but the cancellation will be effective even if we have not made or offered a refund.

f. If notice of cancellation is mailed, proof of mailing will be sufficient proof of notice.

g. If we decide not to renew this policy, we will mail or deliver to the first Named Insured written notice of nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**12. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**13. Transfer of Your Rights and Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative, but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties, but only with respect to that property.

**SECTION V - DEFINITIONS**

1. **"Advertising injury"** means injury arising out of one or more of the following offenses:

   a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   b. Oral or written publication of material that violates a person's right of privacy;

   c. Misappropriation of advertising ideas or style of doing business; or

   d. Infringement of copyright, title or slogan.

   Such offenses must be committed in the course of advertising your goods or products during the "policy period."

2. **"Auto"** means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment."

3. **"Aircraft"** means a vehicle used or built for flight in the air.

4. **"Bodily injury"** means physical injury, sickness or disease and mental anguish or emotional distress when accompanied by physical injury, sustained by a person, including death resulting from any of these at any time.

5. **"Coverage territory"** means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada:

   b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in (a) above; or

   c. All parts of the world if:

      (1) The injury or damage arises out of:

         (a) Goods or products made or sold by you in the territory described in a. above; or

         (b) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; and

      (2) The insured's responsibility to pay "damages" is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

6. **"Damages"** means money that is paid to compensate an injured party for "bodily injury," "property damage," "personal injury" or "advertising injury."

7. **"Employee"** includes a "leased worker." "Employee" does not include a "temporary worker."

8. **"Executive officer"** means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

9. **"Impaired property"** means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use; or

c.  The repair, replacement, adjustment, or removal of "your product" or "your work"; or

d.  Your fulfilling the terms of the contract or agreement.

10.  "Insured contract" means a written contract for:

a.  A lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b.  A sidetrack agreement;

c.  Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d.  An obligation, as required by ordinance, to indemnify a municipality; or

e.  An elevator maintenance agreement.

f.  That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1)  That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

(2)  That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a)  Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

(b)  Giving directions or instruction, or failing to give them, if that is the primary cause of the injury or damage;

(3)  Under which the insured, if an architect, engineer or surveyor, assumes liability for any injury or damage arising out of the insured's rendering or failure to render professional

service, including those listed in (2) above and supervisory, inspection or engineering services.

11.  "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. A "leased worker" does not include a "temporary worker."

12.  "Loading or unloading" means the handling of property:

a.  After it is moved from the place where it is accepted for movement into or onto an "aircraft", watercraft or "auto";

b.  While it is in or on an "aircraft," watercraft or "auto"; or

c.  While it is being moved from an "aircraft", watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the "aircraft", watercraft or "auto."

13.  "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a.  Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b.  Vehicles maintained for use solely on or next to premises you own or rent;

c.  Vehicles that travel on crawler treads;

d.  Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1)  Power cranes, shovels, loaders, diggers or drills; or

(2)  Road construction or resurfacing equipment such as graders, scrapers or rollers;

e.  Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1)  Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2)  Cherry pickers and similar devices used to raise or lower workers;

f.  Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos:"

    (1) Equipment designed primarily for:

        (a) Snow removal;

        (b) Road maintenance, but not construction or resurfacing; or

        (c) Street cleaning;

    (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

14. **"Occurrence"** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in "bodily injury" or "property damage."

15. **"Personal injury"** means injury, other than "bodily injury," arising out of one or more of the following offenses:

  a.  False arrest, detention or imprisonment;

  b.  Malicious prosecution;

  c.  Any of the following acts if done by or on behalf of an owner, landlord or lessor:

    (1) Wrongful eviction from,

    (2) Wrongful entry into, or

    (3) Invasion of the right or private occupancy of a room, dwelling or premises that a person occupies;

  d.  Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

  e.  Oral or written publication of material that violates a person's right of privacy.

16. **"Policy period"** means the period set forth in Item 1 of the Declarations.

17. a.  **"Products- completed operations hazard"** means all "bodily injury" and "property damage" occurring away from premises you own rent or occupy and arising out of "your product" or "your work," except:

    (1) Products that are still in your physical possession; or

    (2) Work that has not yet been completed or abandoned.

  b.  "Your work" will be deemed completed at the earliest of the following times:

    (1) When all of the work called for in your contract has been completed.

