UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
SIX FLAGS, INC., and TIG INSURANCE  )
COMPANY,                            )
                                    )
           Plaintiffs,              )
                                    )
v.                                  )        CIVIL ACTION NO. 05-11444 NMG
                                    )
STEADFAST INSURANCE COMPANY,        )
                                    )
           Defendant.               )
                                    )
```

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs Six Flags, Inc. ("Six Flags")[1] and TIG Insurance Company ("TIG"), hereby oppose defendant Steadfast Insurance Company's ("Steadfast") motion for summary judgment and, in addition, move for summary judgment on Counts I, II and III of their Complaint. Under both Endorsement 11 and Endorsement 12 of the Steadfast policy, Six Flags was an additional insured with respect to the underlying litigation. Accordingly, Plaintiffs respectfully request that this Court enter a judgment declaring that Steadfast owed a duty to defend and indemnify Six Flags in the underlying action, and that it is required to reimburse the plaintiffs for all the costs and fees incurred by them in defending and indemnifying Six Flags, as well as the cost of this coverage litigation.

**FACTUAL BACKGROUND**

Beginning in 1985, Six Flags contracted with O.D. Hopkins Associates, Inc. ("OD Hopkins") to construct rides for its amusement parks. In mid-1998, Six Flags negotiated with

---

[1] From 1994 until June 30, 2000, Six Flags, Inc. was known as Premier Parks, Inc. For the sake of clarity, "Six Flags" will be used to identify the plaintiff regardless of the time period being discussed.

James Glover, OD Hopkins' Vice President of Sales and Marketing, as to the terms for the construction of a river raft ride at its Agawam amusement park.  Glover was the primary contact from OD Hopkins in the negotiation of the terms for the project.  James Pendleton, the president of OD Hopkins, had minimal involvement as he was spending extensive time traveling to Asia on other projects.

 As part of the negotiation process, OD Hopkins drafted several documents setting out the specifications for the project, and proposed payment terms, including a purchase price of $1,057,000.  OD Hopkins began construction of the ride even though Six Flags had not signed any contract documents.

In November, 1998, Six Flags sent a Letter Agreement to James Glover that included seventeen numbered paragraphs containing proposed terms and conditions for the project.  The Letter Agreement incorporated an appendix which listed the purchase price as $1,057,000, the same figure that appeared in the OD Hopkins proposal.  Paragraph 13 of the Letter of Agreement obliged OD Hopkins to maintain $5,000,000 of comprehensive liability insurance naming Six Flags as an additional insured.

Glover responded to the Letter of Agreement in a fax dated November 25, 1998.  In the fax, Glover expressed concern with some of the proposed terms in the Six Flags Letter Agreement and expressed the need for either "a signed contract, or at the very least, the deposit, so we can get outside components ordered."  Glover went on to state that "we will attempt to work in a manner that is acceptable to you."  Although Glover took issue with many of the proposed terms in the Letter Agreement, he "Accepted as written" four of the numbered paragraphs, including the insurance provision contained in Paragraph 13.  The president of OD Hopkins was copied on the November 25 fax.

In a telephone conversation in December 1998, Gary Story, the President of Six Flags, spoke with Glover and agreed to the numbered terms contained in the November 25 fax. Following the telephone conversation, Six Flags paid OD Hopkins a deposit for work on the project. OD Hopkins continued to work on the project following the November 25 fax and Six Flags continued to pay OD Hopkins for the work. The project was completed on or about June 1999 without Six Flags being informed of any objections by OD Hopkins to the written agreement Glover provided to Hopkins with respect to the provision of insurance coverage.

Following the correspondence between Six Flags and OD Hopkins that culminated with the agreement to insure or include Six Flags as an additional insured, and in conformance with that agreement, OD Hopkins purchased a commercial general liability policy from Steadfast with limits of $5,000,000. The policy also contained Endorsement 12, which states, in relevant part:

> Who is an Insured (Section II) is amended to include any person or organization for whom you perform operations when you and such person have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability arising out of "your work" performed for that insured.

After Six Flags and OD Hopkins were sued in Worcester Superior Court by plaintiffs seeking damages for a July 1, 1999 accident involving the river raft constructed by OD Hopkins, Steadfast refused to defend or indemnify Six Flags (the "Worcester lawsuit"). TIG Insurance Company assumed the defense of Six Flags, and ultimately agreed to contribute its policy limit of $1,000,000 to settle the claims.

## ARGUMENT

On the undisputed facts of this case, OD Hopkins' appointed representative in the negotiation of the sale of the river raft ride agreed, in writing, to provide insurance coverage

3

for Six Flags by making Six Flags an additional insured in the OD Hopkins liability policy.

