UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SIX FLAGS, INC., and TIG INSURANCE COMPANY,<br><br>        Plaintiffs,<br><br>v.<br><br>STEADFAST INSURANCE COMPANY,<br><br>        Defendant. | CIVIL ACTION NO. 05-11444 NMG |

## AFFIDAVIT OF SAMUEL M. FURGANG

I, Samuel M. Furgang, do hereby depose and state under oath:

1.      I am an attorney at the law firm of Sugarman, Rogers, Barshak & Cohen, P.C., counsel to the plaintiffs, Six Flags, Inc., and TIG Insurance Company in this matter.

2.      A true and accurate copy of relevant portions of the Deposition of Jeremy L. Pendleton, which was taken in the action entitled *Messier, et. al.  v. Six Flags, Inc., et. al.,* (Worcester Superior Court, No. SUCV2001-01494B (the "Underlying Actions") is attached hereto as  Exhibit 1.

3.      A true and accurate copy of relevant portions of the Deposition of James F. Glover, which was taken in the Underlying Actions, is attached hereto as Exhibit 2.

4.      A true and accurate copy of relevant portions of the Deposition of Bradford P. Smith, which was taken in the Underlying Actions, is attached hereto as Exhibit 3.

5.      A true and accurate copy of the Affidavit of Gary Story is attached hereto as Exhibit 4.

6.    A true and accurate copy of  a Memorandum of Understanding executed as part of the settlement of the Underlying Actions is attached hereto as Exhibit 5.

7.    A true and accurate copy relevant portions of TIG Insurance Company Policy No. T7 0003796851600 for the policy period 7/1/98-11/15/01 is attached hereto as Exhibit 6.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 15th DAY OF MAY 2006.

/s/ Samuel M. Furgang
Samuel M. Furgang

377534

2

```
 1   Volume:  I                      Pages:    1 to 174

 2                                   Exhibits:  1 to 13

 3              COMMONWEALTH OF MASSACHUSETTS

 4   Worcester, ss.                  Superior Court

 5   -- - - - - - - - - - - - - - - - - - - - - - - x

 6   ERNEST MESSIER and SUSAN MESSIER, Individually and

 7   as parents and next friends of DANIEL MESSIER; JOHN

 8   PASCONE and KIMBERLY PASCONE, Individually and as

 9   parents and next friends of JONATHAN PASCONE,

10   ANGELICA PASCONE; GERALD PESCARO and KIMBERLY

11   PESCARO,                    Civil Action No. 011494B

12                  Plaintiffs,

13      v.

14   SIX FLAGS, INC., RIVERSIDE PARK ENTERPRISES, INC.,

15   PREMIER PARKS, INC., O.D. HOPKINS ASSOCIATES, INC.,

16   MARTIN FLORES and CHARLES FLORES,

17                  Defendants.

18   - - - - - - - - - - - - - - - - - - - - - - - - x

19         DEPOSITION OF O.D. HOPKINS ASSOCIATES,

20      Through its Designee JEREMY L. PENDLETON

21      Friday, October 10, 2003      10:05 a.m.

22      Meehan, Boyle, Black & Fitzgerald, P.C.

23      Two Center Plaza, Boston, Massachusetts

24         Reporter:  Lisa A. Moreira, RMR/CRR
```



1    sale of the ride which is the subject of this

2    lawsuit, do you know who did at O.D. Hopkins?

3        A.   Regarding the sale?

4        Q.   Yes.  Let's start there.

5        A.   The sales manager of the company, which he

6    had the title, at least, was a fellow by the name of

7    James Glover, and he was the one that sold the ride

8    to the Six Flags corporation.

9        Q.   And do you have any knowledge or

10   understanding as to when that was done

11   approximately?

12       A.   I believe it was late 1998.  Possibly

13   September, October.

14       Q.   Had O.D. Hopkins done business with Six

15   Flags or any of the Six Flags parks before that?

16       A.   Yes.

17       Q.   And from your memory, can you describe that?

18       A.   The first business that we had with Six

19   Flags was in 1985, and we built several

20   chute-to-chute rides, which is, as I said, a very

21   large -- essentially a very large flume ride.

22       Q.   Uh-huh.

23       A.   Over a period of four or five years, I think

24   we sold either five or six of those rides.

1      Q.   Mr. Pendleton, what position did Jim Glover

2   have in 1998?

3      A.   He was sales.

4      Q.   And was he a vice president of sales and

5   marketing?

6      A.   That's what we called him.  He wasn't

7   legally a vice president of the company.

8      Q.   And were you president of the company at the

9   time?

10      A.   Yes, I was.

11      Q.   And this document purports to be a response

12   to Exhibit No. 12; is that correct?

13      A.   No.  It purports to be a response to a fax

14   by a Russell Kuteman, who I have no idea who he is.

15   This is not a fax by him.  It's a letter from Gary

16   Story.

17      Q.   Okay.  Do you know, sir, whether or not --

18   did Mr. Glover speak to you about sending out this

19   document?

20      A.   I have no recollection of that.

21      Q.   The Six Flags letter, Exhibit 12, Paragraph

22   1, states, "Seller will design, engineer, prototype,

23   as required, test, refine, document, and deliver the

24   ride that meets the specifications, considerations,

1    sale of the ride which is the subject of this

2    lawsuit, do you know who did at O.D. Hopkins?

3        A.   Regarding the sale?

4        Q.   Yes.  Let's start there.

5        A.   The sales manager of the company, which he

6    had the title, at least, was a fellow by the name of

7    James Glover, and he was the one that sold the ride

8    to the Six Flags corporation.

9        Q.   And do you have any knowledge or

10   understanding as to when that was done

11   approximately?

12       A.   I believe it was late 1998.  Possibly

13   September, October.

14       Q.   Had O.D. Hopkins done business with Six

15   Flags or any of the Six Flags parks before that?

16       A.   Yes.

17       Q.   And from your memory, can you describe that?

18       A.   The first business that we had with Six

19   Flags was in 1985, and we built several

20   chute-to-chute rides, which is, as I said, a very

21   large -- essentially a very large flume ride.

22       Q.   Uh-huh.

23       A.   Over a period of four or five years, I think

24   we sold either five or six of those rides.

1    incident, do you recall any others involving

2    allegations or claims that there had been a tipover

3    in an O.D. Hopkins water ride?

4        A.  I don't recall any.

5        Q.  Had there been, to your recollection, any

6    claims at any time that a water ride incident had

7    resulted in a death because of some fault of O.D.

8    Hopkins?

9        A.  Not to my knowledge.

10       Q.  Do you know, other than Mr. Glover, if there

11   were any other O.D. Hopkins persons involved in the

12   sales transaction of the ride which is the incident

13   of this lawsuit to Six Flags?

14       A.  Not to my knowledge.  I mean, I obviously

15   had some involvement with regard to the contract

16   preparation, but other than that, I don't believe

17   there was anybody else involved in sales.

18       Q.  Other than your involvement with contract

19   preparation, did you have any other involvement in

20   any part of the sale, construction, delivery of the

21   ride involved in this lawsuit?

22       A.  No, I didn't.  I had engineering staff and

23   production staff that handled all that.