    (2) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

    (3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete will be treated as completed.

  c.  This hazard does not include "bodily injury" or "property damage" arising out of:

    (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it;

    (2) The existence of tools, uninstalled equipment or abandoned or unused materials;

    (3) Products or operations for which the classification in this policy or in our manual of rules includes products or completed operations.

18. **"Property damage"** means:

  a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

  b.  Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

19. **"Suit"** means a civil proceeding in which "damages," because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this policy applies are alleged. "Suit" includes an arbitration proceeding alleging such "damages" to which the insured submits with our consent, or any alternative dispute resolution in which such "damages" are claimed and to which the insured submits with our consent.

20. **"Temporary worker"** means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

21. **"Your product"** means:

a.  Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

   (1) You;

   (2) Others trading under your name; or

   (3) A person or organization whose business or assets you have acquired; and

b.  Containers (other than vehicles), materials parts or equipment furnished in connection with such goods or products.

"Your product" includes:

a.  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

b.  The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

22. "**Your work**" means:

a.  Work or operations performed by you or on your behalf; and

b.  Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

a.  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

b.  The providing of or failure to provide warnings or instructions in connection with such goods or products.



**ZURICH**

## Steadfast Insurance Company

| POLICY NUMBER | EFF. DATE OF POLICY | EXP. DATE OF POLICY | EFF. DATE OF ENDT. | PRODUCER NUMBER | DATE TYPED | ENDORSEMENT NUMBER |
|---|---|---|---|---|---|---|
| SCO 377616400 | 7/1/99 | 7/1/2000 | 7/1/99 | 18435000 | 7/16/99 | 1 |

**NAMED INSURED: O.D. Hopkins Associates, Inc.**

| Cross Liability Suits Exclusion |
|---|

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

This endorsement modifies insurance provided under the:

**Commercial General Liability Coverage Part**

**This policy does not apply to** "bodily injury", "property damage", "personal injury" or "advertising injury" sustained by any named insured, whether or not such injury or damage arises out of the activities or operations of any other named insured.

**Countersigned**

_____

Authorized Representative

STF-CGL-1003A CW (7/98)



**ZURICH**

## Steadfast Insurance Company

| POLICY NUMBER | EFF. DATE OF POLICY | EXP. DATE OF POLICY | EFF. DATE OF ENDT. | PRODUCER NUMBER | DATE TYPED | ENDORSEMENT NUMBER |
|---|---|---|---|---|---|---|
| SCO 377616400 | 7/1/99 | 7/1/2000 | 7/1/99 | 18435000 | 7/16/99 | 2 |

**NAMED INSURED: O.D. Hopkins Associates, Inc.**

| | Schedule of Operations |
|---|---|

General Liability Hazards:

| Description Of Hazards | Code Number | Premium Basis | Rate | Advance Premium |
|---|---|---|---|---|
| Amusement Park | 33363 | $19,800,000 (s) | $2.78 | $55,000 |

| | |
|---|---|
| **TOTAL ADVANCE PREMIUM** (Minimum & Deposit) | $55,000 |
| **MINIMUM ANNUAL PREMIUM** | $55,000 |
| **MINIMUM EARNED PREMIUM** ( Minimum Earned Premium is 25% of Advance Premium ) | $13,750 |

Premium Basis Guide
s- Per $1000 of Gross Sales                         c-Per $1,000 Total Cost
p-Per $1,000 Payroll                                    o- Other

Definitions
Gross Sales - means Gross Sales of the Insured less intercompany sales and any sales from those
        operations specifically excluded by endorsement to this policy.

Payroll - means total Payroll of the Insured less overtime premium payroll and any payroll for those
        operations specially excluded by endorsement to this policy.