That undertaking was part of an overall contract or agreement for the construction of the ride –

a ride which Six Flags paid for; and OD Hopkins constructed and delivered.  Therefore,

pursuant to the clear terms of Endorsement 12, Six Flags is an "Insured" under the Steadfast

policy issued to OD Hopkins, and Steadfast was obligated to defend and indemnify Six Flags

for the claims made in the Worcester lawsuit.  Furthermore, the vendor's endorsement

contained in the Steadfast policy provides an alternative basis for coverage as Six Flags was a

distributor of the river raft ride.  For these reasons, this Court should deny Steadfast's motion

for summary judgment and allow the plaintiffs' cross-motion for partial summary judgment.

**I.      Applicable Law.**

Choice of law disputes need only be resolved if an "actual conflict exists." *Diomed, Inc.*

*v. Vascular Solutions, Inc.*, 417 F. Supp. 2d 137, 143 (D. Mass. 2006)(where the parties agreed at

oral argument that "neither party has identified a difference between the two states," the court

did not need to do a conflicts of law analysis).  Here, Steadfast has argued, and Plaintiffs do not

disagree, that the law of all the jurisdictions with an interest in this matter are substantially

similar with respect to the issues at hand (Steadfast Mem. at p. 9).  Therefore, this Court should

resolve the matter before it by applying Massachusetts law, but without hesitating to look to the

law of the other jurisdictions for guidance and instruction.

**II.     Legal Principles For Construing Insurance Policies.**

Steadfast's duty to defend and indemnify Six Flags arises from the broad language

contained in the Additional Insured Endorsement as well as the Vendor's Endorsement of its

policy.  These endorsements are construed according to long-accepted maxims.  Thus, the

interpretation of the policy is a question of law for the court.  *Cody v. Connecticut Gen. Life*

*Ins. Co.,* 387 Mass. 142, 146, 439 N.E.2d 234, 237 (1982).  Ambiguous terms are resolved

against the insurer, who drafted the policy, and in favor of the insured.  Accordingly, if there

are two rational interpretations of the policy language, the insured is entitled to the benefit of

the one that is more favorable to it.  *GRE Ins. Group v. Metropolitan Boston Housing*

*Partnership, Inc.,* 61 F.3d 79, 81 (1st Cir. 1995).  The words of the policy are construed in their

usual and ordinary sense, and the Court is not free to revise or change the order of the words.

*Hakim v. Mass. Insurer's Insolvency Fund,* 424 Mass. 275, 281, 675 N.E.2d 1161, 1164-1165

(1997).  The policy language must be construed as a whole, and effect must be given to every

word whenever possible.  For this reason, interpretations that reduce words to mere surplusage

should be rejected.  *Jimenez v. Peninsular & Oriental Steam Navigation Co.,* 974 F.2d 221,

223 (1st Cir. 1992).  *See also, Littlefield v. Acadia Insurance Company,* 392 F.3d 1, 7-8 (1st Cir.

2004) (construing New Hampshire law).

## III.    Six Flags Is An Additional Insured Under The Steadfast Policy Because Six Flags And OD Hopkins Agreed In Writing That Six Flags Was An Additional Insured

Endorsement 12 of the Steadfast Policy states that an "additional insured" is any entity

with whom OD Hopkins has "agreed in writing in a contract or agreement that such person or

organization be added as an additional insured . . . ."[2]  Here, Six Flags requested – *in writing* –

that OD Hopkins maintain a minimum amount of insurance and that it include Six Flags as an

insured party under OD Hopkins' insurance policies (Exhibit 5 at ¶ 13).  OD Hopkins responded

– also *in writing* – that it agreed to do so (Exhibit 6 at ¶ 13).  OD Hopkins subsequently procured

[2] It is undisputed that the additional requirement of Endorsement 12 – that the liability arise out of OD Hopkins' "work performed for" Six Flags - is met by the Worcester lawsuit. The underlying complaint alleged, in part, that OD Hopkins failed to establish reasonable safety procedures, designed an unstable ride and failed to warn of the dangerous instability of the ride.  The parties have stipulated that for the purposes of this coverage litigation, "none of the parties … shall take the position that the negligence of any of the Defendants in connection with the above-entitled matters is 0%" (Exhibit 5).  The stipulation and the allegations in the complaint meet the "arising out of 'your work'" language in the endorsement. *See Merchants Insurance Company of New Hampshire, Inc. v. United States Fid. and Guar. Co.,* 143 F.3d 5, 8-10 (1st Cir. 1998).

an insurance policy from Steadfast that complied with the written agreement - it contained the agreed upon policy limit and an additional insured endorsement. The language in Endorsement 12 is unambiguous and clear, as are the letters between Six Flags and OD Hopkins memorializing their agreement concerning insurance coverage. Therefore, there can be no dispute that these two parties agreed *in writing* that Six Flags would be named as an insured under OD Hopkins' insurance policies, including the Steadfast Policy.