24       Q.  Had you yourself traveled to Six Flags in

1  by your counsel, if you don't recall something,

2  please tell us.  If it comes back to you later on,

3  feel free to interrupt and provide the answer at a

4  later time in the deposition.

5      A.  Okay.

6      Q.  Do you recall the production manager in '99?

7      A.  I can't say that I do.

8      Q.  Okay.  Did you have any contact yourself

9  with the sale of the ride which is the subject of

10  this lawsuit to Six Flags?

11      A.  I had very little involvement in that

12  project at all.  I was traveling mainly to Japan,

13  China -- mainly to Asia.  75 percent of our business

14  was outside the United States.

15      Q.  Okay.  You've mentioned some of the places

16  where you did or at least solicited business.  Where

17  else, by country, did the company do business?

18      A.  We did business in Japan, China, Taiwan,

19  Thailand, Indonesia, several locations on the island

20  of Bali, Australia, U.K., France, Italy, Dubai.  I'm

21  sure I've left some out, but that's...

22      Q.  Okay.  Through the '90s, did you have

23  companies that you considered to be your

24  competitors?

Q.   And had there been any business with them
subsequent to that, before the '98 sale?

A.   There probably were other sales, but quite
honestly, I can't remember all of the various sales.

Q.   Okay.  Let me show you a document which is
titled "Fax Transmittal, Hopkins Amusement Rides
Worldwide" dated November 25 of 1998.

A.   (Witness reviews document) Uh-huh.

Q.   All right.  Is that a letter or a memo or
document you've seen before?

A.   I can't honestly say that I have.  I
probably did at one point.  I see my name as being
copied here, but...

Q.   Okay.  Am I correct that this is part of the
sales transaction for the ride which is the subject
of this lawsuit?

A.   It appears to be.  Obviously there's not a
contract attached to it here, which we normally
would have had.

Q.   I do see on Page 1 reference to anticipating
a signed contract and a deposit.  Do you know
whether a written contract for the sale of the ride
which is the subject of this lawsuit was ever
executed?

1      A.   To the best of my knowledge, there was never

2    an executed contract.

3      Q.   Was that an unusual circumstance for O.D.

4    Hopkins in its purchases of rides?

5      A.   Yes.

6      Q.   Do you know any reason for explaining the

7    absence of the written contract?

8      A.   We were having a -- I do know that we were

9    having numerous discussions with Six Flags

10   Corporation, which was then, I think, known as

11   Premier Parks, Incorporated.  They wanted some very

12   stringent additions to the contract that we had been

13   signing.  I had refused to accept most, if not all,

14   of those additions.

15         And in the course of reviewing documents

16   for this deposition, I came across a copy of a

17   contract we had submitted to them that was -- that I

18   had signed and initialed, because I signed all the

19   contracts, but there was never any other signature,

20   and to the best of my knowledge, there never was

21   one.

22      Q.   Okay.  Looking at what we'll mark as Exhibit

23   2, the fax transmittal memo, I see on the third

24   page, for example, a reference to what appear to be

EXHIBIT 2

# ORIGINAL

1

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS                    SUPERIOR COURT

C.A. NO. 011494B

* * * * * * * * * * * * * * * * *

ERNEST MESSIER AND SUSAN MESSIER,      *

ET AL.,                                *

     Plaintiffs                        *

                       *

vs.                                    *

SIX FLAGS, INC., ET AL.,               *

     Defendants                        *

* * * * * * * * * * * * * * * * *

   DEPOSITION OF **BRADFORD P. SMITH**, taken on

behalf of the Defendant Six Flags, Inc., before

Maryellen Coughlin, CSR/RPR, a Notary Public

within and for the State of New Hampshire, at

the Law Offices of Malloy & Sullivan, LLP,

78 West Merrimack Street, Manchester, New

Hampshire, on August 3, 2004, commencing at

10:10 a.m.

**ELLEN M. FRITCH & ASSOCIATES**
373 SILVER STREET
SOUTH BOSTON, MASSACHUSETTS 02127
(617) 269-5448

16

1   1994 O.D. Hopkins was doing amusement park work

2   both domestically and abroad?

3          A.       Yes.

4          Q.       And were you limited to projects

5   which were domestic or did you have

6   responsibility for either or both?

7          A.       I had various responsibilities, and

8   we didn't discriminate between domestic or

9   international work.

10         Q.       Were you the only project manager?

11         A.       At the time that I joined, yes, I

12  was.

13         Q.       At some point was there another

14  project manager added or others?

15         A.       Not specifically until we hired

16  Mr. Nason.

17         Q.       And was Mr. Nason hired as a

18  project manager?

19         A.       Yes.

20         Q.       But as a less senior one than

21  you --

22         A.       Correct.

23         Q.       -- because at that point you were

24  about to or had obtained a stock interest in the

17

1    company.

2          A.        Correct.

3          Q.        So you were not only a project

4    manager but you were a part owner.

5          A.        Correct.

6          Q.        Up until the time that this

7    accident occurred in August of 1999, did your

8    title actually change at all?

9          A.        Yes, at some point I became vice

10   president.

11         Q.        Okay.  And what year was that?

12         A.        I don't recall.

13         Q.        You do remember it was prior to

14   1999, though?

15         A.        Yes.

16         Q.        Okay.  And were there other vice

17   presidents other than you?

18         A.        No.

19         Q.        Okay.  Do you recognize the name

20   James Glover?

21         A.        Yes.

22         Q.        And was Mr. Glover there when you

23   started?

24         A.        No.

21

1    in terms of offices, and Mr. Glover had free

2    access to Jerry Pendleton when need be, and they

3    worked very closely together.

4        Q.    Did you actually have a written job

5    description at any point, was it that formal?

6        A.    Not that I recall.

7        Q.    Did anyone have written job

8    descriptions in or around 1998 or 1999?

9        A.    Not that I recall.

10       Q.    So Mr. Glover would have reported

11   to Mr. Pendleton and not necessarily to you, is

12   that correct?

13       A.    Correct.

14       Q.    And was he on the road a lot trying

15   to sell product?

16       A.    Yes.

17       Q.    And did he have business cards?

18       A.    Yes.

19       Q.    And did he have stationery that he

20   had access to if he needed it?

21       A.    Not that would have his name on it.

22   There was generic Hopkins stationery.

23       Q.    Did you ever see him send out

24   correspondence, documents executed with the

66

1   was a lot of disagreement.

2        Q.        Okay.  And so he's attempting to

3   bring the parties closer together at this point

4   in time?

5        A.        I think he's attempting to point

6   out what's acceptable and what isn't acceptable

7   to Hopkins.

8        Q.        Okay.  And did he correctly

9   represent himself in November of 1998 as a

10   vice president of sales and marketing?

11       A.        To the best of my recollection,

12   yes.

13       Q.        Okay.  And in that position, he had

14   not stationery but he had business cards

15   indicating that he had that title?

16       A.        I would assume, yes.

17       Q.        Okay.  If you saw him out on the

18   road doing his work and he was giving out

19   business cards that said vice president of sales

20   and marketing, you wouldn't upbraid him for that,

21   that was his correct designation, is that

22   correct?