Total Cost -
Other -

Countersigned _____
                    Authorized Representative

STF-CGL-1101 A CW (7/98)



**ZURICH**

## Steadfast Insurance Company

| POLICY NUMBER | EFF. DATE OF POLICY | EXP. DATE OF POLICY | EFF. DATE OF ENDT. | PRODUCER NUMBER | DATE TYPED | ENDORSEMENT NUMBER |
|---|---|---|---|---|---|---|
| SCO 377616400 | 7/1/99 | 7/1/2000 | 7/1/99 | 18435000 | 7/16/99 | 3 |

### NAMED INSURED: O.D. Hopkins Associates, Inc.

---

Self Insured Retention Endorsement (Defense Costs Included)

---

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the:

**Commercial General Liability Coverage Part**

---

### SCHEDULE

#### SELF INSURED RETENTION AMOUNTS

$ N/A        **Per Occurrence**

$ 5,000      **Per Claim**

**AGGREGATE $**

PERIODIC REPORTING REQUIREMENT -  Quarterly

LEVEL OF NOTIFICATION OF POTENTIAL PENETRATION - 50 % OF SELF INSURED

RETENTION

---

The insurance provided by this policy is subject to the following additional provisions, which in the event of conflict with any other provisions elsewhere in the policy, shall control the application of the insurance to which this endorsement applies:

I. **Self Insured Retention and Defense Costs - Your Obligations**

A. The "self insured retention" amounts stated in the Schedule of this endorsement apply as follows:

1. If a Per Occurrence "self insured retention" amount is shown in the Schedule of this endorsement, you shall be responsible for payment of all

damages and "defense costs" for each "occurrence" or offense, until you have paid "self insured retention" amounts and "defense costs" equal to the Per Occurrence amount shown in the Schedule, subject to the provisions of A. 3. below, if applicable. The Per Occurrence amount is the most you will pay for "self insured retention" amounts and "defense costs" arising out of any one "occurrence" or offense, regardless of the number of persons or organizations making claims or bringing suits because of the "occurrence" or offense.

2. If a Per Claim "self insured retention" amount is shown in the Schedule of this

---

Countersigned _____

Authorized Representative

STF-CGL-1201 A CW (7/98)

endorsement, you shall responsible for payment of all damages and "defense costs" for each claim until you have paid "self insured retention" amounts and "defense costs" equal to the Per Claim amount shown in the Schedule, subject to the provisions of A. 3. below, if applicable. The Per Claim amount is the most you will pay for "self insured retention" amounts and "defense costs" sustained by any one person or organization as a result of any one "occurrence" or offense.

3. If an Aggregate "self insured retention" amount is shown in the Schedule of this endorsement, the Aggregate amount is the most you will pay for all "self insured retention" amounts and "defense costs" incurred under this policy. This amount applies separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations of this policy.

If no entry appears in the Schedule of this endorsement as Aggregate, then your obligation for payment of "self insured retention" amounts and "defense costs" applies in accordance with the Per Occurrence or Per Claim "self insured retention" provisions, as applicable.

4. Except for any "defense costs" that we may elect to pay, you shall pay all such "defense costs" as they are incurred until you have paid "defense costs" and damages for "bodily injury," "property damage," "personal injury," "advertising injury", medical payments or any other such coverages which may be included in the policy, equal to the applicable "self insured retention" amount. If any final judgment or settlement and "defense costs" is less than the "self insured retention" amount stated above, we shall have no obligation to reimburse you or pay "defense costs" under this policy.

B. **Settlement of Claim**

You may not settle any claim or suit which exceeds any "self insured retention" amount indicated in the Schedule of this endorsement without our written permission to do so. If you fail to obtain such written permission, we shall have no obligation to provide coverage for that claim or suit under this policy.

C. **Authorized Claim Service Provider**

1. You shall employ a claim service

provider acceptable to us for the purpose of providing claim services for settlement of losses within the "self insured retention" amounts. You shall pay all fees, charges and costs of the claim service provider in addition to the "self insured retention" amounts, without any reimbursement from us.

2. In the event of cancellation, expiration or revision of the claims service contract between you and the claim service provider, you shall notify us within (10) days of such change and shall replace the claim service provider with another claim service provider that is acceptable to us.

D. **Notification of Potential Penetration**

1. You or the authorized claim service provider must notify us promptly of an "occurrence" or offense which may result in a claim under this policy. Notice must include:

   a. How, when and where the "occurrence or offense took place;

   b. The names and addresses of any injured persons and witnesses; and

   c. The nature and location of any injury or damage arising out of the "occurrence" or offense.