Not surprisingly, in light of the foregoing, Steadfast focuses not on the lack of an agreement in writing to procure coverage, but rather on the alleged lack of a "contract or agreement" between the parties. Notwithstanding Steadfast's suggestions to the contrary, however, Endorsement 12 does not set forth any particular type of contract or agreement, or form of language therein, that must be used to obtain additional insured status. Thus, for example, the endorsement does not state that the entire "contract or agreement" must be in writing or signed by the entity to be charged. Nor does the endorsement state that the scope of any such contract or agreement must cover the "work" of OD Hopkins; the agreement to insure can be independent of, or only part of, any ultimate agreement between the parties to construct and sell the ride. Steadfast's insistence upon a signed written contract containing all terms of the agreement to build and purchase the river raft ride is simply not part of Endorsement 12.

The language of the endorsement, in its disjunctive use of the terms "contract" and "agreement," emphasizes that the promise to insure need not be part of a formal written contract, as argued by Steadfast. Although the terms "contract" and "agreement" are often used interchangeably, there can be situations in which these terms take on separate meanings with important distinctions. The Restatement defines a "contract" as "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some

way recognizes as a duty." Restatement (Second) of Contracts § 1 (1979). An agreement, on the

other hand, is defined as "a manifestation of mutual assent on the part of two or more persons."

*Id.* at § 3. The Comments to the Restatement distinguish these two terms as follows:

> Agreement has in some respects a wider meaning than contract, bargain or promise. On
> the other hand, there are some contracts which do not require agreement . . . . The word
> "agreement" contains no implication that legal consequences are or are not produced. It
> applies to transactions executed on one or both sides, and also to those that are wholly
> executory. The word contains no implication of mental agreement. Such agreement
> usually but not always exists where the parties manifest assent to a transaction.

*Id.* at § 3, Comment a. *See also Gaskins v. Blue Cross-Blue Shield of South Carolina*, 271 S.C.

101, 105-06, 245 S.E.2d 598, 600 (S.C. 1978) ("agreement" has wider meaning than "contract"

as it broadly defines "a concurrence and an engagement that something should be done or

omitted").

Accordingly, an "agreement" can exist without ever ripening into an enforceable

"contract" for one reason or another. *See, e.g., Health Plans, Inc. v. New York Life Insurance

Co.*, 898 F. Supp. 941, 946-47 (D. Mass. 1995)(agreement to agree fails as a legally enforceable

contract). And a contract can be viewed as containing specific agreements on particular issues.

*Town of Danvers v. Wexler Construction Co., Inc.*, 12 Mass. App. Ct. 160, 160, 422 N.E.2d 782,

783 (1981)("[t]he contract . . . contains an agreement [to arbitrate]"). In our case, Steadfast

expressly differentiated between the terms "contract" and "agreement" by agreeing to provide

coverage in the event of the parties either contracting **or** agreeing to do so. Indeed, if Steadfast

wished to limit coverage to only those persons with a "contract," then it could have used

language to reflect this intention. *See, e.g., North American Site Developers, Inc. v. MRP Site

Development, Inc.*, 63 Mass. App. Ct. 529, 532, 827 N.E.2d 251, 253-54 (2005)(additional

insured status applied to "any person or organization [the named insured is] required by written

contract to include as an insured").

Here, the fact that OD Hopkins and Six Flags reached an agreement on one or more terms of what would define certain aspects of their relationship prior to the formation of an overall contract does not render that agreement invalid, non-binding, or non-existent.  For example, in *Atofina Petrochemicals, Inc. v. Continental Casualty Co.*, 185 S.W.3d 440, 49 Tex. Sup. Ct. J. 225 (Tex. 2005), discussed in more detail, *infra*, the court found it sufficient that a contractor and a homeowner agreed, prior to executing a formal contract, that the homeowner would be an additional insured on the contractor's policy.  *Id.* at 441-42.  In a different context, the courts have held that in issuing an insurance binder an agent creates an obligation on the part of the insurer to cover the insured because the binder is a temporary or preliminary agreement for insurance in contemplation of a more formal contract covering all terms of the relationship.  *See, e.g., Cambridge Mutual Insurance Co. v. Patriot Mutual Insurance Co.*, 323 F. Supp. 2d 95, 103 (D. Me. 2004)(citing authorities).  Thus, parties may enter into agreements on important matters, such as the issuance of insurance, in advance of executing a formal contract regardless of whether or not they ultimately do execute such a formal contract.

Moreover, it is entirely proper that Six Flags and OD Hopkins would agree that Six Flags was an additional insured even absent a subsequent formal contract concerning the construction of the ride.  Under Endorsement 12, if the agreement concerning additional insured status was preliminary and OD Hopkins did not construct the ride, the "arising out of 'your work'" clause would render such coverage moot and eliminate any additional exposure to Steadfast.  Thus, the endorsement did not require the existence of a fully executed written contract because if no customer relationship developed subsequent to the agreement to provide insurance there would be no detriment to OD Hopkins or Steadfast.  The initial agreement to provide insurance would merely have the same effect as an agreement to maintain a bond or other security in place in the

event that the parties entered into a subsequent relationship.[3]

On the other hand, where, as here, the parties do subsequently reach agreement on any remaining open terms and proceed to complete the contemplated work, the agreement to make Six Flags an additional insured is fully enforceable even if no further writing reflecting the final contract terms is created. Because the undisputed facts establish that OD Hopkins did "agree in writing" to name Six Flags as an insured on its policies, as part of an overall "agreement" to construct and sell the ride, under Endorsement 12, Six Flags is an additional insured under the Steadfast Policy for the Worcester lawsuit arising out of that very ride.