23       A.        Correct.

24       Q.        And he was duly authorized to

67

1    represent himself as such to the public, is that

2    correct?

3        A.        Yes.

4        Q.        People in the firm knew that that

5    was his title and his role, is that correct?

6        A.        Within Hopkins?

7        Q.        Correct.

8        A.        Yes.

9        Q.        Now, will you please read the

10   bullet point on number 13.

11       A.        You want me to read 13?

12       Q.        Correct.

13       A.        "Accepted as written."

14       Q.        And do you recall that I read

15   number 13 into the record?

16                 MR. SHEEHAN:  Well, I'm --

17                 MR. GRACEFFA:  Wait a minute, Tom.

18   Once again, you can object, but that's all you're

19   suppose to do.

20                 MR. SHEEHAN:  I will object and --

21                 MR. GRACEFFA:  You're not suppose

22   to say anything.

23                 MR. SHEEHAN:  That these two

24   documents are not related to each other.  If you

34

1    A.    That is my understanding.

2    Q.    Okay.  And was that the usual

3  business practice between Six Flags and O.D.

4  Hopkins?

5    A.    No.

6    Q.    Do you know why the contract wasn't

7  executed?

8    A.    I would say there were timing

9  issues with respect to the work needing to be

10  done before all contract negotiation could be

11  completed.

12    Q.    Okay.  And do you base that on your

13  personal knowledge having been in the project,

14  involved in the project?

15    A.    I was not involved in the project,

16  but because of my position in the company, I was

17  certainly aware that we were going ahead with

18  work without a signed contract.

19    Q.    Okay.  And did that occur with your

20  approval?

21    A.    Because of our responsibilities, it

22  went ahead with Mr. Pendleton's approval.

23    Q.    Were you, quote/unquote, the

24  project manager on this or was Mr. Nason?

65

1   read Exhibit No. 2.

2              Have you ever seen that before?

3        A.    No.

4        Q.    Do you know what it is?

5        A.    Well, having just read it, it

6   appears to be a response by Jim Glover to a

7   letter or a fax from a Russell Kuteman,

8   K-U-T-E-M-A-N, outlining the points of agreement

9   and disagreement.

10       Q.    Between who and who?

11       A.    Between Premier Parks and O.D.

12  Hopkins on the matter of this ride.

13       Q.    All right.  And in November of

14  1998, did Mr. Glover normally engage in

15  correspondence between a potential buyer of a

16  ride and O.D. Hopkins to clarify the points of

17  agreement?

18       A.    I would say yes.

19       Q.    This is not an unusual type letter

20  for somebody in his position during November of

21  1998?

22       A.    Well, it's only unusual in that so

23  much work had already been undertaken and there

24  still was no agreement, and it appears that there

66

1    was a lot of disagreement.

2            Q.        Okay.  And so he's attempting to

3    bring the parties closer together at this point

4    in time?

5            A.        I think he's attempting to point

6    out what's acceptable and what isn't acceptable

7    to Hopkins.

8            Q.        Okay.  And did he correctly

9    represent himself in November of 1998 as a

10   vice president of sales and marketing?

11           A.        To the best of my recollection,

12   yes.

13           Q.        Okay.  And in that position, he had

14   not stationery but he had business cards

15   indicating that he had that title?

16           A.        I would assume, yes.

17           Q.        Okay.  If you saw him out on the

18   road doing his work and he was giving out

19   business cards that said vice president of sales

20   and marketing, you wouldn't upbraid him for that,

21   that was his correct designation, is that

22   correct?

23           A.        Correct.

24           Q.        And he was duly authorized to

70

1    permission to execute No. 2?

2          A.      I don't know.

3          Q.      Did he need to?

4          A.      I don't know that because I'm not

5    sure whether that was binding us to anything.

6          Q.      Okay.  *Well, you'll agree with me

7    that pursuant to Exhibit 2 Mr. Glover was

8    attempting to clarify certain points of agreement

9    and disagreement between Six Flags and O.D.

10   Hopkins in the design, sale, and production of

11   the Blizzard River Ride, is that correct?

12              MR. SHEEHAN:  I object in that it

13   takes things out of context and mischaracterizes

14   what Mr. Glover states.  And as it says, "We will

15   work in good faith to conclude an acceptable

16   Purchase Agreement."

17              MR. GRACEFFA:  Can you read back my

18   question, please.

19              (*The preceding question was read.)

20         A.      It would appear that he was.

21         Q.      And that was within the scope of

22   his duties and responsibilities, is that correct,

23   Mr. Smith?

24         A.      To try and clarify and eliminate

ELLEN FRITCH & ASSOCIATES  -  (617) 269-5448

71

1   disagreements.

2       Q.      Yes?  The answer is "yes"?

3       A.      Yes.

4       Q.      Did he ever ask you in your

5   capacity as the insurance coordinating person to

6   make sure that Premier Parks was named as an

7   additional insured on your contract of insurance?

8       A.      I don't recall.

9       Q.      Did you have an assistant who might

10  have been the person that would actually have

11  done that mechanical work or did you do it

12  yourself?

13      A.      I typically would have done that

14  myself.

15      Q.      Did you have anything to do with

16  the patents, copyrights, or trademarks of any

17  O.D. Hopkins product?

18      A.      I did get involved in, I believe

19  the terminology is the registration of a patent.

20      Q.      Okay.  And patent for what?

21      A.      This was unrelated to the raft

22  ride.  It was a nonmechanical means of reversing

23  the direction of a boat.

24      Q.      Okay.  Mr. Pendleton indicated that

James J.  Glover



1

1    COMMONWEALTH OF MASSACHUSETTS
2   WORCESTER, SS.        SUPERIOR COURT
                          CIVIL ACTION NO. 011494B

3

ERNEST MESSIER and SUSAN
4   MESSIER, JOHN PASCONE and
KIMBERLY PASCONE, Individually
5   and as Parents and Next
Friends of JONATHAN PASCONE,
6   ANGELICA PASCONE, GERALD PESCARO,
and KIMBERLY PESCARO,

7

        Plaintiffs,

8
9   vs.
10   SIX FLAGS, INC., RIVERSIDE PARK
ENTERPRISES, INC., PREMIER PARKS,
11   INC., O.D. HOPKINS ASSOCIATES,
INC., MARTIN FLORES, and CHARLES
12   FLORES,
13           Defendants.
14   _____/
15

             - - -

16

        DEPOSITION OF THE WITNESS
17            JAMES F. GLOVER
        TAKEN BY THE PLAINTIFFS

18

             - - -

19

        1800 Centrepark Drive East
20       West Palm Beach, Florida
         Thursday, January 13, 2005
21       9:50 a.m. - 11:55 a.m.
         Before Janette P. Hert, RPR, RMR, CRR
22       and Notary Public, State of Florida
23
24   APPEARANCES on Page 2.
25

James J.  Glover

37

1    Q.  And what did it comprehend in general?

2    A.  Just outlining my commission base.

3    Q.  Did it outline your duties?

4    A.  That I was in sales and marketing,

5 correct.

6    Q.  And what were you identified as at that

7 point?

8    A.  As a sales representative.

9    Q.  When did you become a vice president of

10 marketing and -- strike that.