2. You or the authorized claim service provider must notify us promptly, per D.1. above, in the event of any "occurrence" or offense, without regard to liability, which results in any of the following injuries:

   a. Death;

   b. Brain damage;

   c. Paraplegic or quadriplegic impairment;

   d. Amputation or serious functional impairment of any major limb;

   e. Severe burns involving more than 25% of the body or causing serious disfigurement;

   f. sensory impairment (sight, hearing, taste or smell);

   g. Severe internal body organ damage or loss;

   h. Multiple fractures involving more than one body part;

   i. Permanent and total disability;

   j. Sexual abuse or molestation; or

   k. Significant psychological / neurological involvement.

3. You or the authorized claim service provider

STF-CGL-1201 A CW (7/98)

must notify us promptly of:

a.  potential exposure which equals or exceeds the level of notification of potential penetration of the "self insured retention" amount shown in the Schedule of this endorsement for Per Occurrence or Per Claim, whichever applies;

b.  loss reserve established which equals or exceeds the level of notification of potential penetration of the "self insured retention" amount shown in the Schedule of this endorsement for Per Occurrence or Per Claim, whichever applies;

c.  potential judgment, if the claim prevails, without regard to liability, which equals or exceeds the level of notification of potential penetration of the "self insured retention" amount shown in the Schedule of this endorsement for Per Occurrence or Per Claim, whichever applies; or

d.  suit, in the event a suit is filed, and we         shall have the right to appoint defense counsel, even if the amount claimed in the suit is unspecified or less than the "self insured retention" amount shown in the Schedule of this endorsement for Per Occurrence or Per Claim, whichever applies.

E.  **Reporting – Self Insured Retention**

1.  You must report on claims or suits per the following:

You or the authorized claim service provider must monitor the cumulative "self insured retention" incurred amounts and "defense costs" sustained during the policy period and report those total amounts to us in accordance with the frequency of report indicated in the Periodic Reporting Requirement of the Schedule of this endorsement. However, if the total of all incurred losses and "defense costs" should at any time during the policy period attain a total amount equal to 75% of the Aggregate Self Insured Retention amount, you are required in that event to make an immediate report to us as to total incurred losses and "defense costs" sustained at that time.

The Periodic Report that you send to us must be in a format that is acceptable to us, and include an accounting of all individual losses and "defense costs" incurred as of the date of the Report.

2.  Within forty-five (45) days after the end of the policy term, you must give us a listing of all existing claims or suits within the Self Insured Retention Amounts. At a minimum, such listing will include the following for each claim or suit:

i.  a description of each claim or suit;

ii  the date of the "occurrence" or offense;

iii.  the amounts paid and reserved for future payments for loss and "defense costs"; and

iv.  the current status of the claim or suit.

3.  Quarterly thereafter, you are required to give us an updated listing of the status of all claims or suits, both paid and reserved, until all claims or suits for the reporting period are closed or settled.

4.  Compliance with the reporting requirements set forth in this endorsement is a condition precedent to coverage. You acknowledge that in the event of non-compliance, we shall not be required to establish prejudice resulting from the non- compliance, but shall be automatically relieved of liability with respect to the claim.

F.  **Representations**

By acceptance of this policy you agree that you will not procure insurance for all or any part of the "self insured retention" amounts shown in the Schedule of this endorsement. If such insurance is procured, there will be no coverage under this policy.

II.  **Self Insured Retention and Defense Costs - Our Rights and Obligations**

A.  In the event of your refusal to respond to your obligations for the payment of "self insured retention" amounts or "defense costs" for any reason, the insurance provided by this policy shall not make payments for you, nor in any event shall we be required to substitute for you as respects your responsibility for payment of these "self insured retention" or "defense costs" amounts.

B.  We shall be liable only for the amount of damages and "defense costs" in excess of the "self insured retention" amounts as applicable, shown in the Schedule above, up to the applicable Limits of Insurance shown in the

Declarations of this po

C.  **Settlement of Claims**

1.  We shall have, at our option, the right to negotiate the settlement of any claim we deem expedient both within and in excess of the applicable "self insured retention" amount, but

    continue with any legal proceedings in connection with such claim, our liability for that claim shall not exceed the amount determined by subtracting the "self insured retention" amount from the amount for which the claim could have been settled, including "defense costs" incurred with our consent to the date of such refusal. And we shall have no liability with respect to such claim if that difference is zero or negative.