## IV. The Courts Have Rejected A Strict Construction Of Similar Additional Insured Endorsements And Do Not Require Formal Written Contracts To Establish Additional Insured Status

Steadfast does not point to any authorities that suggest that this Court should adopt the narrow view of Endorsement 12 that it proposes. This is not surprising since other courts faced with the same policy language and similar facts have repeatedly rejected the strict construction of the "contract or agreement" proposed by Steadfast, and, instead, have found in favor of parties' additional insured status under less formal arrangements.

Thus, for example, in *Atofina Petrochemicals, Inc. v. Continental Casualty Co.*, 185 S.W.3d 440, 49 Tex. Sup. Ct. J. 225 (Tex. 2005), a contractor's insurance policy provided that "additional insureds" included those persons with whom the contractor agreed "under a written contract or agreement" would be an insured. *Id.* at 441. In *Atofina*, the contractor submitted a construction proposal to a homeowner, which stated that the contractor would provide the

---

[3] This is not a situation where Steadfast had to approve of any additional insured or even had the right to notice of any additional insured. Moreover, the Endorsement language does not require that the agreement or contract between OD Hopkins and an additional insured have any particular legal effect. Therefore, the Endorsement only serves to limit the universe of additional insureds to those who contemplated in writing a need for protection prior to any incident. It is also worth noting that in drafting the additional insured endorsement, Steadfast created a broad universe of potential additional insureds, yet Steadfast now seeks an overly narrow reading of its own endorsement language.

homeowner with insurance. *Id.* at 442. The homeowner orally accepted and sent purchase requisitions to the contractor. *Id.* The court concluded that the homeowner was an additional insured because "a written instrument signed by one party and expressly accepted orally by the other becomes a written contract." *Id.* at 443. That is precisely what occurred in this case. Six Flags orally accepted the terms contained in the signed February 25 fax and subsequently paid for the work, fully performing its end of the bargain.

Similarly, in *Brooklyn Hospital Center v. One Beacon Insurance*, 5 Misc. 3d 1029(A), 799 N.Y.S.2d 158 (N.Y. Sup. Ct. Dec. 14, 2004), a subcontractor agreed to procure insurance for the general contractor. As in Endorsement 12, the policy granted additional insured status to those persons with whom the subcontractor agreed "in writing in a contract or agreement" would be an insured. *Id.* The court found that the general contractor was an additional insured and concluded that "[a]lthough the Purchase Order was not signed by [the subcontractor], there is no dispute that it forms the binding subcontract agreement between [the general] and [the subcontractor], and that it was in writing . . . . Accordingly, the absence of a signature is of no consequence." *Id.*

This same result was also reached in a similar context in *Jackson v. Northeast United Corporation*, 186 Misc. 2d 259, 262, 718 N.Y.S.2d 564 (N.Y. Sup. Ct. Sept. 30, 2000). In *Jackson*, the question was whether a subcontractor was required to indemnify a general contractor and the property owner. *Id.* Under the applicable Workers' Compensation Act, third-party claims against an employer were barred unless the employer provided the right of contribution or indemnification by way of a written agreement. *Id.* The court, however, was faced with a situation where the parties' contract required the subcontractor to provide insurance for the owner and general contractor, but the contract remained unsigned. *Id.* The court found

that the unsigned contract was still binding and stated, "The writing need not be signed where the offer and acceptance are manifested by conduct." *Id.*

As these cases illustrate, the requirement that parties "agree in writing in a contract or agreement" simply means that there must be some writing evidencing the agreement. The writing need not be signed by both parties, nor even the party to be charged, and it need not include all the terms governing the contractual arrangement. Here, it is undisputed that Six Flags and OD Hopkins had a written agreement to name Six Flags as an additional insured on the Steadfast Policy, as part of an overall agreement to construct and sell the ride, and that is all that is required under Endorsement 12 to make Six Flags an insured under the Steadfast policy.[4]

## V.    Six Flags And OD Hopkins Did Enter Into A Formal "Contract" For The Construction Of The Ride, Which Included A Written Agreement Concerning Insurance

Even were this Court to take the position that Endorsement 12 requires that the additional insured agreement be incorporated as part of a formal contract covering the entire scope of OD Hopkins' work, such a contract is present here. As Steadfast correctly points out, all that is required to form a contract is that there be an acceptance of an offer (Steadfast Mem. at p. 9). Steadfast also correctly points out that when an offer is met by a qualified acceptance accompanied by a rejection of specific terms and a proposal for different terms, that response constitutes a counter-offer, which if accepted forms a contract. *Id.*, *quoting*, *inter alia*, *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.,* 441 Mass. 376, 388 n.6, 805 N.E.2d 957, 966 n.6 (2004). Here, contrary to Steadfast's arguments, a binding contract was established when Six

---

[4] Although this matter does not require a statute of frauds analysis, the comparison is apt. Under the Massachusetts statute of frauds, certain contracts are required to be in writing and signed by the party to be charged therewith. G.L. c. 259, § 1. However, the contract can be enforced even where the other party did not sign. *See, e.g., Old Colony R. Corp. v. Evans*, 72 Mass (6 Gray) 25 (1856). Here, the promise at issue is OD Hopkins' agreement that Six Flags was an additional insured. Thus, by analogy, the only concern here is whether OD Hopkins, and not Six Flags, agreed in writing that Six Flags was an additional insured.