11        When did you become a vice president of

12 sales and marketing at O.D. Hopkins?

13    A.  '97, '98.

14    Q.  And who gave you that title?

15    A.  Jerry Pendleton.

16    Q.  And were you, at that point, Mr. Glover,

17 the third highest person in the company behind

18 Mr. Pendleton and Mr. Smith?

19    A.  I would say that's correct.

20    Q.  Okay.  You clearly were the third

21 highest compensated person in the company at that

22 point; is that correct?

23    A.  Perhaps even more than that.

24    Q.  Okay.  You were perhaps making more than

25 Mr. Smith after 1997; is that correct?

James J.  Glover

73

1        Q.  Okay.  Well, you dealt with Six Flags;
2   is that correct?
3        A.  I dealt with Six Flags, correct.
4        Q.  Okay.  Did anyone else?
5        A.  With Six Flags directly, no.
6        Q.  Who was the primary representative of
7   O.D. Hopkins in the negotiations and sale of the
8   ride?
9        A.  I would have been.  And perhaps
10  "negotiator" is not the correct word.  I would act
11  as an intermediate, if you will.
12       Q.  Did anyone else, to the best of your
13  knowledge, Mr. Glover, speak to Mr. Story about
14  this ride in August, September, October, and
15  November other than you?
16       A.  Yes.
17       Q.  Who?
18       A.  I would imagine --
19       Q.  No, no?
20       A.  To the best of my knowledge, yes, and I
21  would imagine it would -- my guess, my
22  recollection is Jerry Pendleton.
23       Q.  All right.  I have to move to strike
24  your answer, and I want to make sure, if you have
25  a memory of that --

James J.  Glover

74

```
1        A.   Okay.

2        Q.   -- then I want you to tell me, but if

3   you're guessing, then I don't think you can answer

4   the question.

5            Do you have a memory of anyone else on

6   behalf of O.D. Hopkins speaking to Mr. Story

7   between August and November of '98?

8        A.   Repeat one more time.

9        Q.   Do you have a memory, a specific memory,

10  of anyone other than yourself --

11       A.   No.

12       Q.   All right.  But clearly in your mind,

13  you recall being the primary representative on

14  behalf of O.D. Hopkins dealing with Mr. Story

15  during this period of time; is that correct?

16       A.   Yes.

17       Q.   Okay.  Exhibit Number 6 is the liability

18  policy which was in effect on behalf of Hopkins

19  during the time in question.

20            Did anyone from Six Flags, during the

21  negotiations or the building of the ride, ever ask

22  for a copy of the insurance policy --

23       A.   No.

24       Q.   -- from you?

25       A.   Not that I'm aware of.
```

James J.  Glover

58

1      A.  My guess is I would have gone to the

2   park to see the site which they'd like to put the

3   new ride at and meet their general manager of that

4   park.

5      Q.  Okay.  And who did you meet?

6      A.  I don't recall.  It's either the general

7   manager or the project manager.

8      Q.  Okay.  And did you put a proposal

9   together?

10      A.  We would have worked on putting a layout

11   together first.

12      Q.  Okay.  And at some point, did you and

13   Mr. Story come to an agreement that they were

14   going to buy the ride and you were going to sell

15   them the ride?

16      A.  Yes.

17      Q.  When did that occur?

18      A.  Later.  I'm guessing to say three or

19   four months with them finding a layout and

20   determining our scope of work and our scope of

21   supply.

22      Q.  Okay.  I may be telling you things you

23   know, but to assist us both, let me just give you

24   what I think is an undisputed time line in this

25   case.

James J. Glover

78

1      Q. Okay. Is your letter in response to the
2  17 provisions set out in the Story letter?
3          MR. SHEEHAN: Objection. Asked and
4  answered. He's already testified that he's not
5  sure if Exhibit Number 5 was a response to Exhibit
6  Number 4.
7      Q. (BY MR. GRACEFFA) Okay. Well, is it?
8      A. I'm not sure.
9      Q. The paragraphs exactly correspond, do
10 they not?
11         MR. SHEEHAN: Objection.
12         MR. GRACEFFA: No speaking. You can
13 object, and I'll rephrase it.
14         MR. SHEEHAN: Okay. I object.
15     Q. (BY MR. GRACEFFA) Does your letter
16 respond to something that had been sent you by Six
17 Flags?
18     A. Yes.
19     Q. Okay. And can I see it?
20     A. (Hands document.)
21     Q. Did you have the authority to send
22 Exhibit Number 5 on November 25th, 1998?
23     A. Yes.
24     Q. Okay. This document indicates that,
25 just prior to you, Mr. Glover, going to Dallas on

James J.  Glover

91

1    Kuteman and J. Pendleton; is that correct?

2        A.  Yes.

3        Q.  And who is R. Kuteman?

4        A.  The Six Flags representative from

5    corporate.

6        Q.  Okay.  And who is J. Pendleton?

7        A.  Jerry Pendleton.

8        Q.  So that wouldn't have been John; that

9    would have been Jerry?

10       A.  That's correct.

11       Q.  Jerry was the president of the company;

12   is that correct?

13       A.  That is correct.

14       Q.  So when you sent out your response to

15   the Story letter, this document purports that you

16   copied Mr. Pendleton; is that correct?

17       A.  Yes, it does.

18       Q.  And did Mr. Pendleton speak to you on or

19   after this date about this letter?

20       A.  I don't recall.

21       Q.  Did you ever send a letter of retraction

22   out which in any way retracted any of the

23   provisions of Glover 5?

24       A.  I don't recall.

25       Q.  Did Mr. Pendleton ever tell you that you

James J.  Glover

92

1    didn't have the authority to send this letter?

2        A.   No, I don't believe so.

3        Q.   Okay.  And to the best of your

4    knowledge, he received a copy of it; is that

5    correct?

6        A.   To the best of my knowledge, yes.

7        Q.   And that is your signature; is that

8    correct?

9        A.   Yes.

10       Q.   Mr. Sheehan has pointed out, and you

11   have too, that no fully executed contract was ever

12   entered into in regard to this project; is that

13   correct?

14       A.   To the best of my knowledge.

15       Q.   Hopkins completed the project and

16   certified and commissioned it and turned it over

17   to Six Flags; is that correct?

18       A.   Yes.

19       Q.   And you were paid for the ride; is that

20   correct?

21       A.   Well, I don't know if we were paid a

22   hundred percent of it, but we certainly received

23   the majority of the monies owed.

24       Q.   Okay.  So on or after your letter of

25   November 25th, 1998, Hopkins was proceeding

James J.  Glover

90

1  still in negotiations.

2      Q.  Okay.  On or after November 25th, 1998,

3  did you send any further letters to Mr. Story or

4  he to you in regard to negotiations?

5      A.  I don't recall.

6      Q.  On or before the accident in August of

7  1999, did you send any letters to Six Flags or

8  they to you in regard to contractual

9  negotiations?

10      A.  I don't believe so.

11      Q.  Did you receive your bonus on this ride

12  during calendar year 1998 or 1999?