2.  With respect to any claim under this insurance which has been tendered to us and which may exceed the "self insured retention" amount shown in the Schedule of this endorsement for Per Occurrence or Per Claim, whichever applies, we may pay any or all of the "self insured retention" amount and "defense costs" on your behalf to defend or to effect settlement of such claim. Such amount paid by us shall be reimbursed promptly by you.

    Regardless of whether the damages for "bodily injury", "property damage", "personal injury", "advertising injury" medical payments or any other such coverages or "defense costs" for which coverage is provided under this policy appear likely to exceed the "self insured retention" amounts stated above, we shall have the right, but not the duty, to defend any claim seeking damages for which coverage would be provided under this policy in the absence of the "self insured retention" amount.    In the event we incur any "defense costs" in the exercise of our right to defend any claim, you shall not be liable to reimburse us for those "defense costs".

we shall obtain your consent prior to entering into any settlement of any claim which is equal to or less than the "self insured retention" amount. If, however, you shall refuse to consent to any settlement recommended by us within the "self insured retention" amount and shall elect to contest the claim or

III.  **Midterm Cancellation**

In the event of a midterm cancellation of this policy, the "self insured retention" amount shown in the Schedule of this endorsement as Aggregate is not subject to any pro rata reduction. Such Aggregate amount will apply as if the policy term had not been shortened.

IV.  **Definitions**

A.  "Self insured retention" means:

    the amount or amounts which you or any insured must pay for all compensatory damages which you or any insured shall become legally obligated to pay because of "bodily injury", "property damage", "advertising injury", "personal injury", medical payments or any other such coverage included in the policy, sustained by one or more persons or organizations.

B.  "Defense costs" means:

    expenses directly allocable to specific claims and shall include but not be limited to all Supplementary payments as defined under the policy(ies); all court costs, fees and expenses; costs for all attorneys, witnesses, experts, depositions, reported or recorded statements, summonses, service of process, legal transcripts or testimony, copies of any public records; alternative dispute resolution; interest; investigative services, medical examinations, autopsies, medical costs containment; declaratory judgment, subrogation and any other fees, costs or expenses reasonably chargeable to the investigation, negotiation, settlement or defense of a claim or a loss under the policy(ies).



**ZURICH**

# Steadfast Insurance Company

| POLICY NUMBER | EFF. DATE OF POLICY | EXP. DATE OF POLICY | EFF. DATE OF ENDT. | PRODUCER NUMBER | DATE TYPED | ENDORSEMENT NUMBER |
|---|---|---|---|---|---|---|
| SCO 377616400 | 7/1/99 | 7/1/2000 | 7/1/99 | 18435000 | 7/16/99 | 4 |

**NAMED INSURED: O.D. Hopkins Associates, Inc.**

| | |
|---|---|
| | **Important Notice** |

**Service of Suit Clause**

In the event of our failure to pay any amount to be due under this policy, at your request, we will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver of our right to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or any state in the United States. It is agreed that service of process in such suit may be made upon our General Counsel, Law Department, Steadfast Insurance Company, 1400 American Lane, Schaumburg, Illinois 60196-1056, or his or her representative, and we will abide by the final decision of such court or of any appellate court in the event of an appeal of any suit initiated against us under this policy.

If any statute of any state, territory or district of the United States requires service of process be made upon an officer of the state, we designate the Superintendent, Commissioner, or Director of Insurance, or other officer specified for this purpose in the statute, as our true and lawful attorney whom may be served any lawful process instituted by you or on your behalf, or any beneficiary, arising out of this policy. We designate our General Counsel as the person to whom the officer is authorized to mail such process.

## In Witness Clause

In return for the payment of premium, and subject to the terms of this policy, we agree to provide insurance as stated in this policy. This policy shall not be valid unless countersigned by our duly authorized representative.