Flags orally accepted the counter-offer from OD Hopkins in the form of Mr. Glover's fax.

Steadfast attempts to avoid the legal consequence of the November 25 fax by arguing that "Mr. Glover's letter did not constitute a counteroffer, as he specifically qualified his response by stating that, '[w]e will work in good faith to conclude an acceptable Purchase Agreement.'" However, this is a misreading of the letter and ignores the alternative means of acceptance expressly stated therein.

A.    **The November 25 Fax Was A Counter-offer Which Was Accepted By Agreement And Through Performance**

It is clear that an offer or counter-offer may be accepted by an express writing or through any other reasonable means. "[I]f an offeror merely suggests a permitted method of acceptance, other methods of acceptance are not precluded [to bind the parties]." *Polaroid Corp. v. Rollins Environmental Services, Inc.*, 416 Mass. 684, 690, 624 N.E.2d 959, 964 (1993), *citing* the Restatement (2nd) of Contracts § 50 (1981). *See also David J. Tierney, Jr., Inc. v. T. Wellington Carpets, Inc.*, 8 Mass. App. Ct. 237, 241, 392 N.E.2d 1066, 1069 (1979)(holding that only substantial variation from expressly stated exclusive method of acceptance fails). Accordingly, performance of an agreement constitutes acceptance. *DB Riley, Inc. v. AB Engineering Corp.*, 977 F. Supp. 84, 89 (D. Mass. 1997), *citing Northampton Institution for Savings v. Putnam*, 313 Mass. 1, 7, 45 N.E.2d 936, 938-39 (1943); *Gladstone v. Union Warren Savings Bank*, 2 Mass. App. Ct. 850, 851, 312 N.E.2d 579, 580 (1974). This is because the goal is to go beyond "imperfect negotiations" to reach a meeting of the minds on the material terms. *Situation Management Systems, Inc. v. Malouf, Inc.*, 430 Mass. 875, 878-89, 724 N.E.2d 699, 703 (2000).

For example, making a proposed payment constitutes acceptance of an offer, thus creating a contract. *See, e.g., Frick Co. v. New England Insulation Co.*, 347 Mass. 461, 466-67, 198 N.E.2d 433, 437 (1964); *Baseball Pub. Co. v. Bruton*, 302 Mass. 54, 55, 18 N.E.2d 362, 363

(1938).[5]  If an offeror states that acceptance and deposit of a check will constitute acceptance of an agreement, the offeree doing so creates a binding contract.[6]  *Lincoln National Life Ins. Co. v. Prodromidis*, 862 F. Supp. 10, 13 (D. Mass. 1994).

Here, contrary to Steadfast's suggestion that a more formal contract was required to create a binding agreement, OD Hopkins did not specify a single required means of acceptance of its counter-offer.  Instead, it stated that **in order to proceed**, it needed a "signed contract, or at the very least, the deposit . . . ."  (Exhibit 6 at p. 1, ¶ 3).  It also said that it would work towards concluding an acceptable Purchase Agreement, but requested the deposit before it began work to ensure timely completion (Exhibit 6 at p. 2).  Therefore, OD Hopkins expressly stated that Six Flags could accept its counter-offer through several reasonable means, including, at its suggestion, executing a separate document, sending a deposit, or otherwise performing in accordance with the proposed terms of the counter-offer. It is undisputed that the deposit was paid, and the ride constructed and paid for, establishing, as a matter of law, the acceptance of the counter-offer and the existence of a binding contract.

Moreover, as the affidavit of Mr. Story shows, Six Flags also accepted OD Hopkins' counter-offer, by expressly accepting the terms of the counter-offer and performing in accordance with those terms.  Specifically, Six Flags orally accepted the terms of the November 25 fax, and therefore made the deposit and the requested payments to OD Hopkins. Ultimately,

---

[5] In both *Frick Co.* and *Baseball Pub*, the payment was made by way of a check.  Thus, as here, in addition to acceptance of an offer by performance, the check represents the signature of the party accepting the offer and intending to be bound to the terms of the contract.