13          MR. SHEEHAN:  Objection.

14          THE WITNESS:  My commission?

15      Q.  (BY MR. GRACEFFA)  Yes.

16      A.  Yes.

17      Q.  In both years or '98 or '99?

18      A.  Both years.

19      Q.  Okay.  And was that normal, if a

20  contract had not been completed, to take your

21  commission over the two-year life of the

22  project?

23      A.  It would be normal to receive my

24  commission as payments came in.

25      Q.  Okay.  On Glover 5, you copied R.

James J.  Glover

92

1  didn't have the authority to send this letter?

2      A.  No, I don't believe so.

3      Q.  Okay.  And to the best of your

4  knowledge, he received a copy of it; is that

5  correct?

6      A.  To the best of my knowledge, yes.

7      Q.  And that is your signature; is that

8  correct?

9      A.  Yes.

10      Q.  Mr. Sheehan has pointed out, and you

11  have too, that no fully executed contract was ever

12  entered into in regard to this project; is that

13  correct?

14      A.  To the best of my knowledge.

15      Q.  Hopkins completed the project and

16  certified and commissioned it and turned it over

17  to Six Flags; is that correct?

18      A.  Yes.

19      Q.  And you were paid for the ride; is that

20  correct?

21      A.  Well, I don't know if we were paid a

22  hundred percent of it, but we certainly received

23  the majority of the monies owed.