In Witness Whereof, we have executed this policy, and, where required, have had it countersigned by our duly authorized representative.

President
Steadfast Insurance Company

Corporate Secretary
Steadfast Insurance Company

**Countersigned**

_____
Authorized Representative

STF-CGL-1221 A CW (8/98)



## Steadfast Insurance Company

| POLICY NUMBER | EFF. DATE OF POLICY | EXP. DATE OF POLICY | EFF. DATE OF ENDT. | PRODUCER NUMBER | DATE TYPED | ENDORSEMENT NUMBER |
|---|---|---|---|---|---|---|
| SCO 377616400 | 7/1/99 | 7/1/2000 | 7/1/99 | 18435000 | 7/16/99 | 5 |

### NAMED INSURED: O.D. Hopkins Associates, Inc.

| Employee Benefits Liability Coverage (Defense Costs Outside Limits) |
|---|
| Shared Aggregate |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

This endorsement modifies insurance provided under the:

**Commercial General Liability Coverage Part**

| SCHEDULE |
|---|

**Limits of Insurance:**
$5,000 000 each "negligent act"

**Self-Insured Retention:**
$2,500 each "negligent act"

A.  **Coverage:**

We will pay those sums the "insured" becomes legally obligated to pay because of damages because of a "negligent act" in the "administration" of "your employee benefits program." No other obligation or liability to pay sums or to perform acts or services is covered unless explicitly provided for in the Supplementary Payments section of the Commercial General Liability Coverage Form to which this endorsement is attached.

B.  **Self-Insured Retention/Deductible:**

This insurance applies only to damages over the per "negligent act" amount shown above. We will only pay that part of the damages which exceed the Self-Insured Retention/Deductible up to the LIMITS OF INSURANCE.

C.  **Policy Territory and Period:**

This insurance applies only to "negligent acts" committed by an "insured" during the policy period within the United States of America, its territories or possessions.

Countersigned _____    _____
                        **Authorized Representative**

D. **Definitions:**

1. "Administration" means the performance of the following ministerial functions for "your employee benefits program":

    a. Advising "employees" eligible to participate in "your employee benefits program" of their rights and options;

    b. Handling of records in connection with "your employee benefits program;

    c. Enrolling, terminating, or canceling of "employees" in "your employee benefits program;

    d. Collecting contributions and applying them as called for under the rules of "your employee benefits program";

    e. Processing claims in connection with "your employee benefits program"; or

    f. Preparation of communications to inform "employees" about their benefits.

2. "Employee" means your officers or any persons employed and compensated by you, whether actively employed, disabled or retired.

3. "Insured" means the named insured, any partner, executive officer, director, stockholder or "employee" authorized to act in the "administration" of "your employee benefits program."

4. "Negligent act" means any negligent act, error or omission in the "administration" of "your employee benefits program."

5. "Your employee benefits program" means group life insurance, group accident and health insurance, profit sharing plans, pension plans, "employee" stock subscription plans, worker's compensation, unemployment insurance, social security and disability insurance or similar plans or programs.

E. **Limits of Insurance:**

The Limits of Insurance stated in the Schedule:

1. for each "negligent act" is the maximum we will pay regardless of the number of:

    a. "insureds";

    b. "negligent acts";

    c. claims made or suits brought;

    d. persons or organizations making claims or bringing suits; or

    e. plans included in "your employee benefits program".

2. as Aggregate is subject to the above rule for each "negligent act" and is included within and not in addition to the General Aggregate Limit as described in SECTION III Limits of Insurance in the Commercial General Liability Coverage Form to which this endorsement is attached.

F. Condition:

CONDITION 2. of SECTION IV. of the Commercial General Liability Form is replaced with the following:

2. Duties in the Event of a "Negligent Act," Claim or Suit

    a. You must see to it that we are notified as soon as practicable of an alleged "negligent act" which may result in a claim or suit. Notice should include as many details as possible.

    b. If a claim is received by any "insured" you must:

        (1) immediately record the specifics of the claim and the date received; and

        (2) notify us as soon as practicable.

    c. You and any other involved "insured" must:

        (1) immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit;

        (2) authorize us to obtain records and other information;

STF-CGL-1303 A CW (7/98)
page 2