[6] **NH**: Party may accept contract by performance or conduct. *Kalled v. Albee*, 712 A.2d 616, 617 (N.H. 1998); *Tsiatsios v. Tsiatsios*, 663 A.2d 1335, 1339 (N.H. 1995); *Blanchette v. Sargent*, 173 A. 383, 384 (N.H. 1934). **NY**: An offer may be accepted by performance -- conduct or acquiescence.  *Liner Technology, Inc. v. Hayes*, 624 N.Y.S.2d 284, 285 (N.Y.A.D. 3 Dept. 1995); *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2nd Cir. 1993); *Wachovia Bank of Georgia, N.A. v. Apex Tech of Georgia*, 144 B.R. 649, 654 (S.D.N.Y. 1992).  **Okla**: A contract ripens into a binding agreement upon partial performance upon the terms of the offeror.  *Bourke v. Western Business Products, Inc.*, 120 P.3d 876, 883 (Okla. App. 2005).

OD Hopkins built the ride, and Six Flags accepted delivery of the ride. Steadfast simply ignores reality when it suggests there was no contract or agreement between the parties.[7]

### B.    A Desire To Better "Formalize" An Agreement In The Future Is Not A Bar To The Present Existence Of A Contract

In addition to ignoring the actual performance of the contract in its memorandum, Steadfast further argues that no contract existed because Mr. Glover's letter references a desire to document the transaction by completing something more formal and polished than the exchanged letters. As discussed above, this argument ignores the fact that a counter-offer can be accepted by any reasonable means, and Mr. Glover's letter did not limit acceptance of OD Hopkins' terms to the execution of a formal document. Moreover, simply because a more formal document is envisioned does not mean that the less formal writing is not a contract or agreement.

If parties have agreed upon all material terms, it may be inferred that the purpose of a final document which the parties agree to execute in the future is to serve as the polished memorandum of an already binding contract. *Goren v. Royal Investments Inc.*, 25 Mass. App. Ct. 137, 143, 516 N.E.2d 173, 175 (1988). Where essential terms of a transaction have been agreed to and those parties to the transaction intend to be bound presently, contemplation of execution of a more formal document does nothing to preclude the present existence of a contract. *Coan v. Holbrook*, 327 Mass. 221, 223-24, 97 N.E.2d 649, 650-51 (1951).[8]

---

[7] While Steadfast may claim that Mr. Story's verbal acceptance is not undisputed, any such factual dispute precludes a grant of Steadfast's motion which is, in essence, based on the lack of a verbal or written contract or agreement between OD Hopkins and Six Flags. On the other hand, even without Mr. Story's affidavit, the undisputed facts make clear that there was an agreement in writing to make Six Flags an additional insured, and it was part of an overall contract that was fully performed by both parties. Summary judgment, is therefore appropriate for Six Flags on this record.

[8] **NY**: Where the parties have agreed on all material terms and only have to commit them to a formal writing, a contract has still been formed. *Municipal Consultants & Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144, 148-49 (N.Y.A.D. 3 Dept. 1979). **Okla**: Parties may have a binding contract even though they have an understanding that the agreement should be formally drawn. *East Coastal Oklahoma Electric Co-op, Inc. v. Oklahoma Gas and Electric Co.*, 505 P.2d 1324, 1328 (Okla. 1973).

Here, putting aside whether one or both of the parties might have preferred to do so, it was unnecessary for OD Hopkins and Six Flags to "sign, seal, and deliver" a more polished version of the written document containing the terms of their contract. The parties were obviously satisfied that their intentions and agreement were sufficiently reduced to writing in a form that allowed them comfortably to proceed with performance. Steadfast takes the reference to "an acceptable Purchase Agreement" out of context. OD Hopkins did not include the execution of a polished formal document as a contractual condition. Rather, OD Hopkins stated that it would work in good faith to conclude a Purchase Agreement in the future, but asked that the parties immediately agree on the numbered terms and immediately begin performance in accordance therewith.[9] It is undisputed that this was done, and the project was completed. Steadfast cannot now avoid obligations under the insurance agreement any more than OD Hopkins or Six Flags could ignore their obligations to complete the project and pay the amount owed under their contract.

## VI.    Mr. Glover Had The Authority To Formulate An Agreement With Six Flags And, In Any Event, OD Hopkins Ratified Mr. Glover's Acts By Accepting The Benefit Of Six Flag's Performance

Steadfast suggests, without expressly arguing, that Mr. Glover did not have actual authority to bind OD Hopkins to the terms of a contract. Even if this were correct, however, it would not justify allowance of Steadfast's motion for summary judgment. This is because of the abundant evidence that both OD Hopkins and Six Flags agreed to the construction of the river raft ride and that Mr. Glover was authorized to negotiate with Six Flags to establish the terms of

---

[9] Steadfast argues that a formal contract would need to be signed by Mr. Pendleton, and therefore Six Flags could not have treated Mr. Glover's letter as a true counter-offer. Mr. Glover's letter, however, does not qualify the counter-offer by stating that Mr. Pendleton's signature or approval was a prerequisite. Additionally, the letter was copied to Mr. Pendleton and clearly sets forth certain agreements and commitments by OD Hopkins to Six Flags. Mr. Glover's authority, both actual and apparent, to negotiate and enter into transactions on behalf of OD Hopkins, an issue not directly addressed by Steadfast, is further discussed in Section VI, *infra*.