24      Q.  Okay.  So on or after your letter of

25  November 25th, 1998, Hopkins was proceeding

EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
SIX FLAGS, INC., and TIG INSURANCE )
COMPANY,                           )
                                    )
            Plaintiffs,            )
                                    )
v.                                  )        CIVIL ACTION NO. 05-11444 NMG
                                    )
STEADFAST INSURANCE COMPANY,       )
                                    )
            Defendant.             )
_____)
```

### AFFIDAVIT OF GARY STORY

I, Gary Story, do hereby depose and state under oath:

1.      I was Vice President of Six Flags, Inc. (formerly known as Premier Parks, Inc. and, prior to 1994 Tierco Group, Inc.) from 1990 until 1992, I was Executive Vice President from 1992-1994 and President of Six Flags, Inc. from 1994 until 2004.

2.      Beginning in mid-1998 I had several meetings and telephone communications with James Glover, the Vice President of Sales and Marketing at O.D. Hopkins Associates, Inc. ("OD Hopkins") in which we negotiated the sale by OD Hopkins of a river raft ride named the "Blizzard River Ride" ("river raft ride") to be installed at a Six Flags amusement park located in Agawam, Massachusetts.

3.      The river raft ride at Agawam was the first OD Hopkins project that I negotiated with Mr. Glover.

4.      I had negotiated with Sandor Kernacs, Mr. Glover's predecessor at OD Hopkins to establish the terms of the contract on previous projects by OD Hopkins for Six Flags.

5.    In all my dealings with OD Hopkins, including for the river the raft ride, the OD Hopkins sales representative was the person responsible for negotiating the terms of the contract including price, delivery schedules, and insurance coverage.

6.    In November 1998, I authorized Russell Kuteman, an employee of Six Flags, to transmit to Mr. Glover the proposal contained in the Letter Agreement identified in paragraph 5 of the Affidavit of Peter Hermes in Support of Steadfast Insurance Company's Motion for Summary Judgment ("Hermes Affidavit").

7.    Mr. Glover was the only person at OD Hopkins with whom Six Flags negotiated the terms of the agreement to build the river raft ride.

8.    Mr. Glover responded to the Letter Agreement in a fax dated November 25, 1998 and identified in paragraph 5 of the Hermes Affidavit ("November 25 fax").

9.    In December 1998, I spoke with Mr. Glover and agreed to all the terms set out in the numbered paragraphs of the November 25 fax.

10.    In the December 1998 telephone conversation, Mr. Glover reaffirmed that OD Hopkins would comply with the insurance requirements originally set out in the Letter Agreement and accepted in the November 25 fax.

11.    Following the December 1998 telephone conversation with Mr. Glover and, in conformance with the November 25 fax, Six Flags paid a deposit to OD Hopkins for the river raft ride project at Agawam.

12.    I was never informed by OD Hopkins that a signed contract was the only acceptable way for OD Hopkins to fulfill the agreement to build the river raft ride.

13.    Six Flags paid OD Hopkins on a periodic basis upon completion of various stages

2

of the river raft ride as described in Exhibit A of the November 25 fax.

14.    Final payment for the river raft ride was made shortly after the ride was opened for use by the public.

15.    Jerry Pendleton, president of OD Hopkins, never rejected any of the terms of the agreement between Six Flags and OD Hopkins with respect to the river raft ride in Agawam.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 13th DAY OF MAY 2006.

                    /s/ Gary Story
                    Gary Story

377497

3

COMMONWEALTH OF MASSACHUSETTS

Ernest Messier and Susan Messier (Plaintiffs) v. Six Flags, Inc. , et al. (Defendants)

Worcester Superior Court (Docket #01-1494B)

MEMORANDUM OF UNDERSTANDING

The Defendants and their insurers in the above-entitled matter hereby agree to the following:

1.    The settlement funds shall be paid in connection with the above-entitled matter as follows: (a) 50% from Defendant O.D. Hopkins Associates, Inc.; and (b) 50% from the remaining Defendants.

2.    The Defendants and their insurers reserve all rights against each other in connection with all indemnification and contribution rights and claims for insurance coverage including without limitation those currently pending in Federal District Court.

3.    For purposes of the litigation of the rights and claims described in paragraph 2 above, none of the parties to this Memorandum of Understanding shall take the position that the negligence of any of the Defendants in connection with the above-entitled matters is 0%.

4.    Nothing in this Memorandum of Understanding is intended to create a direct obligation on the part of O.D. Hopkins Associates, Inc. to pay any claim, and recovery is limited to the insurance available to O.D. Hopkins from Steadfast Insurance Company.

_____
Counsel for O.D. Hopkins

_____
Counsel for Steadfast Insurance Company

_____
Counsel for Six Flags, Inc.

_____
Counsel for TIG Insurance

Date: _April 11, 2006_

EXHIBIT 6

**INSURANCE**ₛₘ

Policy No. T7 0003796851600
Replacement No.

**Commercial General Liability -
Declarations**

**NAMED INSURED AND ADDRESS:**
PREMIER PARKS INC.
(REFER TO FORM ZC17348)
11501 NORTHEAST EXPRESSWAY
OKLAHOMA CITY, OK 73131

**FORM OF BUSINESS:**
☐ Individual        ☐ Joint Venture
☐ Partnership      ☒ Organization (other than a partnership or joint venture)

**RETROACTIVE DATE:** (CG 00 02 only) Coverage A of this insurance does not apply to "bodily injury" or "property damage" which occurs before the following Retroactive Date(if any):

**LIMITS OF INSURANCE**

| | |
|---|---|
| General Aggregate Limit (other than products - completed operations) | NONE |
| Products - Completed Operations Aggregate Limit | $ 5,000,000 |
| Personal and Advertising Injury Limit | $ 1,000,000 |
| Each Occurrence Limit | $ 1,000,000 |
| Fire Damage Limit | $ 300,000  any one fire |
| Medical Expense Limit | NOT COVERED  any one person |

**LOCATION OF ALL PREMISES YOU OWN, RENT OR OCCUPY:**

VARIOUS

T7 0003796851600

# QUICK REFERENCE
# COMMERCIAL GENERAL LIABILITY COVERAGE PART

Please read your policy carefully.

**DECLARATIONS PAGES**
    Named Insured and Mailing Address
    Policy Period
    Description of Business and Location
    Coverages and Limits of Insurance

**Beginning on Page**

**SECTION I - COVERAGES**
    Coverage A -
        Bodily Injury
        and Property Damage
        Liability

Insuring Agreement ................................................. 1

Exclusions ................................................. 1

    Coverage B -
        Personal and
        Advertising
        Injury Liability

Insuring Agreement ................................................. 4

Exclusions ................................................. 4

    Coverage C -
        Medical Payments

Insuring Agreement ................................................. 5

Exclusions ................................................. 5

**SECTION II -  WHO IS AN INSURED** ................................................. 7
**SECTION III - LIMITS OF INSURANCE** ................................................. 8
**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS** ................................................. 8
    Bankruptcy ................................................. 8
    Duties In The Event of Occurrence, Claim or Suit ................................................. 9
    Legal Action Against Us ................................................. 9
    Other Insurance ................................................. 10
    Premium Audit ................................................. 10
    Representations ................................................. 10
    Separation of Insureds ................................................. 10
    Transfer of Rights of Recovery Against Others To Us ................................................. 10

# LIABILITY SCHEDULE AND PREMIUM RECAP

POLICY NUMBER:    T7 0003796851600

| OC. NO | * DESCRIPTION SUBLINE - CLASS CODE | **PREMIUM BASE ACT. EXPOSURE | | RATES | PREMIUMS |
|---|---|---|---|---|---|
| 0001 | (347)  10015 AMUSEMENT PARKS | E | 99,600,000 | .2348 | $23,386,080* |
| | | | | | |
| | * Three year prepaid discount. | | | | ($ 761,773) |
| | | | | | |
| | | | | TOTAL PREMIUMS | $ 22,624,307 |

Policy Change
Number

GU 269
(11-85)

THE ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

IL 12 01 11 85

## POLICY CHANGES

| POLICY NO.<br><br>T7 0003796851600 | POLICY CHANGES EFFECTIVE<br><br>07/01/98 | COMPANY<br><br>TIG INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED<br>PREMIER PARKS INC. | | AUTHORIZED REPRESENTATIVE<br>K&K INSURANCE GROUP, INC. |

| COVERAGE PARTS AFFECTED |
|---|
| COMMERCIAL GENERAL LIABILITY |

| CHANGES |
|---|
| Paragraph 2.a. of coverage A (Section I) is amended to read:<br><br>"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of force to protect persons or property. |

olicy Change
umber

GU 269
(11-85)

**THE ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

IL 12 01 11 85

## POLICY CHANGES

| POLICY NO.<br><br>T7 0003796851600 | POLICY CHANGES<br>EFFECTIVE<br>07/01/98 | COMPANY<br><br>TIG INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED<br>PREMIER PARKS INC. | | AUTHORIZED REPRESENTATIVE<br>K&K INSURANCE GROUP, INC. |

**COVERAGE PARTS AFFECTED**

COMMERCIAL GENERAL LIABILITY

**CHANGES**

Section I., Coverage A., Item 1 is amended to include:

d.    Damages because of "Bodily Injury" or "Property Damage" include damages claimed by any person or organization for loss of means of support as respects Liquor Liability.

olicy Change
umber

GU 269
(11-85)

## THE ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

IL 12 01 11 85

## POLICY CHANGES

| POLICY NO.<br><br>T7 0003796851600 | POLICY CHANGES EFFECTIVE<br><br>07/01/98 | COMPANY<br><br>TIG INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED<br><br>   PREMIER PARKS INC. | | AUTHORIZED REPRESENTATIVE<br>K&K INSURANCE GROUP, INC. |

**COVERAGE PARTS AFFECTED**

   COMMERCIAL GENERAL LIABILITY

### CHANGES

Paragraphs 2.f.(1)(a) and 2.f.(1)(d)(I) of Coverage A (Section I) do not apply to "bodily injury" or "property damage" arising out of fire, explosion, lightening, windstorm, vandalism or malicious mischief, riot or civil commotion, collision or upset of mobile equipment or automatic sprinkler leakage.

GU 269
(11-85)

Policy Change
Number

## THE ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

IL 12 01 11 85

## POLICY CHANGES

| POLICY NO. | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| T7 0003796851600 | 07/01/98 | TIG INSURANCE COMPANY |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| PREMIER PARKS INC. | K&K INSURANCE GROUP, INC. |

**COVERAGE PARTS AFFECTED**

COMMERCIAL GENERAL LIABILITY