that agreement.  Moreover, the undisputed evidence shows both that Mr. Glover had at least

apparent authority to contract with Six Flags, and that OD Hopkins ratified the agreement set out

in the November 25 fax by carrying out the terms of that agreement.

### A.    Mr. Glover Had Apparent Authority To Contract On Behalf Of OD Hopkins

"Apparent or ostensible authority 'results from conduct by the principal which causes a

third person reasonably to believe that a particular person . . . has authority to enter into

negotiations or to make representations as his agent.' . . .  If a third person goes on to change his

position in reliance on this reasonable belief, the principal is estopped from denying that the

agency is authorized."  *Linkage Corporation v. Trustees of Boston University*, 425 Mass. 1, 16,

679 N.E.2d 191, 203 (1997), *quoting Hudson v. Massachusetts Prop. Ins. Underwriting Ass'n*,

386 Mass. 450, 457, 436 N.E.2d 155 (1982).  Apparent authority can arise where, like here, a

company holds out a particular representative as the primary contact person for negotiations and

the relationship between the parties.  *See, e.g., Linkage Corp.*, 425 Mass. at 16-17, 679 N.E.2d at

203.  Also relevant is the representative's title and whether that gives the impression that the

representative has authority to act.  *Id.* (apparent authority where title was vice-president for

external programs); *Thesenga Land Co. v. Cirrus Warehouse, Inc.*, 2003 WL 22889499, at *1-2

(Minn. Ct. App. Dec. 9, 2003)(finding support for apparent authority when agent used business

card designating him as vice-president and when agent met with representatives of plaintiff and

directed and negotiated contract terms).  Where, as here, there are no relevant facts in dispute,

the issue of the existence of apparent authority can be a legal question.  *United States v.*

*O'Connell*, 890 F.2d 563, 567 (1st Cir. 1989).

Here, it was Mr. Glover, the Vice President of Sales & Marketing, that was assigned by

the President of OD Hopkins to negotiate the terms of the transaction with Six Flags.  In all his

dealings with OD Hopkins, the President of Six Flags negotiated with the OD Hopkins sales representative with respect to the terms of the contract including price, delivery schedules, and insurance coverage.  As part of the sales process, one of Mr. Glover's responsibilities was to correspond with customers to clarify points of agreement.  After Six Flags communicated an offer to OD Hopkins, Mr. Glover, on behalf of OD Hopkins, responded to this offer by rejecting it and making a counter-offer that included several points on which both parties were already in agreement.  This counter-offer was copied to Mr. Pendleton, OD Hopkins' President.  Six Flags agreed to the terms of the counter-offer and work proceeded to completion without any objections to the agreements made in the November 25 fax.

Based on these undisputed facts, Mr. Glover had apparent authority to agree to a contract with Six Flags on OD Hopkins' behalf, and Steadfast cannot avoid its obligations under its policy any more than OD Hopkins could have avoided its obligations under the contract with Six Flags.

### B. Even Absent Apparent Authority, OD Hopkins Ratified Mr. Glover's Actions And Accepted The Benefit Of Six Flag's Performance

Even in the absence of an agent's actual or apparent authority, a principal will be bound by that agent's actions where the principal acquiesces in the agent's actions or fails promptly to disavow the unauthorized conduct.  *Linkage Corp.*, 425 Mass. at 18, 679 N.E.2d at 204. Ratification doest not require that the principal take affirmative actions or have actual knowledge of the agent's conduct; rather, there may be ratification when the principal "purposely shut[s] his eyes."  *Inn Foods, Inc. v. Equitable Co-operative Bank*, 45 F.3d 594, 597 (1st Cir. 1995).  It may also occur when the principal, or its corporate officers, act in a manner inconsistent with an intent to disavow the conduct.  *Lemanski v. Lenox Savings Bank*, 1996 WL 253315, at *9 (D. Mass. April 12, 1996)(collecting authorities).  The purpose of this rule is to prevent a

perpetuation of an inference of authority and allows a damaged third-party to mitigate any harm derived from the unauthorized agent's conduct. *Inn Foods*, at 598. Where the facts are not in dispute, whether ratification has taken place is an issue of law for this Court to decide. *Id.*; *see also Lemanski*, at *8.