### CHANGES

Paragraphs 2.c. through 2.n. of Coverage A (Section I) do not apply to fire, smoke, explosion or water damage to premises rented, leased or loaned to you, or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in LIMITS OF INSURANCE (Section III).

Furthermore, Section III, Paragraph 6 is amended to read ;

Subject to 5. above, the Fire Damage Limit is the most we will pay under Coverage A for damages because of "property damage" to premises, while rented to you or temporarily occupied by you with permission of the owner, arising out of any one fire, smoke, explosion or water damage.

GU 269
(11-85)

Policy Change
Number

## THE ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

IL 12 01 11 85

## POLICY CHANGES

| POLICY NO.<br><br>T7 0003796851600 | POLICY CHANGES<br>EFFECTIVE<br>07/01/98 | COMPANY<br><br>TIG INSURANCE COMPANY |
| --- | --- | --- |
| NAMED INSURED<br>PREMIER PARKS INC. | | AUTHORIZED REPRESENTATIVE<br>K&K INSURANCE GROUP, INC. |

COVERAGE PARTS AFFECTED

COMMERCIAL GENERAL LIABILITY

### CHANGES

Paragraph 2.a.(4) of Coverage B (Section I) is deleted.

GU 269
(11-85)

'olicy Change
lumber

**THE ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

IL 12 01 11 85

# POLICY CHANGES

| POLICY NO.<br><br>T7 0003796851600 | POLICY CHANGES<br>EFFECTIVE<br><br>07/01/98 | COMPANY<br><br>TIG INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED<br><br>PREMIER PARKS INC. | | AUTHORIZED REPRESENTATIVE<br>K&K INSURANCE GROUP, INC. |

**COVERAGE PARTS AFFECTED**

COMMERCIAL GENERAL LIABILITY

**CHANGES**

Incidental Malpractice Liability:

1.     It is understood and agreed that this policy is extended to include coverage for the Named Insured's liability because of the rendering of or the failure to render medical, paramedical or psychological counseling services and/or the furnishing or dispensing of drugs or medical supplies to persons by a physician, dentist, nurse, emergency medical technician, ambulance driver or attendant, or paramedic who is employed by you, or on a retainer, fee or any other financial arrangement with you, including a sponsored employee benefit plan to provide such services.

2.     Section II - Who Is An Insured is amended to include as an additional insured any physician, dentist, nurse, emergency medical technician, ambulance driver or attendant, or paramedic employed by you, or on a retainer, fee or any other financial arrangement with you to provide medical or paramedical services, but only while acting within the scope of such employment or arrangement and Section II 2.a.(1) is deleted as respects coverage afforded by this endorsement.

3.     For the purposes of this insurance only, employees covered under this endorsement shall be considered to be acting within the scope of their employment while engaged in activities generally referred to as "Good Samaritan."

Policy Change
Number

GU 269
(11-85)

THE ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

IL 12 01 11 85

## POLICY CHANGES

| POLICY NO.<br><br>T7 0003796851600 | POLICY CHANGES EFFECTIVE<br><br>07/01/98 | COMPANY<br><br>TIG INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED<br><br>PREMIER PARKS INC. | | AUTHORIZED REPRESENTATIVE<br>K&K INSURANCE GROUP, INC. |

**COVERAGE PARTS AFFECTED**

COMMERCIAL GENERAL LIABILITY

**CHANGES**

Paragraphs 2.a.(1) and 3.a. of Section II are deleted.

olicy Change
umber

GU 269
(11-85)

## THE ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

IL 12 01 11 85

## POLICY CHANGES

| POLICY NO.<br><br>T7 0003796851600 | POLICY CHANGES EFFECTIVE<br><br>07/01/98 | COMPANY<br><br>TIG INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED<br><br>PREMIER PARKS INC. | | AUTHORIZED REPRESENTATIVE<br>K&K INSURANCE GROUP, INC. |

**COVERAGE PARTS AFFECTED**

COMMERCIAL GENERAL LIABILITY

### CHANGES

Paragraph 4. of Section II is amended to read:

4.  Any "Core Business" of Amusement/Theme Parks you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a.  Coverage under this provision is afforded only until the 180th day after you acquire or form the "Core Business" of Amusement/Theme Parks or the end of the policy period, whichever is earlier;

   b.  Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the "Core Business" of Amusement/Theme Parks: and

   c.  Coverage B does not apply to "personal injury" or "advertising injury" arising out of an offense committed before you acquired or formed the "Core business" of Amusement/Theme Parks.

GU 269
(11-85)

Policy Change
Number

THE ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

IL 12 01 11 85

## POLICY CHANGES

| POLICY NO. | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| T7 0003796851600 | 07/01/98 | TIG INSURANCE COMPANY |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| PREMIER PARKS INC. | K&K INSURANCE GROUP, INC. |

**COVERAGE PARTS AFFECTED**

COMMERCIAL GENERAL LIABILITY

### CHANGES

Section II is amended to include:

5.  Any person or organization for whom you have agreed under written contract or agreement to provide insurance. However:

    a.  The insurance provided shall not exceed the scope of coverage and/or limits of this policy; and

    b.  In no event shall the insurance provided exceed the scope of coverage and/or limits required by said contract or agreement.

GU 269
(11-85)

olicy Change
umber

**THE ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

IL 12 01 11 85

# POLICY CHANGES

| POLICY NO. | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| T7 0003796851600 | 07/01/98 | TIG INSURANCE COMPANY |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| PREMIER PARKS INC. | K&K INSURANCE GROUP, INC. |

**COVERAGE PARTS AFFECTED**

COMMERCIAL GENERAL LIABILITY

**CHANGES**

Paragraph 3. of Section V is amended to read:

"Bodily injury" means bodily injury, sickness or disease sustained by a person, including mental anguish, mental injury, shock or death resulting from any of these at any time.

olicy Change
umber

GU 269
(11-85)

**THE ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

IL 12 01 11 85

# POLICY CHANGES

| POLICY NO.<br><br>T7 0003796851600 | POLICY CHANGES<br>EFFECTIVE<br><br>07/01/98 | COMPANY<br><br>TIG INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED<br><br>PREMIER PARKS INC. | | AUTHORIZED REPRESENTATIVE<br>K&K INSURANCE GROUP, INC. |

**COVERAGE PARTS AFFECTED**

COMMERCIAL GENERAL LIABILITY

**CHANGES**

Section V is amended to include Item 20:

"Core Business" means operations that are of the same nature as those already owned/operated by the insured as of the effective date of this policy.

GU 269
(11-85)

icy Change
mber

## THE ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

IL 12 01 11 85

## POLICY CHANGES

| OLICY NO. | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| T7 0003796851600 | 07/01/98 | TIG INSURANCE COMPANY |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| PREMIER PARKS INC. | K&K INSURANCE GROUP, INC. |

**COVERAGE PARTS AFFECTED**

COMMERCIAL GENERAL LIABILITY

## CHANGES

Paragraph 2.j.(4) of Coverage A (Section I) does not apply to "property damage" to property belonging to a guest for which the named insured is held legally liable as an innkeeper.

Policy Change
Number

GU 269
(11-85)

**THE ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

IL 12 01 11 85

## POLICY CHANGES

| POLICY NO.<br><br>T7 0003796851600 | POLICY CHANGES<br>EFFECTIVE<br>07/01/98 | COMPANY<br><br>TIG INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED<br>    PREMIER PARKS INC. | | AUTHORIZED REPRESENTATIVE<br>K&K INSURANCE GROUP, INC. |

COVERAGE PARTS AFFECTED

COMMERCIAL GENERAL LIABILITY

### CHANGES

Paragraphs 4.a. and b. of Section IV are amended to read:

This insurance is excess over any other valid and collectible insurance applying to the loss except for insurance bought specifically to apply in excess of the Limits of Insurance shown in the declarations of this policy.

Notwithstanding the preceding paragraph, the insurance afforded by this policy is primary insurance with respect to those insureds to whom you are obligated by contract to provided primary insurance.

olicy Change
umber

GU 269
(11-85)

## THE ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

IL 12 01 11 85

## POLICY CHANGES

| POLICY NO.<br><br>T7 0003796851600 | POLICY CHANGES EFFECTIVE<br><br>07/01/98 | COMPANY<br><br>TIG INSURANCE COMPANY |
|---|---|---|
| **NAMED INSURED**<br><br>PREMIER PARKS INC. | | **AUTHORIZED REPRESENTATIVE**<br>K&K INSURANCE GROUP, INC. |

**COVERAGE PARTS AFFECTED**

COMMERCIAL GENERAL LIABILITY

### CHANGES

Unintentional Errors and Omissions

Unintentional errors or omissions by the Insured shall not constitute grounds for a declination of coverage by us.

Knowledge and Notice of Occurrence/Offense

It is agreed that knowledge of an occurrence or offense by an agent, servant or employee of the insured shall not constitute knowledge to the insured unless the Vice President of Administration or Risk Manager shall have received such notice.

It is also agreed that if the insured reports an occurrence or offense to its workers' compensation or automobile carrier that develops into a liability claim, failure to report such occurrence or offense to this company at the time of occurrence shall not be deemed in violation of "Duties In The Event of Occurrence, Offense, Claim Or Suit."

GU 269
(11-85)

olicy Change
umber  0000

## THE ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

IL 12 01 11 85

## POLICY CHANGES

| POLICY NO. | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| T7 0003796851600 | 07/01/98 | TIG INSURANCE COMPANY |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| PREMIER PARKS INC. | K&K INSURANCE GROUP, INC. |

**COVERAGE PARTS AFFECTED**

**COMMERCIAL GENERAL LIABILITY COVERAGE**

**CHANGES**

Schedule of Rides - Texas only

See attached schedule for:

    Six Flags over Texas and Hurricane Harbor

    Six Flags Fiesta Texas

    Six Flags Astro-World and Waterworld

T7 0003796851600

**CL 167**
**(10-93)**

CG 00 01 10 93

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (SECTION II).

Other words and phrases that appear in quotation marks have special meaning. Refer to DEFINITIONS (SECTION V).

## SECTION I - COVERAGES

### COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement.**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS - COVERAGES A AND B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

      (2) The "bodily injury" or "property damage" occurs during the policy period.

   c. Damages because of "bodily injury" include damages

exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b. **Contractual Liability**

   "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

   (1) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

   (2) That the insured would have in the absence of the contract or agreement.

c. **Liquor Liability**

   "Bodily injury" or "property damage" for which any insured may be held liable by reason of:

   (1) Causing or contributing to the intoxication of any person;

   (2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