Here, quite apart from Mr. Glover's authority to negotiate on behalf of OD Hopkins, OD Hopkins subsequently ratified Mr. Glover's conduct by performing in accordance with the terms of that very same contract. The river raft ride was completed, and OD Hopkins procured the Steadfast policy with the appropriate limits and additional insured endorsement. This is not a situation where a rogue employee of OD Hopkins engaged in some surreptitious conduct. Mr. Glover's negotiations with Six Flags were in the open and his counter-offer letter was copied to OD Hopkins' President. Moreover, by constructing the million-dollar ride, OD Hopkins' executives, which include Mr. Glover and Mr. Pendleton, must have been aware of this significant contract and the substantial undertaking in exchange for a very large payment. "It is settled that one cannot accept the benefits of a transaction purporting to be done [on its] behalf and afterwards repudiate it." *Linkage Corp.*, 425 Mass. at 19, 679 N.E.2d at 204 (citations omitted). Where OD Hopkins received the benefit of the contract negotiated and executed by Mr. Glover on its behalf, neither OD Hopkins nor Steadfast can now, well after the fact, argue that the contract is somehow invalid due to a lack of authority.

## VII. Six Flags Is An Additional Insured Under The Vendor's Endorsement

Pursuant to Endorsement 11, the Steadfast policy also extended coverage to any organization (referred to as a "vendor") "with respect to the distribution or sale in regular course of the vendor's business of the named insured's products…" Under the broad, non-defined terms in this endorsement, Six Flags was a vendor of OD Hopkins' product and, therefore,

entitled to coverage.

Steadfast disputes the applicability of the vendor's endorsement by asserting that Six Flags did not sell or distribute OD Hopkins' product. However, in doing so, Steadfast is forced to reconcile its position with the leading case of *Makrigiannis v. Nintendo of America, Inc*., 442 Mass. 675, 815 N.E.2d 1066 (2004). In that case, the Supreme Judicial Court defined "distribution" as "the marketing or merchandising of commodities," and "sale" as "the opportunity of selling or being sold," while "sales" was construed as meaning "operations and activities involved in promoting and selling goods or services." *Id.*, 442 Mass. at 678-679, 815 N.E.2d at 1069. Under these broad definitions, the paid use of the river raft by customers in the regular course of business at the amusement park constituted the merchandising of the product.

In an analogous case, "distribution" was broadly construed to encompass a vending company that placed an electric tea machine in a hospital while retaining ownership of the machine and responsibility for repairs. In *McGill v. Cochran Sysco Foods,* 690 So.2d 952 (La.App. 2 Cir. 1997), the court held that the vendor's endorsement applied because the purpose of the endorsement was to "provide vendors with coverage for claims against them as links in the chain of distribution from manufacturer to consumer." *Id.* at 955. Just as the manufacturer secured insurance to protect the vending company against the risk that the ultimate consumer of the product would be injured, so too OD Hopkins intended to protect Six Flags from claims brought by the users of the ride.

Steadfast's comparison of the merchandising of the ride with the use of the parking lots or bathroom fixtures does not withstand scrutiny. The business, and therefore, merchandising, purpose of the amusement park was for use of the rides for pay by customers. A vendor would be hard-pressed to claim that it was in the business of bathrooms and park benches because it

operated an amusement park since those activities are incidental to the main business purpose.

Simply put, Endorsement 11 provides coverage for Six Flags because it was a vendor and the claim is with respect to the sale or distribution of OD Hopkins' product.

## VII.    The TIG Policy Is Excess To The Steadfast Policy

Because the Underlying Actions were settled for less than the policy limit of the Steadfast policy, Steadfast bears complete responsibility for the defense and indemnity of Six Flags.  This is because, as counsel for Steadfast has stated in open court, the TIG policy is excess to the Steadfast policy. *See Mission Ins. Co. v. United States Fire Ins. Co.,* 401 Mass. 492, 496-499, 517 N.E.2d 463, 466-467 (1988)(effectuating the language of the policies).  The "Other Insurance" provision of the TIG policy states, in relevant part:

This insurance is excess over any other valid and collectible insurance applying to the loss except for insurance bought specifically to apply in excess of the Limits of Insurance shown in the declarations of this policy.

The "Other Insurance" provision of the Steadfast policy states, in relevant part:

If other valid and collectible insurance is available to the insured for a loss we cover under Coverage A or B of this Coverage Part, our obligations are limited as follows:
a.      Primary Insurance
This insurance is primary except when there is other insurance
applying on a primary basis.  Then b. below applies.
b.      Excess Insurance
        This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis.

Since the Steadfast policy was not "bought specifically to apply in excess of the Limits of Insurance shown in the declarations" of the TIG policy, the Steadfast policy is primary.

20

## CONCLUSION

For the foregoing reasons, the plaintiffs respectfully request that Steadfast's motion for summary judgment be denied, and that plaintiffs cross-motion for partial summary judgment be allowed.

Six Flags, Inc. and TIG Insurance Company,
By their attorneys,

/s/Samuel M. Furgang
Regina E. Roman, BBO No. 426120
Samuel M. Furgang, BBO No. 559062
Matthew C. Welnicki, BBO No. 647104
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street
Boston, MA 02113

Dated: May 15, 2006

## CERTIFICATE OF SERVICE

I, Samuel M. Furgang, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 15, 2006.

/s/Samuel M. Furgang
Samuel M. Furgang

377261