   (3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

   This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

d. **Workers Compensation and Similar Laws**

   Any obligation of the insured under a workers' compensation, disability benefits or unemployment

    **(b)** Performing duties related to the conduct of the insured's business, or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f.    Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

    **(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

    **(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

    **(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

    **(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

        **(i)** if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

        **(ii)** if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

Subparagraphs **(a)** and **(d) (i)** do not apply to "bodily injury" or "property damage" arising out of

neutralize, or in any way respond to, or assess the effects of pollutants; or

    **(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**g.    Aircraft, Auto or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

    **(a)** Less than 26 feet long; and

    **(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h.    Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice or preparation for, a prearranged racing, speed or demolition contest or in any stunting activity.

**(1)** Property you own, rent or occupy;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products - completed operations hazard".

**k.** **Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l.** **Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products - completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.** **Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in LIMITS OF INSURANCE (SECTION III).

## COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

**1.** **Insuring Agreement.**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this coverage part applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS - COVERAGES A AND B.

**b.** This insurance applies to:

**(1)** "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

**(2)** "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services;

but only if the offense was committed in the "coverage territory" during the policy period.

**2.** **Exclusions.**

This insurance does not apply to:

**a.** "Personal injury" or "advertising injury":

**(1)** Arising out of oral or written publication of

sured would have in the absence of the contract or agreement.

**b.** "Advertising injury" arising out of:

    **(1)** Breach of contract, other than misappropriation of advertising ideas under an implied contract;

    **(2)** The failure of goods, products or services to conform with advertised quality or performance;

    **(3)** The wrong description of the price of goods, products or services; or

    **(4)** An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

## COVERAGE C. MEDICAL PAYMENTS

**1. Insuring Agreement.**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

    **(1)** On premises you own or rent;

    **(2)** On ways next to premises you own or rent; or

    **(3)** Because of your operations;

provided that:

    **(1)** The accident takes place in the "coverage territory" and during the policy period;

    **(2)** The expenses are incurred and reported to us within one year of the date of the accident; and

    **(3)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

    **(1)** First aid at the time of an accident;

    **(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

    **(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions.**

We will not pay expenses for "bodily injury":

**a.** To any insured.

**b.** To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c.** To a person injured on that part of premises you own or rent that the person normally occupies.

**d.** To a person, whether or not an employee of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

We will pay, with respect to any claim or "suit" we defend:

**1.** All expenses we incur.

**2.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Coverage applies. We do not have to furnish these bonds.

**3.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**4.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $100 a day because of time off from work.

**5.** All costs taxed against the insured in the "suit".

**6.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**7.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

## SECTION II - WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** An organization other than a partnership or joint venture, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**2.** Each of the following is also an insured:

**a.** Your "employees", other than your "executive officers", but only for acts within the scope of their

(b) To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of paragraph **(1)(a)** above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs **(1)(a)** or **(b)** above; or

(d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

(a) Owned, occupied or used by,

(b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees" or, if you are a partnership or joint venture, by any partner or member.

**b.** Any person (other than your "employee"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

**a.** "Bodily injury" to a co-"employee" of the person driving the equipment; or

**b.** Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage B does not apply to "personal injury" or "advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

**SECTION III - LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage C;

**b.** Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products - completed operations hazard"; and

**c.** Damages under Coverage B.

**3.** The Products/Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products - completed operations hazard".

**4.** Subject to **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal injury" and all "advertising injury" sustained by any one person or organization.

**5.** Subject to **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under Coverage A; and

**b.** Medical expenses under Coverage C

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to **5.** above, the Fire Damage Limit is the most we will pay under Coverage A for damages because of "property damage" to premises, while rented to you or temporarily occupied by you with permission of the owner, arising out of any one fire.

additional period will be deemed paid the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

**1. Bankruptcy.**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event of Occurrence, Claim Or Suit.**

a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the "occurrence" or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

b. If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us.**

No person or organization has a right under this Coverage Part:

the insured or the claimant or the claimant's legal representative.

**4. Other Insurance.**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverage A or B of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

b. Excess Insurance

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

(1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(2) That is Fire insurance for premises rented to you; or

(3) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Coverage A (Section I).

When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

c. Method of Sharing

ance to the total applicable limits of insurance of all insurers.

5. **Premium Audit.**

   a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

   b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured.

   c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

6. **Representations.**

   By accepting this policy, you agree:

   a. The statements in the Declarations are accurate and complete;

   b. Those statements are based upon representations you made to us; and

   c. We have issued this policy in reliance upon your representations.

7. **Separation Of Insureds.**

   Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

   a. As if each Named Insured were the only Named Insured; and

   b. Separately to each insured against whom claim is made or "suit" is brought.

8. **Transfer Of Rights Of Recovery Against Others To Us.**

   If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

9. **When We Do Not Renew.**

   If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

   b. Oral or written publication of material that violates a person's right of privacy;

   c. Misappropriation of advertising ideas or style of doing business; or

   d. Infringement of copyright, title or slogan.

2. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in a. above; or

   c. All parts of the world if:

      (1) The injury or damage arises out of:

         (a) Goods or products made or sold by you in the territory described in a. above; or

         (b) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; and

      (2) The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

(1) That indemnifies any person or organization "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection or engineering services.

9. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

10. "Loading or unloading" means the handling of property:

device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

11. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

**e.** Oral or written publication of material that violates a person's right of privacy.

**14. a.** "Products - completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned.

**b.** "Your work" will be deemed completed at the earliest of the following times:

**(1)** When all of the work called for in your contract has been completed.

**(2)** When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

**(3)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**c.** This hazard does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials;

**(3)** Products or operations for which the classification in this Coverage Part or in our manual of rules includes products or completed operations.

**b.** Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

**16.** "Suit" means a civil proceeding in which damage because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

**17.** "Your product" means:

**a.** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(1)** You;

**(2)** Others trading under your name; or

**(3)** A person or organization whose business or assets you have acquired; and

**b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**b.** The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

**18.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**19.** "Your work" means:

**a.** Work or operations performed by you or on your behalf; and

**b.** Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes: